**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAMOND LEE WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 16-2062 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Relevant Excerpts from Plaintiff's Answers to Defendants' First Set of Interrogatories and Requests for Production of Documents, dated Feb. 1, 2018. |
| Exhibit B | Relevant Excerpts from the Transcript of the Deposition of Plaintiff, taken March 4, 2019. |
| Exhibit C | Relevant Progress Notes regarding VA's consultations with Plaintiff, dated October 29-30, 2013. |
| Exhibit D | ICU Admit Note dated November 4, 2013, from Harborview Medical Center. |
| Exhibit E | Form SF-95 and Supplement, dated October 1, 2015. |
| Exhibit F | Expert Report of Fernando A. Porter, M.D., dated August 15, 2018. |
| Exhibit G | Expert Report of Robert W. Macht, M.D., dated January 9, 2018. |
| Exhibit H | Relevant Excerpts from the Transcript of the Deposition of Fernando Porter, M.D., taken March 4, 2019. |
| Exhibit I | Dr. Porter's Notes, produced by Plaintiff's counsel on March 25, 2019. |
| Exhibit J | "Medical Documentation Requirements / Quick Reference Guide – All Regions," produced by Plaintiff's counsel on March 25, 2019 |
| Exhibit K | "Practice Guidelines for the Diagnosis and Management of Skin and Soft Tissue Infections: 2014 Update by the Infectious Diseases Society of America," produced by Plaintiff's counsel on March 25, 2019. |

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAMOND LEE WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-2062 (EGS) |
| | ) | |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Damond L. Williams,  (hereinafter, referred to as "Plaintiff") hereby responds to the First Set of Interrogatories and Production of Documents propounded by the Defendant as follows:

### GENERAL RESPONSE

1. Plaintiff's investigation and development of all facts and circumstances relating to this action is ongoing. These responses and objections are made without prejudice to, and are not a waiver of, Plaintiff's right to rely on other facts or documents at trial.

2. By making the accompanying responses and objections to Defendant's requests for documents and interrogatory, Plaintiff does not waive, and hereby expressly reserves, its right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege. Further, Plaintiff makes the responses and objections herein without in any way implying that it considers the requests and interrogatory, and responses to the requests and interrogatory, to be relevant or material to the subject matter of this action.

3. Plaintiff will produce responsive documents only to the extent that such documents are in the possession, custody, or control of Plaintiff, as set forth in the Federal Rules of Civil Procedure.  Plaintiff's possession, custody, or control does not include any constructive possession that may be conferred by Plaintiff's right or power to compel the production of documents or information from third parties.

4. A response to a document request or interrogatory stating that objections and/or indicating that documents will be produced shall not be deemed or construed that there are, in fact, responsive documents, that Plaintiff performed any of the acts described in the document request, interrogatory, or definitions and/or instructions applicable to the document request or interrogatory, or that Plaintiff acquiesces in the characterization of the conduct or activities contained in the document request, interrogatory, or definitions and/or instructions applicable to the document request or interrogatory.

5. Plaintiff expressly reserves the right to supplement, clarify, revise, or correct any or all of the responses and objections herein, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

6. Plaintiff will make available for inspection at Plaintiff's offices responsive documents. Alternatively, Plaintiff will produce copies of the documents.

7. Publicly available documents including, but not limited to, newspaper clippings, court papers, and documents available on the Internet, will not be produced.

## GENERAL OBJECTIONS

1. Plaintiff objects to each instruction, definition, document request, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Plaintiff objects to each document request and interrogatory that is overly broad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence.

3. Plaintiff objects to each document request to the extent that it calls for production of a privilege log for internal documents of Plaintiff. A request for such a log is unreasonable and unduly burdensome in light of the work product doctrine, governmental deliberative process privilege, and other privileges protecting such internal documents from discovery.

4. Plaintiff objects to each instruction, definition, document request, and interrogatory to the extent that it seeks documents protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work product

doctrine, or any other applicable privilege. Should any such disclosure by Plaintiff occur, it is inadvertent and shall not constitute a waiver of any privilege.

5. Plaintiff objects to each instruction, definition, document request, and interrogatory as overbroad and unduly burdensome to the extent it seeks documents or information that are readily or more accessible to Defendant from Defendant's own files, from documents or information in Defendant's possession, or from documents or information that Defendant previously produced to Plaintiff. Responding to such requests and interrogatory would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such requests and interrogatory is substantially the same or less for Defendant as for Plaintiff. This objection encompasses, but is not limited to, documents and answers to interrogatories previously produced by Defendant to Plaintiff in the course of Plaintiff's administrative petition, all correspondence between the Plaintiff and Defendant, all other information provided by Defendant to Plaintiff, and all information produced by Plaintiff to Defendant in response to discovery requests of Defendant. All such documents and information will not be produced.

6. Defendant's document requests and interrogatory call for the production of documents and information that were produced to the Plaintiff by other entities and that may contain confidential, proprietary, or trade secret information.

7. To the extent any of Defendant's document requests or its interrogatory seek documents or answers that include expert material, including but not limited to survey materials, Plaintiff objects to any such requests and interrogatory as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

8. Plaintiff incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Plaintiff does not waive its right to amend its responses.

9. The inadvertent provision of information or the production by Plaintiff of documents pursuant to Fed. R. Civ. P. 33(d) containing information protected from discovery by the attorney-client privilege, work product doctrine or any other applicable privilege, shall not constitute a waiver of such privileges with respect to that information or those or any other documents.  In the event that inadvertent production occurs, the Defendant  shall return all inadvertently produced documents to the Plaintiff upon request, and/or shall make no use of the contents of such information or documents nor premise any further discovery on information learned therefrom.

10. Plaintiff objects to any interrogatory to the extent that it purports to impose upon him any obligation beyond those imposed by the Federal Rules of Civil Procedure, including, but not limited to, any interrogatory that exceeds the scope of Federal Rules of Civil Procedure 26(b) and 33.

### OBJECTIONS AND ANSWERS TO INTERROGATORIES

*1. Identify each person who has knowledge of facts or evidence relevant to the claims and allegations raised in your complaint and describe in detail the knowledge you believe he or she may have.*

**Answer to Interrogatory # 1**

A.      Charley Hammel, RN -  In a non-clinical setting she saw Plaintiff before and on October 30, 2013, and based on Plaintiff's appearance she advised Plaintiff to go to the VA for evaluation and treatment.

B.      Nicole Allen - She is a friend of Plaintiff who sees him frequently.  She has observed the adverse impact on Plaintiff; post incident, when he performs activities of daily living.  She has observed when he is suffering chronic swelling, stiffness, and pain as result of the injuries sustained from his claims in this action.

C.      Alek Laroche – Friend of Plaintiff wh has observed the adverse impact on Plaintiff; post incident, when he performs activities of daily living.  He has observed when Plaintiff  is suffering chronic swelling, stiffness, and pain as result of the injuries sustained from his claims in this action.

D.      Charmayne Tyler Jackson, BN, MPH – Plaintiff's mother whom he barrowed a cane from to go to the VA for evaluation and treatment at the VA on October 30, 2013.  She also flew out to Washington state to be with Plaintiff when he was discharged from the hospital.  She provided care for him during the period of being discharged until he was in stable enough condition to fly back to Maryland.  She also was present for many of his therapy visits at the VA.

E.      Maureen Toler – Friend of Plaintiff who was present with Plaintiff post incident and observed him attempting to regain his physical fitness and the challenges he faced.

F.      Samuel Fields – Plaintiff's professional manager in Miami Florida from May 2016 – December 2017, who witnessed Plaintiff performing his job duties with apparent limitations.

G.      Dean Robinette – Plaintiff's work supervisor in Indianapolis, IN, from October 2014 – May 2016. He witnessed Plaintiff performing his job duties with apparent limitations.

H.      Mamie Brown – Plaintiff's friend who has know him for over 20 years.  She provided care and comfort while he was recovering from his injuries.

VA Staff members who provided care for Plaintiff.

*2. Identify all non-expert witnesses whom you may call at the trial of this action and describe in detail the subject matter of his or her expected testimony.*

**Answer to Interrogatory # 2**

A-H provided in Answer #1 and Plaintiff.

*3. Identify every injury or impairment, whether physical, mental or psychological, that you allege you have suffered as a result of Defendant's actions.*

**Answer to Interrogatory #3**

All of the treatment that Plaintiff underwent at  Providence Regional Medical Center and Harborview Medical Center as stated in his administrative claim, complaint, and the medical treatment notes.

Subsequently Plaintiff underwent months of physical therapy.  During this period where he could not work and thereafter he suffered depression.

Plaintiff's desire was to leave the field as an aircraft maintenance engineer and start his own physical fitness training company.  However, the injuries suffered as a result of Defendant's negligence has severely limited his mobility and durability as it relates to physical fitness training.

Plaintiff has long-term nerve damage and chronic swelling and stiffness from his left kneecap down to his foot.  Due to the chronic edema Plaintiff has chronic swelling in his left.

Plaintiff has also suffered serve damage to his lymphatic system.  In addition, his right foot and ankle are becoming impaired because they over compensate for limitations in his left leg.

As Plaintiff ages these problems will only become more significant

*4. Identify every medical provider who treated you in connection with your infection beginning in or around October 2013.*

**Answer to Interrogatory #4**

Except for life saving and sustaining measures in Washington state all of Plaintiff's treatment related to this cause of action was at and through the VA.

*5. Identify all financial and non-financial damages you claim to have sustained as a result of Defendant's actions and give a line-by-line accounting, itemizing any losses or expenses which you claim were incurred by you, or on your behalf, as a result of your injury.*

**Answer to Interrogatory #5**

Plaintiff has actual medical expenses of sixty-three dollars ($62,063.00 USD) with sixteen thousand dollars ($16,000.00 USD) from Providence Regional Medical Center and forty five thousand dollars ($45,000.00 USD) from Harborview Medical Center.

Plaintiff was unable to work from on or about November 4, 2013 – June 2014 until because he was either in the hospital, in therapy, or recovering from his injuries.

After being discharged from the hospital in Washington state Plaintiff incurred bills and living expenses from having to stay in an extended stay hotel because he was not stable enough to travel.

Plaintiff had a loss of opportunity with not being able to further develop his physical training fitness company.

*6. Describe in detail all efforts you have made to mitigate your alleged damages.*

**Answer to Interrogatory #6**

Plaintiff followed the advice and advisements of the health care professionals providing him care. He worked really hard in therapy for months, but due to the nature of his injury there was a limit to how much he actually could recover.

*7. If you are claiming compensatory damages for medical conditions, state fully, precisely, and in detail, each medical condition you allege you are suffering from, including when you began to suffer from each medical condition and how each medical condition has affected the quality of your life.*

**Answer to Interrogatory #7**

All of these issues arose for Plaintiff, after Defendant's negligence gave rise to Plaintiff's underlying cause of action.   See Plaintiff's Answer to Interrogatory #3.

Also note:
Limitations with long walks and running.  Left leg is not stable due to muscle detrition and atrophy.  Constant swelling in Plaintiff's left foot.  At times he cannot put his shoe on.  He must daily wear compression socks on his left foot to mitigate swelling.

On flights over an hour, Plaintiff experiences pain and swelling in his left leg.  Plaintiff has to apply ice to his foot and elevate it because of the swelling.

Moreover, this event had taken a psychological toll on Plaintiff.  He constantly struggles with the fact that his body was negatively impacted due to someone else's professional failures.

*8. Identify every medical provider you have seen for any reason since January 1, 2007.*

**Answer to Interrogatory #8**

 Objection.  Overly broad and relevance.

To the best of Plaintiff's knowledge:

British Columbia,  Canada – 2008 -2009 Check-ups and physicals.  Plaintiff cannot recall the providers name.

Tucson, Arizona, 2007-2008 Check-ups and physicals.  Plaintiff cannot recall the providers name.


Dr. Anderson (Dentist)
259 Peninsula Farm Road, Suite 269
Arnold, MD 21012 On or about August/September 2013 – tooth extraction.

Atlas Orthopedics & Sports Medicine
36600 Guion Road, Suite 230
Indianapolis, IN 46222 2/24/2015

Philip D. Zarcteas Ph.D., M.D.
9240 North Meridan Street
Suite 650
Indianapolis, IN 46260-1849 3/4/2015

Every other health care provider was through the VA

*9. Identify all other instances since January 1, 2007, in which you suffered from an infection regardless of whether medical treatment was sought for same.*

7

**Answer to Interrogatory #9**

Tooth infection August/September 2013.  Tooth was extracted by Dr. Anderson's office listed above.


*10. Describe in detail all of your employment and sources of income since January 1, 2012.*

**Answer to Interrogatory #10**

On or about January 2012 Plaintiff was laid-off from Gulfstream Aerospace on Andrews Air Force Base.

Subsequently Plaintiff began working independently as a personal physical fitness trainer – On or about January 2012 – October 2013.

Launch Aerospace – Wilmington, OH On or about June 2014 – September 2014

Triumph /NAAS Field Division On or about October 2014 – Present (Indianapolis, IN and Miami, FL)

*11. State whether you have ever filed or been a party or witness to a lawsuit, and if so, identify the lawsuit and your involvement in it.*

**Answer to Interrogatory #11**

Plaintiff has not, to the best of his knowledge.

*12. Identify and describe in detail every act and/or omission of the Agency which you contend constitutes the basis of your claims in this action.*

**Answer to Interrogatory #12**

NP McGarrah failed to diagnosis Plaintiff and order the appropriate labs. Defendant's NP level of care and attention to detail is reflected in the fact that in her treatment notes she does not even mention the fact that Plaintiff was using a cane to assist him with walking or the swelling in his left foot/ankle area.

NP. McGarrah was not appropriately supervised.

*13. For each alleged act or omission described in your response to interrogatory 12, describe in detail each and every factual basis you allege supports your allegations that the Agency's acts or omissions were negligent.*

**Answer to Interrogatory #13**

VA protocol and healthcare guidelines dictate that Defendant's NP McGarrah, should have at least ordered labs and performed an oral examination on Plaintiff during his visit.  Defendant's failure to both was negligent.

Plaintiff has a good faith belief and understanding that NP McGarrah had professional restrictions that prohibited from providing patient care without oversight.

*14. Describe in detail your recollection of your medical visit on October 30, 2013.*

**Answer to Interrogatory #14**

Plaintiff went to the VA because he was experiencing swelling in his jaw, throat and left foot.  He arrived to the VA using a cane to walk because the swelling had impacted his ability to walk without support.  He was checked in..  The admitting nurse checked his vitals and advised all questions would be answered by the nurse practitioner.

Plaintiff's visit with NP McGarrah lasted for approximately ten (10) minutes.  She checked Plaintiff's temperature, and advised it was high.  She attempted to do an exam on check his ears, nose, and throat but the office equipment (otoscope) was not working properly.  She was about to exit the room to get another device to check Plaintiff's ears, nose and throat but she never did.  She stopped before she left the room, and she said: "fuck it, I am not supposed to do this." She walked back toward Plaintiff touched his neck where the lymph are and never performed a clinical oral exam, to inspect Plaintiff's throat." Finally, she wrote Plaintiff a script.

NP McGarrah also counseled Plaintiff on drug and prescription pill abuse because she thought he was drug seeking. This was odd to Plaintiff because he has never intentionally used tobacco, alcohol, or partaken in recreational drug use.

*15. State the factual basis for your contention that the Agency acted negligently as alleged in your complaint, see ¶¶ 17-41.*

**Answer to Interrogatory #15**

See Plaintiff's Answers to Interrogatories #13 and 14, respectively.

Moreover, please note:
Plaintiff has a good faith belief that NP McGarrah had professional restrictions on her ability to provide care.  She was not supposed to be treating or providing care to patients without direct oversight.  Defendant is the actor who placed NP McGarrah on restrictions but they allowed her to evaluate and treat Plaintiff without supervision.

In NP McGarrah's treatment notes it states that the ear nose and throat exam was unremarkable.  In fact, she never performed it because the equipment  (otoscope) was faulty and she elected not to get another one.  Without performing a complete thorough exam she prescribed medication.

*16. State the factual basis for your contention that the Agency negligently supervised staff as alleged in your complaint, see ¶¶ 42-48.*

**Answer to Interrogatory #16**

See Plaintiff's Answers to Interrogatories #13, #14, and #15.

*17. State the factual basis for your contention that the Agency's acts or omissions were the cause of your damages sought in this lawsuit.*

**Answer to Interrogatory #17**

See Plaintiff's Answers to Interrogatories #13, #14, and #15.


       I have read the foregoing Responses, which are based on a diligent and reasonable effort by me to obtain information currently available.  I reserve the right to make changes in or additions to any of these answers if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available.  Subject to these limitations, these Responses are true to the best of my present knowledge, information, and belief.


_____                                    _____/s/_____
Date                                                      Damond L. Williams

**Plaintiff does not have private health insurance coverage.  His care has been provided by the VA.  The other visits were self-pay.**

14.     All notes, diaries, journals, or logs regarding the allegations contained in your complaint.

**Plaintiff has none to provide.**

15. All documents related to any effort by you to mitigate any alleged damage that you are claiming in this action.

**Plaintiff has none to provide.**


        I have read the foregoing Responses, which are based on a diligent and reasonable effort by me to obtain information currently available.  I reserve the right to make changes in or additions to any of these answers if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available.  Subject to these limitations, these Responses are true to the best of my present knowledge, information, and belief.


        <u>02/01/2018</u>                                    _____/s/_____
        Date                                                        Damond L. Williams

# EXHIBIT  B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                :
DAMOND LEE WILLIAMS,            :
                                :
            Plaintiff,          :   Civil Action No.
                                :   16-2062 (EGS)
        v.                      :
                                :
U.S. DEPARTMENT OF VETERANS     :
AFFAIRS, et al.,                :
                                :
            Defendants.         :
                                :
- - - - - - - - - - - - - - - - x

                          Washington, D.C.

                          Monday, March 4, 2019


Deposition of:

                    DAMOND LEE WILLIAMS

a witness of lawful age, taken on behalf of the Defendants

in the above-entitled action, before Nate Riveness, Notary

Public in and for the District of Columbia, in the Office of

the United States Attorney, 501 Third Street, N.W.,

Washington, D.C. 20005, commencing at 9:51 a.m.


                Diversified Reporting Services, Inc.

                      (202) 467-9200

APPEARANCES:

      On Behalf of the Plaintiff:

           ANDRE T. HAMMEL, ESQ.

           Hammel Law LLC

           9701 Apollo Drive, Suite 301

           Largo, Maryland  20774

           andre.hammel@hamlawus.com


      On Behalf of the Defendants:


           PAUL CIRINO, ESQ.

           Assistant United States Attorney

           Civil Division

           U.S. Attorney's Office for the District

             of Columbia

           555 Fourth Street, N.W.

           Washington, D.C.  20530

           (202) 252-2529

           paul.cirino@usdoj.gov

1      Q      Yes.

2      A      Around a week.

3      Q      Okay.  And can you please describe that athletic

4   event?

5      A      It's called a Tough Mudder.  Several miles of

6   obstacle course.

7      Q      And where was this event?

8      A      I don't remember the exact address.

9      Q      No.  I'm not asking the exact address, but I'd

10   like to know --

11      A      I believe -- I believe it was either in Maryland

12   or Virginia.

13      Q      You don't recall the --

14      A      I would have to go -- I would have to go into my

15   records and emails, because at that time I was actually in a

16   relationship and she went ahead and made the arrangements

17   for that.

18      Q      Okay.

19      A      So I would have to contact her and get all of the

20   information for that.  But a lot of events, a lot of

21   activities that I took part of, were in either Maryland or

22   Virginia at the time.

23      Q      And how often did you participate in the Tough

24   Mudder events in Maryland or Virginia?

25      A      Tough Mudder was one that I've done several, as

1    far as Tough Mudder, Spartan, and other ones that are

2    smaller or around the same magnitude.  I live a pretty

3    active life, or I try to.

4        **Q    How many miles was this Tough Mudder event that**

5    **you participated in about a week before your visit to the**

6    **VA?**

7        A    I'm guessing that that one was 12, since they all

8    do not have the same length.

9        **Q    And what did you do during that event?  I**

10   **understand the concept of an obstacle course, but can you be**

11   **a little more specific about the nature of the obstacles and**

12   **what you are required to do to get through the course?**

13       A    Climbing rope, pulling stones, carrying logs,

14   running up hills, running down hills, pulling sleds,

15   climbing walls, that sort of thing.

16       **Q    What is the nature of the terrain of that course,**

17   **if you can remember?**

18       A    Woods, nature, forest.

19       **Q    And did you experience any injuries during that**

20   **event?  Again, approximately one week prior to October 30,**

21   **2013.**

22       A    Prior to the event or during the event?

23       **Q    Well, we'll start with during.**

24       A    During, I didn't notice any injuries.

25       **Q    And prior to the event?**

1      A    Prior to the event, not one single injury.

2      Q    **Did you suffer scrapes on your legs from that**

3  **event?**

4      A    From that event?  A scrape on my foot.

5      Q    **Which foot was that?**

6      A    Left foot.

7      Q    **And what did you do to address that scrape after**

8  **the event?**

9      A    Clean it, shower, clean, take care of yourself.

10     Q    **Did you apply a bandage to the scrape on your**

11 **foot?**

12     A    At first, yes.

13     Q    **And then it -- you stopped using a bandage?**

14     A    When it seemed as if it healed up and stopped

15 bleeding, yes.

16     Q    **Do you remember what caused the scrape on your**

17 **foot?**

18     A    A pebble.

19     Q    **How did that happen?  You're wearing footwear**

20 **during this competition.**

21     A    Mm-hmm.

22     Q    **Oh.  Pebble was inside the -- inside your shoe?**

23     A    Yeah.

24     Q    **Did you have any pain or discomfort with a toe**

25 **after the Tough Mudder event in October of 2013?**

Page 25

1        A    Do you mean initially or later?

2        **Q    Either one.**

3        A     Initially, no.  Later, from the same area, yes,

4   within a few days.

5        **Q    Can you describe that pain or discomfort with your**

6   **toe that occurred within a few days of the Tough Mudder**

7   **competition?**

8        A     Well, it wasn't the toe.  It was actually the

9   foot.  But stiffness, swelling, difficulty to walk.

10       **Q    Is this different from the scrape, or is it the**

11  **same injury as the scrape on the foot that we talked about**

12  **from the pebble?**

13       A     Elaborate?

14       **Q    Yeah.  I asked you about if you had any scrapes**

15  **from the Tough Mudder competition, and you said that you --**

16  **yes, you had from a pebble that was in your shoe.  Is that**

17  **right?**

18       A     Yeah.

19       **Q    Now I'm asking you about if you had any pain or**

20  **discomfort with a toe, on either foot, from the Tough Mudder**

21  **competition.**

22       A     A few days later --

23            MR. HAMMEL:  Counsel, the question was, was the

24  pain different from the toe with the scrape and the pebble,

25  if they're different.  That is the question that was

1    that day?

2         A    What I was wearing?  Particular clothing, don't

3    know.  But I believe I had on this jacket right here, the

4    same one she gave me.

5         Q    And do you recall how you were walking on that

6    day?

7         A    No.

8         Q    Okay.  Did you carry any instruments with you to

9    assist your walking?

10        A    I believe I had a cane.

11        Q    And where did you get that cane?

12        A    From her.

13        Q    You're referring to your mother?

14        A    Yes, sir.

15        Q    And whose idea was it to use a cane on that day?

16        A    It was hers.

17        Q    Had you used a cane on the previous day --

18        A    No, sir.

19        Q    -- the 29th?

20        A    No, sir.

21        Q    And are you able to describe what your foot looked

22    like on that day, the 30th of October 2013?

23        A    Stiff, swollen, a little bit of a reddish tint.

24        Q    What area of the foot had a reddish tint?

25        A    Probably three-quarters of it, and a centralized

1   location was one of where the pebble had scraped my skin.

2        Q    Which was the part of the foot that did not have a

3   reddish tint?

4        A    To be honest, I can't recollect as far as the back

5   side of where my heel was.  But at that time, I know what I

6   was looking at was the top portion of my foot.

7        Q    And you're saying three-quarters --

8        A    Three-quarters where I can see was miscolored.

9        Q    And how would you describe the swelling on your

10  left foot on that day?

11       A    Noticeable.

12       Q    Okay.  You entered the VA Medical Center at

13  50 Irving Street on October 30, 2013.  And then what

14  happened?

15       A    I went to be seen.  The first nurse saw me.

16       Q    Where was this?  Was it on the main floor, or do

17  you go to another floor?

18       A    It was a couple of floors up.

19       Q    Okay.  And how did you get to that floor?

20       A    I limped, elevator.

21       Q    Had you been there before?

22       A    I've been to that hospital numerous times,

23  relatives.

24       Q    Was this the first time that you were seeking

25  treatment at that hospital?

1       A       Yes, sir.  From the best of my knowledge.

2       **Q       So did you know where to go when you entered?**

3       A       Initially, no.  Help Desk at the front told me

4    where I had to go.

5       **Q       So I guess you then went to the place where you**

6    **were directed and you checked in, or what happened?**

7       A       I believe I gave my information, and she

8    was -- she told me that someone will be there to see me.

9    They called my name, and that's when I ended up seeing the

10   first nurse after my name was called, waiting in the room.

11   She saw me, took my temperature, told me it was high.

12      **Q       Okay.  Did you mention anything to her at that**

13   **point about your medical conditions on that day?  Or was she**

14   **simply there to take your vital signs?**

15      A       I told her the issues that I had.  Sorry.  I told

16   her the issues that I had.  I told her that I had problems

17   walking, problem swallowing, that my foot was swollen, and

18   those were the reasons why she examined me in one -- the

19   first nurse.

20      **Q       Okay.  So the first nurse took what action in**

21   **response to your mentioning of those medical conditions?**

22   **You said took your temperature.**

23      A       Mm-hmm.

24      **Q       Anything else?**

25      A       Took my temperature, looked at my foot, checked my

1  -- she looked in -- I believe she checked my temperature,

2  and I can't recollect that she looked at my foot or not.

3      **Q    Okay.  We're still with the first nurse.  Took**

4  **your temperature.  Do you recall taking your shoes off and**

5  **socks off?**

6      A    I can't remember if I -- I can't remember if I

7  took my shoes and socks off at that time.

8      **Q    And how long were you with this first nurse?**

9      A    Only a matter of minutes.

10     **Q    And there came a time where you met another nurse**

11 **practitioner?**

12     A    After I was told to wait for her to see me.

13     **Q    Okay.  And you -- I guess your name got called**

14 **again, and did you go back to the same room, or a different**

15 **room?**

16     A    Different room.

17     **Q    And do you recall the name of the nurse**

18 **practitioner that you saw in this second room?**

19     A    I don't remember her name.  Off the top of my

20 head, I don't remember her name.

21     **Q    And what did you say to her when you I guess were**

22 **asked -- did she ask you, look, why are you here? Or maybe -**

23 **-**

24     A    I told her I had a problem swallowing, told her my

25 foot was swollen, that I didn't feel well, and that my right

1  arm was actually getting stiff, and my neck was swollen.

2  And that was also added to my foot being swollen.

3      Q    Can you repeat that last thing you said?

4      A    And that was also in addition to my foot being

5  swollen?

6      Q    Yeah.  Okay.  And after you mentioned this to the

7  nurse practitioner, what did she do?

8      A    She took a look at my foot.  She also reached

9  forward and touched my neck, my glands in my neck area,

10  right here.

11      Q    I want the record to show that he used one finger

12  from each hand and pointed directly to his neck under his

13  chin.  Is that a fair characterization of the gesture you

14  made?

15      A    Yes, sir.  Do you want me to continue?

16      Q    Yes, please.

17      A    She checked under there.  She asked me if -- she

18  asked me when was the last time I had my -- my glands

19  checked.  I said, "I don't know."  She said, "You should get

20  them checked because they look spongy."

21      Q    Okay.  I'd like you to continue if there's more to

22  say.

23      A    Okay.  So she continued -- she continued writing.

24  Then she went over to the wall to grab the device for the

25  ear, nose, and throat.  She went to turn the light on, and

1        Q    Why don't we stop at that point.

2        A    Okay.

3        Q    And I'll ask you some follow-ups.  So it's your

4   testimony that with the second nurse you did take off your

5   shoes and socks?

6             MR. HAMMEL:  Nurse practitioner, counsel, right?

7             MR. CIRINO:  Correct.  Nurse practitioner.

8             THE WITNESS:  The nurse practitioner, yes.

9             BY MR. CIRINO:

10        Q    Okay.  Did you take both shoes and socks off, on

11   both feet or only your left foot?  Do you recall?

12        A    I don't remember if I took the right one off, but

13   I know I took the left one off.

14        Q    Okay.  And you said you mentioned that you had

15   stiffness in your right arm --

16        A    Mm-hmm.

17        Q    -- as well?

18        A    Right shoulder.

19        Q    Do you know what the nurse practitioner was

20   writing down?  You mentioned you saw her writing things

21   down.  Do you know what that was?

22        A    What she was writing down other than the

23   penicillin G, I can't recollect.  I cannot recollect -- me

24   as a patient, whenever I go into a facility to see any type

25   of medical professional, I assume what they're writing is

1        A    I went to the first floor of the building where

2    they take your prescription and -- where they take your

3    prescription and they -- you get on the waiting list to have

4    your name called out.  And I gave the guy my prescription,

5    asked him how long it would take, and they were busy that

6    day and he said anywhere between 30 to 40 minutes.

7            And I'm not the -- and I'm the type that I'll wait

8    my time in line.  So since it was a wait, I said thank you,

9    I turned around to go sit down.  He saw how much pain I was

10   in, and he went ahead and gave me my prescription within

11   less than five minutes.

12       **Q    You're referring to him in your answer.  Is that**

13   **the pharmacist?**

14       A    Yes, sir.  What I would suspect of the pharmacist

15   that's on the first floor.

16       **Q    Now, did the nurse practitioner -- what did she**

17   **say about your foot when she examined it?**

18       A    I don't remember her -- I don't remember her

19   making a statement of it's swollen or not.  As far as

20   remarks towards my physical presence that day, I believe

21   that she -- like I said before, she did mention that I

22   should get my glands checked because they seemed swollen or

23   spongy.

24           As far as her making a remark for my foot, I don't

25   remember her making any remark on the foot at this current

1    time.

2         Q    **Did you ask the nurse practitioner to take some**

3    **tests of any kind?**

4         A    Again, me being a patient, for me to -- for me to

5    recommend testing, it's not of my profession.  It's not my

6    specificity.  So when you go and I go, like anyone else,

7    into a medical facility to get something checked out, it is

8    not in my responsibility to say I need this done, I need --

9    or that done.  It's up to my trust within the medical

10   profession -- that I go to the medical professional and say,

11   "Hey, I have this problem."  If they tell me that I should

12   take this pill or that pill, I have to trust that hospital.

13   I have to trust that practitioner to do so.

14         So it's the trust that I have towards her to sit

15   there and to have me say, if I need testing, she will have -

16   - she or he will have -- will tell me that I have to get

17   tested for this or -- or whatever ailment I come in there

18   with.  So if they haven't told me to get tested, it's not my

19   responsibility to go tell them I need to get tested.

20         Q    **Okay.  I understand your answer.  My question was**

21   **very specific was, did you ask for any tests while you were**

22   **with the nurse practitioner?**

23         A    No.

24         Q    **So the pharmacist handed you the medication, and**

25   **then what happened, where did you go?**

1      A    I believe there was a Starbucks in the lobby. I

2   was going to wait in line to go to the Starbucks, and the

3   line was too long, and they were talking way too much.  So I

4   went to the water fountain in the lobby and used that for my

5   first pill.

6      Q    **Okay.  And then did you remain in the hospital, or**

7   **did you leave?**

8      A    I left.

9      Q    **Okay.  Where did you go?**

10     A    I went to my cousin's place, rested there until I

11  had to return back to the hospital to pick up my mother.

12     Q    **And approximately where is your cousin's place?**

13     A    The exact address I can't really say, but -- well,

14  I don't remember the exact address at the moment, but on

15  Peabody Street, Northwest.

16     Q    **What is your cousin's name?**

17     A    Shawn.

18     Q    **And the last name?**

19     A    I don't want to be incorrect.  I can't remember

20  her last name at the moment.  I believe she got married at

21  one point.

22     Q    **So later in the day you returned to the hospital?**

23     A    Yes, sir.

24     Q    **And picked up your mother and drove back to your**

25  **home.**

1      A     Back to her place, yes, sir.

2      **Q     Back to her place.  Anything eventful for the rest**

3  **of that day?  And, again, talking specifically about October**

4  **30, 2013.**

5      A     Other than still being in pain and discomfort, I

6  don't remember.  The only thing I would remember is

7  confirming my dates to travel and get things out of storage.

8      **Q     All right.  Well, let's move on, then, to the**

9  **following day.  Let's take the next few days together if we**

10  **could, October 31, November 1, November 2, do you recall on**

11  **which day you traveled?**

12      A     That weekend, as far as like the exact day, I

13  don't remember the exact day that I traveled, but I did

14  travel to Seattle.

15      **Q     So if October 30 is a Wednesday, October 31 is a**

16  **Thursday, November 1 is a Friday, when do you think you**

17  **boarded a plane to Seattle?**

18      A     I think I boarded the plane on that Friday.

19      **Q     Okay.  That's November 1st.  Do you recall**

20  **anything eventful on the day before the flight?**

21      A     Still feeling bad.  Not really much improvement.

22  The swelling seemed to still be there.

23      **Q     How about the pain in and around the neck area?**

24      A     It seemed about the same.

25      **Q     Okay.  And you continued taking the medication on**

1   but we can -- we can --

2        A    Okay.

3        Q    -- get into that.  But so you checked into, was it

4   Providence Medical Center?

5        A    In Everett, Washington, yes.

6        Q    Okay.  And what prompted you to go to that

7   hospital?

8        A    Because a friend of mine wanted me to go to the

9   hospital the day before, and I told her, I said, "If I feel

10  the same or worse when I wake up, then we're going to the

11  hospital."  So because I was feeling worse when I woke up, I

12  told her, I said, "We need to go to the hospital."

13       Q    And what is your friend's name?

14       A    Judy Firomski.

15       Q    Perhaps you should spell the last name --

16       A    I can --

17       Q    -- for the Court Reporter.  Sure.  Feel free to

18  take out your phone and spell it accurately.

19            THE COURT REPORTER:  I can get it at the end if

20  you want.

21            THE WITNESS:  F-i-r-o-m-s-k-i.

22            BY MR. CIRINO:

23       Q    And what do you recall about your time at the --

24  at Providence Medical Center in Everett?  You --

25       A    Do you want my initial getting in there?

1    Q    You went there, you -- and then what did you do?

2    A    She drove me to the front door.  Well, she drove

3    me to the curb by the front door.  She asked if I needed

4    help getting in.  I told her, "I'll make it to the front;

5    park the car."  She went to go park the car. I went into the

6    hospital.  I dragged my leg because I could no longer stand

7    on it, but put really good pressure on it, walking like a

8    zombie.

9         At this moment, I could not fit a shoe on any

10   more.  So it would leave a -- through the socks that I had

11   on, it left a lime green trail, like a snail, from the curb

12   to the front desk.

13   Q    Did you have your cane with you at this moment?

14   A    Yes.  To the best of my ability, yes.

15   Q    And what did they tell you at Providence Medical

16   Center?

17   A    Well, initially, the lady at the front, she told

18   me -- she asked me if she could check my temperature.  After

19   she checked my temperature, she asked if she could check it

20   again because it was reading high.  She checked it the

21   second time.  When she checked it the second time, she told

22   me that it actually got higher from that moment, from the

23   first to the second.

24        They admitted me, so after they admitted me I went

25   to the room.  The doctor that was in the room, I asked if he

# EXHIBIT C

# Progress Notes

```
ADDITIONAL COMMENTS/INFORMATION:

MAL nurse received call from patient's mother requesting a call from PCP at
her earliest convenience.  Pt was admitted to Harbard Hospital in Seattle,
WA.  Stated pt's WBC's 40,000. Note forwarded to PCP.


+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
Call Type: MESSAGE TO PROVIDER.
Facility Appointed PCP: LIPSCOMBE,DAWN K (GB CBOC TWO )
No Associate Provider Identified

Caller Response: *OTHER.

Protocol(s) used: <Not identified>.


Evaluation/Management Code: HC PRO PHONE CALL 5-10 MIN (98966).
Starting at: 11/4/2013 @ 8:53:18 AM
Ending at: 11/4/2013 @ 8:56:57 AM
Length: 3 minutes.
Author: CALHOUN,PAMELA T
Conversation with OTHER indicates that WILLIAMS,DAMOND LEE has a chief
complaint of: Not applicable to call.

Identified problem: OTHER UNSPECIFIED COUNSELING.

The following identifiers were used to verify this patient:  SSN.

/es/ Pamela T Calhoun
RN STAFF
Signed: 11/04/2013 08:57


Receipt Acknowledged By:
11/05/2013 09:29        /es/ naveena SOMPALLI
                              PHYSICIAN
```

```
 LOCAL TITLE: PRIMARY CARE NURSING TRIAGE NOTE
STANDARD TITLE: PRIMARY CARE NURSING TRIAGE NOTE
DATE OF NOTE: OCT 30, 2013@08:46     ENTRY DATE: OCT 30, 2013@08:46:52
      AUTHOR: GRAY,ARLEEN T        EXP COSIGNER:
      URGENCY:                            STATUS: COMPLETED

    *** PRIMARY CARE NURSING TRIAGE NOTE Has ADDENDA ***


Age: 38

Chief Complaint (include date of onset):c/o pain and swelling of neck and jaw
```

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| WILLIAMS,DAMOND LEE<br>11202 WILLOW COURT<br>CLINTON, MARYLAND  20735 | Printed at WASHINGTON VA MEDICAL CENTER |

# Progress Notes

from infected tooth rt. lower molar x 4 days.

Vital Signs:
  BP: 116/72 (10/30/13)    P: 95 (10/30/13)         R: 20 (10/30/13)
  WT:                    T: 97.7 (10/30/13)       HT:

  SpO2:100% RA

History: (PMH)
  Asthma (Icd-9-cm 493.90)
  Back pain: duration > 3 months (Icd-9-cm 799.9)
  Health Maintenance (Icd-9-cm V65.9)
  Hypercholesterolemia (Icd-9-cm 272.0)
  Syphilis (Icd-9-cm 097.9)
  w/ Mixed Emotions (Icd-9-cm 309.28)

[] Tobacco user. Smoking cessation counseling done.

Clinical Observation (include signs & symptoms):A&O x3. NAD. slight swelling
rt side of jaw.

Medications: No records found.

Over-the-counter drugs:Benadyl, Ibuprofen

Triage protocols/interventions: Ms. McGarrah informed. Pt asked to wait in
waiting area. Pt. verbalized undertanding.

Labs/x-rays ordered:

Patient Disposition: to pt waiting area.
  Pain Assessment:
    Pain Intensity Score
    Pain Location: neck, jaw,
    Previous Pain Score: 0 (09/10/2013 10:37)
    Pain intensity score now:
      7
    PAIN EDUCATION PROVIDED TO:
    Patient
    PAIN TOPICS DISCUSSED:
    Cause(s) of pain
    Assessing and reporting pain
    Pain intensity scale
    Importance of effective pain management
    Pain management with medications
    .
      Level of Understanding: Good
    Medications
      Comment: benadryl, ibuprofen
    EFFECTIVENESS OF CURRENT PAIN MANAGEMENT

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)
WILLIAMS,DAMOND LEE
11202 WILLOW COURT
CLINTON, MARYLAND  20735

VISTA Electronic Medical Documentation
Printed at WASHINGTON VA MEDICAL CENTER

# Progress Notes

Patient NOT satisfied with pain control.  Accepts referral to a
provider.


/es/ arleen t GRAY
RN STAFF
Signed: 10/30/2013 08:56

Receipt Acknowledged By:
10/30/2013 09:19        /es/ MARGUERITE MCGARRAH,NP
                            MWM//

10/30/2013 ADDENDUM               STATUS: COMPLETED
Pt c/o pain and infection x 2 weeks s/p root canal.

mouth; unremarkable; no pus, no gum edema; has past hx of requesting antibx for
dental.


a/p:
--
PenVK ordered
R ant cerv LAD
thyroid feels puffy.

/es/ MARGUERITE MCGARRAH,NP
MWM//
Signed: 10/30/2013 09:33


10/30/2013 ADDENDUM               STATUS: COMPLETED
Note signed prematurely.

HPI:
---
Pt has hx requesting antibx for dental issues.
Pt states that hhe will see his dentist in 6 days. States dentist refused to
order antibx w/o seeing him.

Exam:
------
Neck: Right side: 1+ puffiness;cannot appreciate A/C lymph nodes; puffiness
extends around to thyroid.

Dentition:
-- R lower molar. No gum edema, no erythema, no pus. NO lesions.
his dentist in 6 days.

A/P
----

---

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| WILLIAMS,DAMOND LEE<br>11202 WILLOW COURT<br>CLINTON, MARYLAND  20735 | Printed at WASHINGTON VA MEDICAL CENTER |

# Progress Notes

```
--Pt declines consult to dental clinic;
-- Renewed PEN VK order, with some misgivings, in light of past hx and concern
for antibx resistance.


/es/ MARGUERITE MCGARRAH,NP
MWM//
Signed: 10/30/2013 09:52
```

---

```
 LOCAL TITLE: ADVICE LINE
STANDARD TITLE: TELEPHONE ENCOUNTER NOTE
DATE OF NOTE: OCT 29, 2013@14:23:27  ENTRY DATE: OCT 29, 2013@14:29:12
      AUTHOR: ZARRABI,JANICE O     EXP COSIGNER:
      URGENCY:                           STATUS: COMPLETED


   *** ADVICE LINE Has ADDENDA ***

Type of call: SYMPTOM.
Facility Appointed PCP: LIPSCOMBE,DAWN K

The following identifiers were used to verify this patient:  SSN.
Contact Phone Number:
The patient, WILLIAMS,DAMOND LEE (          )  Phone:                   called the
call center.
Caller Area: GREENBELT CBOC


Caller Response: *OTHER


Evaluation/Management Code: HC PRO PHONE CALL 5-10 MIN (98966).
Starting at: 10/29/2013 @ 2:23:27 PM
Ending at: 10/29/2013 @ 2:26:50 PM
Length: 3 minutes.

Comments:
Pt calls for anti -bx for infection in right lower molar.  Has swelling and
pain in right jaw and back of throat. Ongoing x 5day.  would like to pick up
antibx.
today. To contact pt, pls call cp. Pt declined to come in and be seen.
Author: ZARRABI,JANICE O

Chief Complaint: Not applicable to call.
Identified problem: OTHER UNSPECIFIED COUNSELING.
No Associate Provider Identified
Team: GB CBOC TWO

/es/ JANICE O. ZARRABI
RN
Signed: 10/29/2013 14:29
```

---

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
| --- | --- |
| WILLIAMS,DAMOND LEE<br>11202 WILLOW COURT<br>CLINTON, MARYLAND  20735 | Printed at WASHINGTON VA MEDICAL CENTER |

# Progress Notes

Receipt Acknowledged By:
10/29/2013 15:31         /es/ DAWN K LIPSCOMBE
                             NURSE PRACTITIONER


10/29/2013 ADDENDUM                 STATUS: COMPLETED
10/29/2013-please inform pt he needs to be seen

/es/ DAWN K LIPSCOMBE
NURSE PRACTITIONER
Signed: 10/29/2013 15:31


10/30/2013 ADDENDUM                 STATUS: COMPLETED
Contacted pt and he is at DCVA to pick up antibx.  Reiterates the dental people
wants to be paid up front and he can not pay.  Just wants antibx.  Apparently
this is an ongoing dental problem/infection. After much discussion, pt agrees to
go to green clinic.  [says "won't be able to go back to gbc- feels bad"] says
feels tired.

/es/ JANICE O. ZARRABI
RN
Signed: 10/30/2013 08:06

Receipt Acknowledged By:
10/30/2013 08:25         /es/ DAWN K LIPSCOMBE
                             NURSE PRACTITIONER

---

 LOCAL TITLE: PCC - ESTABLISHED - PROBLEM FOCUSED
STANDARD TITLE: PRIMARY CARE NOTE
DATE OF NOTE: SEP 10, 2013@10:53    ENTRY DATE: SEP 10, 2013@10:54:09
     AUTHOR: SOMPALLI,NAVEENA    EXP COSIGNER:
     URGENCY:                         STATUS: COMPLETED


   *** PCC - ESTABLISHED - PROBLEM FOCUSED Has ADDENDA ***


Age: 38     Sex: MALE    Race: RACE UNKNOWN


Reason for Visit:
This is a 38 y/o male here for paperwork to filled for a prospective job with
metro transit police. Paperwork asks if patient is physically capable of running
a mile, doing 11 push-ups etc.
patient states he is a boot camp fitness instructor and is very physically fit.
recently completed a spartan mud-run which was several miles.
denies any current medical issues. does not take any medications

Allergies: Patient has answered NKA

I REVIEWED THE MEDICATIONS THE PATIENT HAS BEEN TAKING AND THE FOLLOWING

---

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| WILLIAMS,DAMOND LEE<br>11202 WILLOW COURT<br>CLINTON, MARYLAND  20735 | Printed at WASHINGTON VA MEDICAL CENTER |

# EXHIBIT  D

WILLIAMS, DAMOND LEE H3483758
Admit Note Authenticated
Service Date: Nov-04-2013
Dictated by Kading, MD, Kellan James on Nov-04-2013

## ICU ADMIT NOTE

**Hospital Day:** 0

**Chief Concern** *(Required for all billing levels)*
38 yo M with concern for LLE NSTI.

### History of Present Illness

Damond Williams is an otherwise healthy 38 year old man with a 1 week history of LLE infection that has progressed over the past 3 days. He participated in a "mud run" about 2 weeks ago but otherwise denies trauma to the area. He first noticed the infection beginning on the dorsum of his left foot. From there it has spread over his foot and up his leg to the knee. He denies overt fever, chills. He was previously evaluated in an urgent care clinic, but has not received treatment of his infection. He denies SOB, fatigue. He has no h/o MRSA. Nothing like this has ever happened to him before.

### Problem List
Left leg cellulitis
NECROTIZING FASCIITIS

### Allergies
NKA

### Medications Prior to Admission
None

### Past Medical History
Denies

### Family History
Noncontributory

### Social History
Denies habits

**Review of Systems** [_] Unable to Obtain due to Patient Condition
CONSTITUTIONAL [X] Negative _ EYES [X] Negative _ ENMT [X] Negative _
CARDIOVASCULAR [X] Negative _ RESPIRATORY [X] Negative _ GI [X] Negative _
GENITOURINARY [X] Negative _ NEURO [X] Negative _ MUSCULOSKELETAL [_] Negative _
SKIN [_] Negative _ ENDOCRINE [_] Negative _ ALLERGY/IMMUNOLOGY [_] Negative _
HEME/LYMPH [X] Negative _ PSYCHIATRIC [_] Negative _

**Vitals** *(Most recent and 24 hour range.)*
Date  Result  Last  MIN  - MAX

11/03/13 22:09   Temp C:      37.8   37.8    - 37.8
11/03/13 22:09   HR:      101   101    - 101
11/03/13 22:09   RR:    16   16    - 16
11/03/13 22:09   SBP Non-Inv:      134   134    - 134
11/03/13 22:09   DBP Non-Inv:    56   56    - 56

## I&O Data

Height: Height (cm): No Results Found.
Admit Wt:Admit Wt: No Results Found.
BMI: No Results Found.
Last Daily Wt: No Results Found.
Previous Daily Wt: No Results Found.

(24 Hour IO Total = from 06:00 the prior day to 05:59 listed day)

| Result | 11/01/2013 | 11/02/2013 | 11/03/2013 | 11/04/2013 | 11/05/2013 | Total |
|---|---|---|---|---|---|---|
| Intake Total (0600) | 0 | 0 | 0 | 330 | 0 | 330 |
| Output Total (0600) | 0 | 0 | 0 | 0 | 0 | 0 |
| Net I&O Total (0600) | 0 | 0 | 0 | 330 | 0 | 330 |

## Respiratory Data *(Most recent and 24 hour range.)*
Date    11/03/13 22:09
O2 Sat:    99

## Physical Exam

General/Constitutional: laying comfortably in bed, NAD, speaking in full sentences, A&O x4
Eyes: anicteric sclera
Neck: full ROM, supple
Respiratory: easy respiratory effort on RA, CTAB
Cardiovascular: RRR, no MRGs appreciated
Chest: symmetric rise, atraumatic
GI/Abdominal: +BTs, soft, nondistended, nontender to palpation
GU: deferred
Musculoskeletal: left lower leg with erythema, bullae below the knee to the foot, leg is swollen and edematous compared to right, popped blisters contained clear yellowish/orange fluid, leg superior to knee is normal in caliber, leg is nontender, normal sensation, ROM limited by swelling but able to move toes and foot at the ankle
Neurologic: as above
Psychiatric: normal affect

## Laboratory Studies *(Most recent results in 24 hour range.)*

RESULTS FROM TODAY    RESULTS FROM YESTERDAY
                ---    11/03/13 22:55

|- ICa - - -   |- ICa - - -
- - -   - - -   - - -   |- Ca - - -    133   100   17   |- Ca 7.9
---------|------------|------------< - - -   |- Mg - - -    ---------|------------|------------< 103   |- Mg - - -
- - -   - - -   - - -   |- Phos - - -    3.5   26   1.11   |- Phos - - -

RESULTS FROM TODAY    RESULTS FROM YESTERDAY
                ---    11/03/13 22:55

                - - -   |- PT - - -   11.6   |- PT 15.0
        - - -|----------------------[ - - -   |- INR - - -   38.63 |----------------------[ 200   |- INR 1.3



--- |- PTT --- 32   |- PTT 39

## Other Laboratory Studies *(Most recent and 24 hour range.)*
Date   11/03/13 22:55
AST (GOT):   29
ALT (GPT):   18
Alk Phos (Total):   220
Bilirubin (Total):   2.8
Albumin:   1.6

## Last 6 Hematocrits in Preceding 24 Hours
*(NOTE: Comments/notes for Labs are viewable on Flowsheet)*
11/03/13
   22:55
   32

## Assessment / Plan

### UPDATED MORNING ROUNDS PLAN
38 yo otherwise healthy M with concern for LLE NSTI, although more likely severe cellulitis given prolonged
time course, lack of tenderness on exam, and clinical/HD stability given the size of involvement.

#Possible LLE NSTI vs cellulitis

- Closely follow with clinical exams. Will tenatively plan for OR today since patient not showing signs of
improvement with resuscitation and IV antibiotics. Will follow up GS recs post-op.

- Trend CBC Q6hr (WBC 43K at OSH)

- Quad abx, wound culture obtained - broad spectrum until speciation (f/u culture results at OSH)

--clinda, levo, PCN G, vanco

- Repeat LLE duplex to rule out DVT

#Sepsis: leukocytosis with borderline tachycardia

- IVF resuscitation with LR

- Monitor VS, UOP, repeat labs

#Hyperbilirubinemia - etiology unknown
- Follow up repeat labs

#ICU checklist
Fluids/nutrition: MIVF, NPO
Analgesia/sedation: IV morhpine
VTE prophylaxis: SCDs, will discuss starting Lovenox tonight
HOB elevation/activity: HOB elevated
GI prophylaxis: NI
Glucose control: NI
Spine precautions: N/A
TLD: PIVs
Code: full
Dispo: TICU

### ATTENDING STATEMENT:
I saw and evaluated the patient and agree with Dr. Kading's note. I am providing concurrent care for the management
of the patient's multiple medical issues as documented above.

| HMC | Patient: WILLIAMS, DAMOND L (H3483758) | Doc pg 3 of 4 | Job pg 109 of 195 | Req Id: 111314404 | hosmer : 12/26/13 08:51:29 |

Date of Service: 11/4/2013

**Signature Line**
Electronically Reviewed/Signed On: 11/04/13 at 03:31

Kading, MD, Kellan James
Resident, Department of General/trauma Surgery Se
Box 359702
Seattle WA

Electronically Co-Signed On: 11/04/13 at 11:05

Kading, MD, Kellan James
Resident, Department of General/trauma Surgery Se
Box 359702
Seattle WA

Electronically Co-Signed On: 11/07/13 at 15:26

Krishnamoorthy, MD, Vijay
Attending, Anesthesiology
Box 359724
Seattle WA

KJK
DD:11/04/13

**CC Address Information**

# EXHIBIT  E

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Department of Veteran's Affairs \| Office of Regional Counsel 1722 I Street NW, Suite 302 Washington, DC 20421 | Damond Lee Williams 3514 Idlewood Parkway, Apartment 419 Indianapolis, IN 46214 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|---|
| ☐ MILITARY   ☒ CIVILIAN | | Single | Wednesday | 10/30/2013 | 9:00 A.M. |

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

I am a veteran of the United States Air Force; I was honorably discharged. On the above date I was seen by a nurse practitioner at the DC VA hospital for pain in my jaw, throat, & foot. Not ordering an ultrasound of my throat or at least a CBC, the NP deviated from best practice protocol. If she would have done that and not treated me as if I were drug seeking she would have discovered the infection which almost killed me. However it was discovered on 11/3 by a medical team. See attach

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

**RECEIVED**

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

OCT ~~~ 2015

VA REGIONAL COUNSEL
1722 1ST, NW, STE 302
WASHINGTON, DC 20421

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Due to the negligence of the NP who failed to screen or test for the bacterial infection on my 10/30 visit, the infection grew to where my WBC was at 43K, just four (4) days after my visit. In the short term I almost lost my life. Ultimately, I underwent several emergency medical procedures, resulting in my mobility & quality of life being forever impacted. See attached.

| 11. | WITNESSES | |
|---|---|---|
| | NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
| | None at this time reservere the right to amend | |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| | $1.75 million dollars | | $1.75 million dollars |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *[signature]* | (240) 755-5555 | 10/1/15 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

VA0082

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☒ No   17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

19. Do you carry public liability and property damage insurance? ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☒ No

## INSTRUCTIONS

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

**STANDARD FORM 95** REV. (2/2007) BACK

VA0083



**Hammel Law**

*9701 Apollo Drive • Suite 301 • Largo, MD 20774 • Phone: (240) 393-4935 • Fax: (240) 334-4848*

October 1, 2015                                    VIA HAND DELIVERY

Department of Veteran Affairs               **FOR SETTLEMENT PURPOSES ONLY**
Office of Regional Counsel                   **NOT TO BE USED AT TRIAL**
1722 I Street NW, Suite 302
Washington, DC 20421                                                    Page | 1
(202) 530-9420 (Office)
(877) 389-4685 (Fax)

## <u>Supplement to Claimant's Standard Form 95</u>

      RE:      Our Client   :    Damond Lee Williams
                Date of Birth  :    ██████
                Date of Accident :    Wednesday, October 30, 2013
                Military Status :    Veteran, United States Air Force
                                 Honorably Discharged 10/26/1997

Dear Counsel:

Please be advised that the undersigned represents Mr. Damond L. Williams (hereinafter referred to as "Mr. Williams") for the resulting injuries, subsequent pain and suffering, and permanency of bodily harm resulting from the Department of Veteran's Affairs (hereinafter referred to as "VA") negligence. Specifically, seeking relief for the departure from best practice standards and following of medical protocols in providing medical care for Mr. Williams on or about 10/30/2013. As a result of the aforementioned, Mr. Williams condition necessitated extensive medical and surgical interventions, permanent loss of mobility, and persistent and debilitating chronic pain and nerve damage, both of which will forever adversely affect his quality of life.

Per the conditions and directives of the Federal Tort Claim Act, Mr. Williams submits the enclosed Standard Form 95 and this supplemental packet.

### BACKGROUND

At the time of accident Mr. Williams was a 38-year-old single man with no children. Mr. Williams' social security number is 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. At a very early age Mr. Williams made a personal commitment to never drink alcohol or smoke tobacco due to a devastating family history of alcohol and other substance abuse. In addition, Mr. Williams has always made it a priority to maintain his physical fitness through habitual exercise and maintaining a balanced diet. The relevance of Mr. Williams' lifestyle commitments and lifestyle choices is – but for said choices this matter may have been a wrongful death action. It is beyond speculation that Mr. Williams' physical

www.hamlawus.com



### Hammel Law

*9701 Apollo Drive • Suite 301 • Largo, MD 20774 • Phone: (240) 393-4935 • Fax: (240) 334-4848*

fitness helped save his life. Secondly, it helps the evaluator better appreciate the totality of the impact this matter has had and is still having on Mr. Williams' overall quality of life.

Mr. Williams' classification in the United States Air Force was an aircraft fuel maintenance engineer. Upon separation from the Armed Services this skillset kept Mr. Williams gainfully employed while traveling the world. However, in 2013, due to the trade's taxing nature; specifically operating heavy machinery and the potential impacts of daily being exposed to chemicals Mr. Williams decided to make a professional change with the start of Aspiration Fitness LLC. A personal training company dedicated to helping clients get smart about taking care of their physical fitness coupled with meal advisement.

Mr. Williams' hopes of starting said company were dashed due to the VA's breach of professional duty of care, resulting in personal injury injuries to Mr. Williams, limiting his ability to work as a personal trainer. No longer being able to be a physical fitness trainer Mr. Williams is now back working as an aircraft fuel maintenance engineer.

### BASIS OF CLAIM CONTINUED

On or about 10/30/2013, after Mr. Williams mother and sister saw his condition they had a family discussion encouraging Mr. Williams to go to the VA for treatment. That morning, Mr. Williams hobbling with a cane borrowed from his mother, entered Veteran's Affairs hospital (hereinafter referred to as "VA") located at 50 Irving Street NW, Washington, DC. The purpose of his visit was to obtain a medical evaluation and treatment due to a recently developing difficulty with swallowing and walking. Approximately a week earlier Mr. Williams completed a cross-country athletic competition in which he ran, jumped, and did callisthenic type exercises without any unexpected difficulty.

At the VA Mr. Williams was evaluated and treated by a nurse practitioner (hereinafter referred to as "NP"). VA medical notes enclosed in Tab 3. Although Mr. Williams complained of issues with swallowing connected with throat and jaw pain and difficulty with walking due to swelling in his left foot, the NP's progress notes solely reflect her attention to "pain and swelling of neck and jaw." Furthermore, the NP noted slight swelling in Mr. Williams jaw.

The NP provided Mr. Williams with patient education on pain management with medications, noted a history of requesting antibiotics for dental issues, performed an oral exam, referred Mr. Williams to a provider, and with documented misgivings renewed Mr. Williams antibiotic prescription. Mr. Williams' account is that the NP spoke to him about drug seeking and drug abuse. Based on the NP's course of treatment and notes it appears Mr. Williams recollection is accurate.

Page | 2



**Hammel Law**

*9701 Apollo Drive • Suite 301 • Largo, MD 20774 • Phone: (240) 393-4935 • Fax: (240) 334-4848*

---

### PERSONAL INJURY CONTINUED

#### Departure From VA Standard of Care

Page | 3

The NP performed the oral exam and found no remarkable findings with no obvious cause for the discomfort. However, it was notated that Mr. Williams had right neck swelling with puffiness extending to the thyroid. But, the NP failed to mention his acute left leg pain, swollen foot and ambulation with a cane. VA protocols mandate for a patient with said conditions, to at minimum, have a complete blood count lab assessed and an ultrasound of the swollen thyroid. At a bare minimum, the NP should have performed a culture of Mr. Williams throat, examined Mr. Williams' left leg and foot and recommended follow-up in 48-72 hours, sooner if worrisome symptoms manifested. None of this occurred. Making the NP's lack of action more egregious is that Mr. Williams was being treated at the main hospital in the region, with all lab equipment on site. The purpose of the aforementioned exams is to determine the source of medical need and potential intervention for the patient.

That day in the hospital Mr. Williams appeared disheveled and sickly. However, the NP breached her duty in providing care, inaccurately assessing and assuming Mr. Williams was a drug-seeking patient.

The impact of the NP's professional negligence can be seen in the enclosed Tab 4, hospital notes from Providence Regional Medical Center Evert. On November 3, 2013, just four (4) days after his VA NP visit; Mr. Williams was in Everett, Washington to retrieve items from storage. Each day since the VA visit, unknown to him, the infection grew until it crippled Mr. Williams.

Upon admittance into Providence Regional Medical Center, Mr. Williams' white blood cell count had spiked to forty three thousand two hundred (43,200). On 10/30 if the VA NP had ordered a complete blood count the lab results would have revealed that Mr. Williams needed immediate medical intervention to address the growing infection in his body and would have postponed his cross-country travel. Further, by 11/03, the bacterial infection had become so aggressive that it was difficult to assess, causing intense suffering for Mr.Williams. Physically, his leg had swollen so large that he could no longer walk. Also noted in Providence Medical Center records is that Mr. Williams states he advised the VA NP about the infection/issue with his left foot, but that is absent from the medical notes of the VA NP.

Due to a need for advanced medical care and surgical expertise on 11/03 a transfer recommendation was submitted for Mr. Williams to be transferred to Harborview Medical Center.

www.hamlawus.com

VA0086



## Hammel Law

*9701 Apollo Drive • Suite 301 • Largo, MD 20774 • Phone: (240) 393-4935 • Fax: (240) 334-4848*

Notes from Harborview Medical Center are enclosed in Tab 5. At Harborview Medical Center it was discovered that Mr. Williams had such significant swelling and was showing signs of overall body infection that the plan of care to save Mr. Williams' left leg was to perform a fasciotomy procedure. During the fasciotomy the medical staff made four (4) large incisions on said area; ultimately the efforts saved Mr. Williams' limb. Additionally, the muscle mass in Mr. Williams' Page | 4 left leg coupled with his stellar health, were both significant factors in him being able to keep his left leg.

To address pain management at Harborview Medical Center the medical staff treated Mr. Williams with narcotic medication to include Morphine and Roxicodone. Due to the extensive signs of sepsis and potential life threatening consequences from the unknown and uncontrolled infection, Mr. Williams was prescribed a cocktail of antibiotics. They were: Clindamycin, Levofloxacin, Penicillin G, and Vancomycin.

**The 11/08 notes from the Harborview Medical Center's infectious disease team assist with developing the inference that if the VA NP had properly assessed Mr. Williams' complete blood count, she would have been sufficiently equipped to develop a treatment plan which would have significantly mitigated the impact of Mr. Williams' infection; rather than just negligently ordering a script that did not arrest the growth of the infection. Moreover, the VA's NP incompetence and lack of follow-up are the direct and proximate cause of the injuries suffered by Mr. Williams.**

On 11/14/2013, after the bacterial infection was eradicated from Mr. Williams' body and his condition was stable he was discharged from Harborview Medical Center. Post being released from Harborview Medical Center, Mr. Williams could not immediately travel. Thus, he incurred hotel expenses while staying in Washington State. In addition, during this time Mr. Williams suffered in extreme pain. Photos of Mr. Williams left leg and foot post release are enclosed in Tab 6.

*The VA's departure from the standard of care is the sole and proximate cause of the bodily injury sustained by Mr. Williams and the permanent limitations of his limited physical condition. If the VA's NP would have followed protocol Mr. Williams condition could have been timely evaluated and better managed with early medical interventions preventing the infection from spreading and growing. Thus, preventing Mr. Williams from being hospitalized, enduring pain and suffering, and permanent physical change.*

### DAMAGES AMOUNT OF CLAIM

Upon returning to Maryland Mr. Williams was under the care of the medical staff at the VA. Mr. Williams underwent months of physical therapy and substantial wound care. Even with all of

www.hamlawus.com



**Hammel Law**

*9701 Apollo Drive • Suite 301 • Largo, MD 20774 • Phone: (240) 393-4935 • Fax: (240) 334-4848*

the treatments the permanency and debilitating impact of Mr. Williams' injuries will only increase as he ages. Every evening Mr. Williams has swelling in his ankle and foot area. He wears a compression stocking to mitigate pain and swelling. The bodily injured suffered by Mr. Williams is a direct result of the negligence of the VA's NP.

Page | 5

Further, Mr. Williams has developed neuropathy resulting from the swelling and compression of nerves in and around his ankle and foot. As Mr. Williams ages his mobility will be limited and his career options reduced. Moreover, his plan of becoming a personal fitness trainer is not an option and does appear to be long-term proposition.

Mr. Williams total medical expenses were sixty two thousand and sixty-three dollars ($62,063.00 USD) with sixteen thousand dollars ($16,000.00 USD) from Providence Health and Services and forty five thousand dollars ($45,000.00 USD) from Harbor View Medical Center. See medical bills enclosed in Tab 7. Moreover, Mr. Williams incurred hotel expenses and was not able to work for six (6) months post his procedures in Washington. Most importantly for the rest of Mr. Williams' life he will have to suffer from the vestiges of the negligence of the VA. His career options are limited and he will not be able to enjoy his passion of working out and training others.

There is no precise way to monetize or determine appropriate relief for Mr. Williams. However, as a guide, our office has researched jury verdicts and settlements for medical malpractice and personal injury actions in the District of Columbia. Juxtaposing our research to the tragic circumstances in this matter, including but not limited to the near loss of life, personal injury, pain and suffering, medical expenses, and lost wages, we request a tender of *one million seven hundred fifty thousand dollars ($1,750,000.00 USD)*, as full and final payment of all claims arising from this matter for both Mr. Williams.

Please give this matter your immediate attention. If you have any questions, or need further information to evaluate this demand, contact our office. Finally, please contact our office to confirm receipt of the enclosed.

Respectfully Submitted,

| | | | |
|---|---|---|---|
| Mr. Damond Williams | 10/01/2015<br>Date | André T. Hammel, Esq. | 10/01/2015<br>Date |

andre.hammel@hamlawus.com
Counsel for Mr. Damond L. Williams

ATH/tjm | Enclosures

VA0088

# EXHIBIT  F

August 15, 2018
Fernando Porter, MD
Board Certified Family Medicine
12158 Central Ave
Mitchellville, Maryland 20721
404-514-9335

## EXPERT OPINION FOR DAMOND L. WILLIAMS

### Federal Case No.: Civil Action No. 16-2062

My office was retained by attorney Andre T. Hammel to review the negligence claim

by Mr. Damond L. Williams ("Mr. Williams") against the Veteran's Affairs

Administration, with emphasis focused on the departure from the acceptable

standards of care evidenced by nurse practitioner Ms. Marguerite McGarrah (NP

McGarrah") that occurred on October 30, 2013.

### Background:

Mr. Williams is a forty three (43) year old man born on                        At

the time of event, which is the basis for this letter, he was thirty-eight (38) years of

age. Mr. Williams health prior to the October 30, 2013 encounter would be

considered excellent. He was and still is a non-drinker, non-smoker, non-illicit drug

user, who exercised regularly and worked as a personal trainer. He also had just prior

to the encounter, participated in an obstacle course race where he traversed up and

down a number of hills, cross bodies of water, among other physical task over a 12 to

13 mile course.  On October 30, 2013, except for the pain he was experiencing with

swallowing and while walking, was seen by NP McGarrah.

## Medical Records and Notes Reviewed to Establish Basis of Opinion:

- Veterans Affairs Treatment Notes

- Providence Medical Regional Center Notes

- Harbor Medical Center Treatment Notes

- Pictures of Mr. Williams Post Operative Procedures

### Basis of Findings:

It is noted in NP McGarrah's  treatment notes that on October 30, 2013, Mr.

Williams presented with right sided neck swelling and puffiness extending Down to

the level of the thyroid. There is no mention during the encounter of any ambulation

abnormalities.  NP McGarrah performed an oral examination and did not find any

physical findings that suggested that the patient would suffer from dysphasia,

shortness of breath, or infectious cause. Here it appears that NP completed her

clinical assessment of MR. Williams without evaluation of his lower extremities,

which was part of his presenting complaint. Mr. Williams states that he arrived to the

visit with a cane because he needed ambulatory assistance due to swelling in his left

foot. NP McGarrah's notes does not indicate or mention the swelling, indicate that

there was ambulatory dysfunction, or the fact that he walked in with a cane.


On November 3, 2013, four days after being evaluated at the Veterans Affairs

Center in Washington DC, Mr. Williams presented to Providence Regional Medical

Center due to complications of his left foot swelling. His white blood cell count at

that time was recorded at 43,200 and was found to have a severe cellulitis that

extended from the foot up to the level of the thigh. Laboratory testing also found him

to have acute renal insufficiency, elevated bilirubin levels, and rhabdomyolysis

(evidence of severe muscle cell death). His evaluation also included an MRI which

showed severe cellulitis, myositis of the distal gastrocnemius, medial soleus, and

lateral aspect of the peroneal musculature, and early abscess formation of the anterior

lateral compartment for the subcutaneous tissue. The sum of his myositis findings on

MRI was found to be necrotizing fasciitis. Necrotizing fasciitis is considered to be a

life threatening medical problem if not addressed in a timely fashion. Delays in

treatment of necrotizing fasciitis often times result in a chronic decrease in overall function, neurological dysfunction, amputation of the extremity, sepsis, and death. Mr. Williams was evaluated, admitted, and started on high rate IV fluids and IV antibiotics by the hospitalist, infectious disease, and orthopedic surgery teams; who ultimately determined that this particular case exceeded their the scope of practice. Mr. Williams at this time was transferred to Harborview Medical Center.

Upon arrival to the Harborview Medical Center, Mr. Williams underwent a fasciotomy procedure within several hours of his admission to his left leg due to is loss of function of his left lower extremity, the severity of its appearance, and lack of improvement after IV antibiotic administration. After surgery he was admitted into the ICU and administered broad spectrum antibiotics and continued High rates of IV fluids. After this surgical procedure Mr. Williams healed very well with appropriate treatment and was discharged to home after seven days of hospitalization. After his discharge and an additional five days of antibiotics treatment he was finally clear of his left lower extremity cellulitis on November 15, 2013.

**Findings of Negligence:**

As mentioned earlier, Mr. Williams health prior to the October 30, 2013 encounter would be considered excellent. He was and still is a non-drinker, non-smoker, non-illicit drug user, who exercised regularly and worked as a personal trainer. He also had just prior to the encounter participated in an obstacle course race where he traversed up and down a number of hills, cross bodies of water, among other physical task over a 12 to 13 mile course.

When Mr. Williams presented to the VA clinic with a cane and swelling of his jaw, a more thorough exam should have been performed and documented. Based on the documentation from the encounter on October 30, 2013 treatment for a dental abscess was given with no mention of his lower extremity. Standard of care for evaluation and treatment of cellulitis at minimum, would have been to evaluate the extremity or area of concern with a history and physical exam consisting of, but not limited to, the appearance of the skin, observation of fluid collection, color and collection of fluid for culture if drainage was present, temperature of the skin compared to other areas, sensation and laboratory testing. In addition to not practicing within the standard of care there were no follow-up instructions given to advise Mr. Williams if or when to come back if he were to have complications, worsening symptoms, or incomplete/poor response to the treatment given.

If NP McGarrah would have performed even some of the aforementioned exams or test to the lower extremity, or followed up via phone or in person with Mr. Williams, the chances of earlier detection, treatment, and reduce suffering would have been improved for Mr. Williams. It is very likely that if a lower extremity exam had been properly performed, evaluated, and treated with the proper spectrum antibiotics, that Mr. Williams would not have had to undergo life-saving medical treatment that has left him with a career ending outcome (as a personal trainer) due to a significantly decreased physical capacity, overall decrease in quality of life, chronic leg swelling, extremity and joint pain, and neurological dysfunction. It is also not out of the realm of unreasonable thought that a person in a lesser physical condition would not have survived this severe of an infection.

NP McGarrah's personal bias of antibiotic abuse and departure from the standard of care is the direct cause of the life-threatening and continued life altering injuries suffered by Mr. Williams. If a proper evaluation/physical exam was performed and a proper selection of antibiotics was made, or request for follow up was made; it is very likely that Mr. Williams would not have had to undergo such extensive treatments and procedures. Due to the injuries sustained from the October

30th, 2013 encounter, Mr. Williams will not likely fully recover from this unfortunate
event and will not be able to return to his full physical pre-injury shape.

"I hold all my opinions with a reasonable degree of medical probability. This report is
not intended to be complete or final statement of my opinions, and I reserve the right
to expand, modify, or otherwise amend my opinions as the discovery process
proceeds. I do not spend more than 10% of my professional activities directly related
to testimony in personal injury cases."

Fernando A. Porter, M.D.

8/15/18
Date

# Fernando A. Porter, M.D.

12158 Central Ave, Mitchellville, MD 20721
T 404-514-9335    F 301-430-2750
Porter_fernando@bellsouth.net

## EDUCATION

**Florida State University College of Medicine; Tallahassee, FL — 2010**
*Doctor of Medicine*

**Florida State University College of Medicine; Tallahassee, FL    2006**
*Bridge Baccalaureate Program*

**Florida A&M University (FAMU); Tallahassee, FL — 2005**
*Bachelor of Science: Biology Pre-Medicine (Cum Laude)*

## EXPERIENCE

### Physician, Medstar Health; Mitchellville MD — 2014-Present

Full-time physician providing level 3 patient centered medical home primary care services to the Mitchellville, Bowie, Upper Marlboro, Washington DC, and surrounding areas. In addition to providing routine primary care services, provides joint injections, arthrocentesis and radiography readings, cryotherapy procedures, cyst removals, skin biopsies, and incision and drainage procedures. Serves the site EMR superuser and a beta tester for advancements with in the Medstar Health system.

### Physician, Doctor on Demand; San Francisco, CA — 2016-Present

Part-time physician providing telemedicine care to patients in 14 states. Delivers easy, face-to-face consultations via computers or mobile devices to patients with basic ambulatory care needs and some chronic care needs.

### Medical Director, Life Ambulance; Atlanta, GA — 2015-Present

Serves as Medical Director for a private BLS and ALS Emergency Medical Service company. Provides medical oversight of EMS, actively directs and leads the clinical performance of the Life Ambulance EMS, and has the ultimate clinical authority on executed clinical guidelines, rules, procedures, and medications used given the current evidence based practices.

### Physician, Medstar Prompt Care; Washington D.C.    2013-Present

Provider of ambulatory services for patients with urgent needs that do not require emergency care. Identifies who needs emergent or specialty care and directs or refers to the appropriate modality of care, if needed. Performs outpatient procedures such as joint injections, arthrocentesis, radiography readings, cryotherapy, cyst removals, skin biopsies, laceration repairs, and, incision and drainage procedures. Supervises practicing physician assistants and nurse practitioners.

### Resident Physician, Chestnut Hill Hospital; Philadelphia, PA — 2010-2013

Chestnut Hill Family Practice Residency Program serves as a level 3 patient centered medical home to Philadelphia and Montgomery County communities.     As a senior resident responsibilities

included supervising and assisting residents, interns, and medical students in outpatient procedures, and patient management in both inpatient and outpatient settings. Served as a resident team physician for the LaSalle University's men and women's basketball teams, proficiently administering sports physicals. Consistently demonstrate the ability to perform joint injections, arthrocentesis and radiography readings. Also, routinely perform cryotherapy, cyst removals, skin biopsies and incision and drainage procedures.

**Teachers Assistant, Florida State University; Tallahassee FL — 2007**
Assisted the head professor in the subject of Gross Anatomy. Responsible for demonstrating daily dissections, ensuring that students could identify various body parts and structures.

## RESEARCH EXPERIENCE:

**Summer Intern, National Biomedical Research Institute; Atlanta GA — 2003**
Proficient in the experimental procedures of immunohistochemistry
Basic knowledge of functions of the Suprachiasmatic Nucleus and the neurotransmitter Serotonin

**Bridge Program Research, Florida State University College of Medicine; Tallahassee FL — 2006**
Pain management in Sickle Cell Patients
Subjective survey of weather or not the treatment of pain was adequately treated in sickle cell patient from the patient's perspective.

## CERTIFICATIONS AND ACTIVE LICENSERS

**American Board of Family Medicine Board Certified** – *2013- Present*

| | |
|---|---|
| Washington DC – 2013-Present | Virginia – 2017-Present |
| Maryland 2013-Present | West Virginia 2016-Present |
| Georgia 2015-Present | Ohio 2016-Present |
| Florida 2016-Present | Tennessee 2016-Present |
| North Carolina – 2016-Present | Arkansas 2017-Present |
| South Carolina 2016-Present | New Hampshire 2017-Present |
| Kentucky 2016-Present | |

Basic Life support – 2005 - Present
Advanced Life Support 2007 - Present

## PROFESSIONAL & CIVIC MEMBERSHIPS REFERENCES

General Member, AmericanAcademy of Family Physicians – 2006-Present
General Member; Alpha Phi Alpha Inc. – 2006-Present

# EXHIBIT  G



HARBOR COURT OFFICE BLDG.
575 S. CHARLES ST., SUITE 200
BALTIMORE, MARYLAND 21201
(410) 727-3615 PHONE
(410) 752-8430 FAX

ALLAN H. MACHT, M.D.
(1924 - 2007)
ROBERT W. MACHT, M.D.
GENERAL SURGEON
CERTIFIED INDEPENDENT MEDICAL EXAMINER
JOSHUA B. MACHT, M.D.
BOARD CERTIFIED IN INTERNAL MEDICINE
CERTIFIED INDEPENDENT MEDICAL EXAMINER

January 9, 2018

## EXPERT OPINION FOR DAMOND L. WILLIAMS
### Federal Case No.: Civil Action No. 16-2062

My office was retained by attorney André T. Hammel to review the negligence claim by Mr. Damond L. Williams ("Mr. Williams") against the Veteran's Affairs Administration, with emphasis focused on the departure from the acceptable standards of care evidenced by nurse practitioner Ms. Marguerite McGarrah (NP McGarrah") that occurred on October 30, 2014.

### Background:

Mr. Williams is a forty one (41) year old man born on ▇▇▇▇▇▇▇▇▇▇   At the time of event, which is the basis for this letter, he was thirty-eight (38) years of age. It is stated that Mr. Williams was a non-smoker of tobacco or other products, did not use drugs, or consume alcohol.   On October 30, 2014, except for the pain he was experiencing with swallowing and walking, when Mr. Williams was seen  by NP McGarrah he was seemingly in overall good health for a man of his age.

1



HARBOR COURT OFFICE BLDG.
575 S. CHARLES ST., SUITE 200
BALTIMORE, MARYLAND 21201
(410) 727-3615 PHONE
(410) 752-8430 FAX

ALLAN H. MACHT, M.D.
(1924 - 2007)
ROBERT W. MACHT, M.D.
GENERAL SURGEON
CERTIFIED INDEPENDENT MEDICAL EXAMINER
JOSHUA B. MACHT, M.D.
BOARD CERTIFIED IN INTERNAL MEDICINE
CERTIFIED INDEPENDENT MEDICAL EXAMINER

## Medical Records and Notes Reviewed To Establish Basis of Opinion:

·   Veterans Affairs Treatment Notes

·   Providence Medical Regional Center Notes

·   Harborview Medical Center Treatment Notes

·   Pictures of Mr. Williams post procedures

## Basis of Findings:

It is noted in NP McGarrah's primary care treatment notes that on October 30, 2014, Mr. Williams had right neck swelling with puffiness extending to his thyroid without mention of ambulation difficulties. NP McGarrah's performed an in office oral examination but found no remarkable findings indicating the cause of the discomfort. Here it appears that NP completed her clinical assessment of Mr. Williams without mention of concurrent swelling. Mr. Williams states that he arrived to the visit with a cane because he needed ambulatory assistance due to swelling in his left foot. NP McGarrah's notes do not indicate or mention the swelling in Mr. William's left foot or that he had any ambulatory limitations.

NP McGarrah completed her treatment of Mr. Williams by providing him with patient education on medication and renewed Mr. Williams' antibiotic prescription.



HARBOR COURT OFFICE BLDG.
575 S. CHARLES ST., SUITE 200
BALTIMORE, MARYLAND 21201
(410) 727-3615 PHONE
(410) 752-8430 FAX

ALLAN H. MACHT, M.D.
(1924 - 2007)
ROBERT W. MACHT, M.D.
GENERAL SURGEON
CERTIFIED INDEPENDENT MEDICAL EXAMINER
JOSHUA B. MACHT, M.D.
BOARD CERTIFIED IN INTERNAL MEDICINE
CERTIFIED INDEPENDENT MEDICAL EXAMINER

Four days later Mr. Williams was admitted to Providence Regional Medical Center due to complications from his infection which increased his white blood cell count to forty-three thousand two hundred (43,200).   The Providence Regional Medical Center notes states that Mr. Williams advised his Veteran's Affairs care provider (NP McGarrah) of the swelling in his left foot but again that is absent from NP McGarrah medical treatment notes.

On November 3, 2014 Mr. Williams care and treatment had exceeded the scope of the expertise of the practitioners at Providence Regional Medical Center, so Mr. Williams was transferred to Harborview Medical Center.  At Harborview Medical Center Mr. Williams underwent a  fasciotomy procedure in attempt to save his left lower extremity.  The swelling was so great in Mr. Williams' left leg that he was no longer ambulatory.  Moreover, the infection in his body had progressed so that the infectious disease medical staff at Harborview Medical Center could not determine causation.  For pain management Mr. Williams was being treated with Morphine and Roxicodone. On November 14, 2014, the bacterial infection Mr. Williams was suffering from was finally controlled.



HARBOR COURT OFFICE BLDG.
575 S. CHARLES ST., SUITE 200
BALTIMORE, MARYLAND 21201
(410) 727-3615 PHONE
(410) 752-8430 FAX

ALLAN H. MACHT, M.D.
(1924 - 2007)
ROBERT W. MACHT, M.D.
GENERAL SURGEON
CERTIFIED INDEPENDENT MEDICAL EXAMINER
JOSHUA B. MACHT, M.D.
BOARD CERTIFIED IN INTERNAL MEDICINE
CERTIFIED INDEPENDENT MEDICAL EXAMINER

### Findings of Negligence

Mr. Williams being in fair health presenting with a cane on October 30, 2014, and swelling in his jaw should have triggered NP McGarrah to go beyond her oral examination since her findings were unremarkable. Standard of care is to obtain minimal labs and warranted cultures, start treatment and to followup with the patient. It is appropriate to collaborate with another colleague as well. And if the patient exam / clinical findings exceed the scope of a primary care setting, then a patient is to be referred for full urgent/emergent evaluation. A throat culture of Mr. Williams or complete blood count lab should have been performed by NP McGarrah. Moreover, NP McGarrah should have advised Mr. Williams to come back for a follow-up visit.

If NP McGarrah would have performed the aforementioned exam or test or followed up via phone or in person with Mr Williams, the chances of earlier detection, expeditious treatment and reduced suffering would have been improved for Mr. Williams. More importantly, if it had been detected at that stage by NP McGarra, Mr. Williams would not have had to undergo life-saving medical treatments and he would not have existing nerve damage and chronic swelling due to the life

4



HARBOR COURT OFFICE BLDG.
575 S. CHARLES ST., SUITE 200
BALTIMORE, MARYLAND 21201
(410) 727-3615 PHONE
(410) 752-8430 FAX

ALLAN H. MACHT, M.D.
(1924 - 2007)
ROBERT W. MACHT, M.D.
GENERAL SURGEON
CERTIFIED INDEPENDENT MEDICAL EXAMINER
JOSHUA B. MACHT, M.D.
BOARD CERTIFIED IN INTERNAL MEDICINE
CERTIFIED INDEPENDENT MEDICAL EXAMINER

saving procedures that occurred at Providence Regional Medical Center and Harborview Medical Center.

NP McGarrah's negligence in providing care Mr. Williams is the direct cause of the extensive injuries suffered by Mr. Williams.  Again, if the infection had been detected earlier, by proper examination and  testing, Mr. Williams' would not have had to undergo such extensive treatments and procedures.  To determine the long term impact on Mr. Williams health an independent medical exam should be performed.

"I hold all of my opinions with a reasonable degree of medical probability. This report is not intended to be a complete or final statement of my opinions, and I reserve the right to expand, modify or otherwise amend my opinions as the discovery process proceeds.  I do not spend more than 20% of my professional activities directly related to testimony in personal injury cases."

Robert W. Macht, M.D.

1/9/18

Date

5

HARBOR COURT OFFICE BLDG.
575 S. CHARLES ST., SUITE 200
BALTIMORE, MARYLAND 21201
(410) 727-3615 PHONE
(410) 752-8430 FAX



**MACHT MEDICAL**
— G R O U P —

ALLAN H. MACHT, M.D.
(1924 - 2007)
ROBERT W. MACHT, M.D.
GENERAL SURGEON
CERTIFIED INDEPENDENT MEDICAL EXAMINER
JOSHUA B. MACHT, M.D.
BOARD CERTIFIED IN INTERNAL MEDICINE
CERTIFIED INDEPENDENT MEDICAL EXAMINER

Curriculum Vitae

## Robert W. Macht, M.D.

**Contact Information**

| | |
|---|---|
| Business Address | Macht Medical Group |
| | 575 S Charles Street Suite 200 |
| | Baltimore, MD 21201 |
| Office Phone | 410-727-3615 |
| Office Fax | 410-752-8430 |

**Specialty**           General Surgery and Independent Medical Examinations

**Board Certification**

| | |
|---|---|
| 2005-Present | American Board of Independent Medical Examiners |
| 1985-2006 | American Board of Surgery |

**Licensure**

| | |
|---|---|
| 1979-Present | Maryland Board of Physicians |

**Education**

| | |
|---|---|
| 1978-1983 | General Surgery Residency |
| | Sinai Hospital of Baltimore |
| 1974-1978 | University of Maryland School of Medicine |
| 1971-1974 | Boston University |

**Staff Privileges**

Sinai Hospital of Baltimore
Northwest Hospital Center

**Medical Societies**

American Medical Association
Baltimore City Medical Society
Maryland Chirurgical Society

# EXHIBIT  H

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                              :

DAMOND LEE WILLIAMS,         :

                            :

         Plaintiff,     :   Civil Action No.

                            :   16-2062 (EGS)

     v.                  :

                            :

U.S. DEPARTMENT OF VETERANS    :

AFFAIRS, et al.,          :

                            :

         Defendants.    :

                            :

- - - - - - - - - - - - - - - - x

Washington, D.C.

Monday, March 4, 2019

Deposition of:

FERNANDO PORTER, M.D.

a witness of lawful age, taken on behalf of the Defendants

in the above-entitled action, before Nate Riveness, Notary

Public in and for the District of Columbia, in the Office of

the United States Attorney, 501 Third Street, N.W.,

Washington, D.C. 20005, commencing at 1:58 p.m.

Diversified Reporting Services, Inc.

(202) 467-9200

APPEARANCES:

On Behalf of the Plaintiff:

ANDRE T. HAMMEL, ESQ.

Hammel Law LLC

9701 Apollo Drive, Suite 301

Largo, Maryland  20774

andre.hammel@hamlawus.com


On Behalf of the Defendants:


PAUL CIRINO, ESQ.

Assistant United States Attorney

Civil Division

U.S. Attorney's Office for the District

  of Columbia

555 Fourth Street, N.W.

Washington, D.C.  20530

(202) 252-2529

paul.cirino@usdoj.gov


Also Present:


Damond Lee Williams, Plaintiff

1    ask you to guess or speculate.  You know, if you don't know,

2    we'll make --

3         A    I mean --

4         Q    Give us your best estimate, but I don't want you

5    guessing or speculating.  Is that understood?

6         A    Okay.  Yeah.  I was going to say, yeah, based on

7    when I completed my report, it was in -- I believe it was in

8    August of 2018.

9         Q    Okay.

10        A    Yeah.  yeah.  August of 2018.

11        Q    And what was the nature of the questions that you

12   had after taking a first look at the file?

13        A    So based on looking at the file, there was one set

14   of documentation that did not go along with the

15   hospitalization.  And so my questions pertained more to what

16   his side of the story was and what his presenting complaint

17   was when he actually went to this acute care facility to be

18   seen.

19        Q    Okay.  Tell me what you meant when you said that

20   there was one set of documents that didn't go along with

21   something else.  I don't understand.

22        A    So the document here only refers to part of what

23   his complaint was, and that's after -- after hearing his

24   side of it.  And that kind of filled in the gaps between

25   what was omitted from care and his actual hospitalization.

1      Q    I see.  So you felt that there was a gap in the

2   information that you had been provided.

3      A    Yes.

4      Q    Okay.  And based on that information gap, you

5   wanted to speak with the Plaintiff.

6      A    Correct.

7      Q    And you did speak with the Plaintiff.

8      A    I did.

9      Q    Okay.  Do you recall when that conversation took

10   place?

11          MR. HAMMEL:  Objection.  Asked and answered.

12          You can answer the question.  Go ahead.

13          THE WITNESS:  I do not.

14          BY MR. CIRINO:

15      Q    And do you recall some of the questions you asked

16   the Plaintiff, Mr. Williams?

17      A    Not exactly.  I do recall asking him, you know,

18   tell me your story.  And I asked him specifically were there

19   any injuries that occurred between the time that he was seen

20   and the time that he actually went to the hospital.  Those

21   two questions I do remember asking.

22          We did review his -- his general health prior to

23   any of his current.  We did review his social history, his

24   past medical history.  And I remember that based on my

25   documentation from my -- my review.

1    **Q    Okay.  And why was it important to you to have the**

2    **Plaintiff tell his story?**

3    A    Well, it did not appear that, again, based on his

4    hospitalization and his -- his acute care -- his acute care

5    visit at the VA, it didn't appear that the entire story was

6    presented to me in his file.

7    **Q    And why not?**

8    A    The extent of his injuries and the extent of the

9    hospitalization would have had to amount to a very tragic

10   injury between the time of his acute care visit and his --

11   and his hospitalization.  And so the likelihood that this

12   didn't exist prior to, or something didn't exist prior to,

13   was -- was suspicious to me.  So it made me ask more

14   questions about, was there anything that had been going on

15   before the visit that occurred?

16   **Q    And in addition to questioning Mr. Williams, did**

17   **you ask questions of anybody else in connection with trying**

18   **to fill in these gaps?**

19   A    I did not.

20   **Q    Why not?**

21   A    In health care, when you are documenting, for

22   legal purposes, for reviewing purposes, for handing off

23   purposes from one physician to the next, your documentation

24   is the most important form of communication.  And that's --

25   I guess the lack thereof is what led me to ask more

1       Q    What new information would be presented to you?

2  Do you have something in mind?

3            MR. HAMMEL:  Objection, Your Honor.  That calls

4  for speculation.  We need a Judge right here.  I keep saying

5  Your Honor.  Bad habit.  So you answer the question.

6            THE WITNESS:  I'm sorry.  Say it one more time?

7            BY MR. CIRINO:

8       Q    The question was:  are you expecting any new

9  information to come about?

10      A    I am not.

11      Q    Okay.  And I accept -- I accept that that's your

12  position, that if new information comes you expect to look -

13  - have the opportunity to look at it again.  Does your

14  report contain the facts or data that you considered in

15  forming your opinions?

16      A    Yes.

17      Q    And does the document in the back, which looks

18  like your resume, is that a list of your qualifications?

19      A    That is correct.

20      Q    Okay.  Now, do you have any publications that you

21  have authored in the past 10 years?

22      A    No, sir.

23      Q    And it's correct that you have not testified

24  previously as an expert at trial or at a deposition?

25      A    That's correct.

1     Q    Now, in preparation for this deposition, what did

2 you do?

3     A    I reviewed the file.  I -- probably another two or

4 three times.  I reviewed my documentation, and that was it.

5 I spoke with I guess someone from your office and someone

6 from Attorney Hammel's office, and I was afforded the copy

7 of the Defendant's expert witness, reviewed his opinion, his

8 or her opinion, and that was it.

9     Q    Okay.  And when did you receive the Defendant's

10 expert's opinion -- report?

11     A    About 10 days ago.

12     Q    And you've never been qualified as an expert by a

13 court or a tribunal?

14     A    Tribunal?  What is --

15     Q    It could be an administrative court or some other

16 adjudicative panel would be a tribunal.

17     A    That would be correct.

18     Q    Okay.  Now, you have -- have you met Mr. Williams

19 before today?

20     A    I have not.

21     Q    So you have not evaluated Mr. Williams' medical

22 condition?

23     A    When you say, "I have not evaluated his medical

24 condition," what do you mean by that?

25     Q    Well, good question.  I was getting at, have you

1  deal with infections of urinary tracts.  I deal with

2  infections of genitals.  I deal with infections of eyes.

3  And, on a rare occasion, infections of the neurological

4  system.

5       Q    Okay.  What if we take from the 20 to 30 percent,

6  and what if I ask you what percentage of your practice is

7  dedicated to infections on the skin?

8       A    I don't know that I can answer that question, just

9  simply because it was just -- I mean, I see quite a few

10 patients.  I'm not real sure --

11      Q    Okay.

12      A    -- how to guesstimate that.

13      Q    All right.  It's not -- well, it -- I mean,

14 roughly half of all infections would be skin infections, or

15 is it some more or some less?

16      A    Again, I couldn't -- that would be speculation on

17 my part.

18      Q    Well, I definitely don't want you to speculate.

19 And have you ever diagnosed a patient with cellulitis?

20      A    I have.

21      Q    How many?

22      A    Too many to count.  I don't know the exact number.

23      Q    Okay.  And have you ever diagnosed a patient with

24 fasciitis?

25      A    I have.

 1      Q    Okay.  How many?

 2      A    At least four.

 3      Q    And of the four, how many were necrotizing?

 4      A    All of them.

 5      Q    And have you ever treated a patient with

 6  necrotizing fasciitis?

 7      A    I have assisted with the treatment.  However, the

 8  direct treatment is beyond my scope of practice.

 9      Q    And how did you assist with the treatment?

10      A    I made the diagnosis, and I referred to a

11  specialist.

12      Q    Okay.  Now, the reference in your resume in the

13  first paragraph to incision and drainage procedures I see is

14  repeated a few times.  It's in the -- it's in the fourth

15  paragraph pertaining to the MedStar prompt care.

16      A    That's correct.

17      Q    And then it's in the following paragraph regarding

18  your formal work at --

19      A    That's correct.

20      Q    -- Chestnut Hill Hospital.  Was your discussion of

21  what that involves, is that the same for each of those, or

22  are there differences in some of these three positions?

23      A    I'm sorry.  Say it one more time.

24      Q    You've testified about what you meant by the

25  phrase "incision and drainage procedures."

1       Q       First of all, what was the mouth pain that was

2   complained of?

3       A       He complained about difficulty with swallowing.

4       Q       Okay.  What did --

5       A       And throat pain.

6       Q       Forgive me for interrupting.  What did the nurse

7   practitioner do in response to that complaint?

8       A       She did an oral exam and neck exam, and based on I

9   guess -- I'm not really sure.  But based on -- she had

10  normal findings of the mouth, which is what is documented,

11  and an abnormal neck exam, or an exam that is not normal

12  based on her documentation of the neck.

13              And her, then, assessment of it was to give

14  penicillin, and I'm not sure for what reason.

15      Q       Okay.

16      A       Because that's not necessarily accurately depicted

17  as to why based on her physical exam findings.

18      Q       Okay.  All right.  Same question with regard to

19  the foot.  So he complains of foot pain.  What is the

20  situation with the foot?

21      A       What's the situation?  I don't -- I don't --

22      Q       What's going on with the foot that needs to be

23  addressed in your view?

24      A       Just to look at it, examine it.  I'm not saying

25  that -- I'm not saying that she -- I'm not saying that she

1   would have been able to directly address that issue, or,

2   excuse me, I'm not saying that she would have been able to

3   do surgery if that were needed, but just examine it would

4   have --

5       **Q    You mean you wanted the nurse practitioner to have**

6   **the Plaintiff take off his shoes and socks and have her look**

7   **at it.**

8       A    Yes.

9       **Q    Okay.  Do you have any issue with -- well, strike**

10  **that.**

11          MR. CIRINO:  Okay.  Well, I think I have no

12  further questions at the moment.  Thank you for coming, Dr.

13  Porter.  I appreciate your time.

14          THE WITNESS:  Thank you.

15          MR. CIRINO:  And now we should go off the record,

16  so I can make a copy of an exhibit for counsel.

17          MR. HAMMEL:  And, counsel, pardon me.  Just two,

18  since you've rested now.

19              EXAMINATION BY COUNSEL FOR PLAINTIFF

20          BY MR. HAMMEL:

21      **Q    All right.  Dr. Porter, good afternoon.  You**

22  **stated earlier that you, in speaking with Mr. Williams, you**

23  **inquired about what happened between the VA visit on the**

24  **30th and his admission into the hospital, in Providence.**

25  **Why did you inquire about those days in between?**

# EXHIBIT I

Fernando Porter, MD
FEDERAL CASE NO: 16-2062

## August 3rd 2018
## Patient History:

-38 yo at the time of the event
- eval done at the Washington DC VA with a cc of painful/difficulty swallowing, throat pain, subjective fevers, foot pain, and difficulty walking (had been using his mothers cane days prior to his presentation).
- Had taken anti-inflammatory to help with pain prior to presentation but was found to be ineffective.
- Called VA acute care office and was told he needed to be seen for treatment.
- 2 weeks prior to the presentation participated in an obstacle course race in WVa.
- Also had a dental procedure (root canal) prior to the presentation
- Pt states that his provider's disposition aggressive was accused of "drug seeking". Also states that he did not have a complete oral and throat exam (no otoscope, ophthalmoscope, or other source of light was used to evaluate his throat).
-PT states that his foot was not examined at all despite that being a part of his complaint. The left foot was said to be red, swollen, and had a blister present.
- He states that he was discharged with antibiotics and told to follow up with his dentist and given a lecture about antibiotic abuse.
- He began to take the medication which he states was not effective in reducing his symptoms of his lower extremity.  He thought that he needed more time for the medication to be effective for his leg and continued to press on with his travel plans to Seattle Washington.  Prior to his travel, the patient reports no further trauma, or medical evaluations prior to his arrival to Seattle.  On his arrival to Seattle Wa, He felt worse and immediately proceeded to the hospital where he was found to have a significant cellulitis of the left lower foot and extremity.
- He was treated, had several surgeries (pre, intra, and post hospital noted detail care rendered), completed several months of physical therapy, and has over the years since his treatment has had issues, with numbness, and sharp shooting/ aching pain, swelling of the lower ext, difficulty with running (limited in ability), exercising, standing in the left lower extremity.

## Social History :
-   Air Force Veteran (retired)
-   Personal Trainer (prior to event)
    o   At the time of the event the pt was said to be working towards discontinuing his service with the FAA and pursuing a career in fitness.  He had several paying clients who he trained several times weekly in addition to working out on his own regularly.
-   Currently works for FAA
-   No ETOH, Tobacco, Elicit Drug use.

## Family History:
No Family history of early coronary artery disease.

# EXHIBIT  J

**TriWest Healthcare Alliance**

# Medical Documentation Requirements

## Quick Reference Guide – All Regions

### Key Points:
- Medical documentation is required for all services provided to a Veteran under the Department of Veterans Affairs (VA) Patient-Centered Community Care (PC3) Program and the Veterans Choice Program (VCP).
- Medical documentation should be uploaded as soon as possible, but no later than 30 days from the date of service. Specific categories may require faster timelines.
- Providers located in the TriWest expansion regions (Regions 1, 2 and 4) must submit medical documentation to the authorizing VA Medical Centers (VAMC) within the VA-defined timeframes.
- Providers in Regions 3, 5 and 6 should submit medical documentation to TriWest. TriWest will then upload these documents to the VAMC.
- **NEVER** submit medical documentation with claims!

## General Medical Documentation Content Requirements:
- Providers must submit all required records to the Veteran's authorizing VAMC (Regions 1, 2 and 4) or TriWest (Regions 3, 5 and 6).
- Community Care programs in general require the initial appointment and end-of-episode-of-care documentation. However, some specialties may have additional requirements.
- If additional care is needed, providers should submit a Request for Care (RFS) or Secondary Authorization Request (SAR).
  - o If the Veteran's authorizing VAMC is scheduling care and setting appointments, then the RFS should be submitted directly to VA. This may be done via the HealthShare Referral Manager (HSRM) portal. If you cannot submit the RFS via the portal, please contact your VAMC for alternate options.
  - o If TriWest is scheduling care and setting appointments for your state, please complete a Secondary Authorization Request (SAR) form and fax this to TriWest. This applies to all of Regions 3, 5 and 6 and those locations in Regions 1, 2 and 4 where VA is not managing the appointing process. SAR forms can be downloaded from TriWest's provider portal or from TriWest's Payer Space on Availity.
  - o Please follow the Authorization Request Quick Reference Guide for more information.
- To be compliant, any faxed records must have the Veteran's unique identifiers on each page. Unique identifiers should include the following at a minimum:
  - o Veteran's name
  - o Authorization number
  - o Date of birth
  - o Last four digits of social security number
- Providers must sign and date all submitted records/reports. Signatures will be requested for noncompliant documentation.
- Depending upon your region, TriWest or VA may be contacting your for any missing documentation/health records. Document submission is a program requirement.



View a map of PC3 and VCP Regions

# Specific Medical Documentation Submission Timelines and Deadlines:

| Service | VCP and PC3 Submission Maximum Timeframe Requirements |
|---|---|
| Inpatient *(includes surgery)* | • **_30 calendar days_** after discharge<br>• Discharge summary related to the episode of care<br>• Provider will coordinate with TriWest or VA (depending upon region) to arrange necessary supplies, home health services and equipment.<br>• For **_surgery_**, also complete and submit the **VA Purchased Surgical Care Patient Outcome Form**<br>• If additional care is required, please submit a request for additional care to TriWest or the VAMC as appropriate. |
| Inpatient Rehabilitation | • Within 30 calendar days after discharge<br>• Include functional status and status change from onset of treatment through discharge<br>• Use the CMS **Inpatient Rehabilitation Facility Patient Assessment** Instrument (IRF-PAI)<br>• The IRF-PAI example can be found at: **https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS10036.pdf** |
| Outpatient Specialty Services *(includes surgery)* | • **_30 calendar days_** after the initial appointment<br>• If additional appointments are authorized, submit to TriWest within 30 days upon completion of episode of care<br>• For **_surgery_**, also complete and submit the **VA Purchased Surgical Care Patient Outcome Form** to TriWest<br>• If additional visits or procedures are required, please submit a request for additional care to TriWest or the VAMC as appropriate. |
| ***Critical Findings Category*** | • **Definition:** a test result or interpretation that, if left untreated, could be life threatening or place the Veteran at serious health risk; includes results from laboratory, cardiology, radiology and other diagnostic areas are determined to be "critical," regardless of ordering priority<br>• **_Within 24 hours_** of identification, reach point of contact at authorizing VAMC by phone<br>• Indicate the VAMC staff name (point of contact) and date/time of contact in your discharge summary<br>• After notifying VA, submit medical documentation as soon as possible, but no later than 30 days. Providers must comply with any VA request for earlier upload in order to expedite care. |
| Suicide Risk *****Critical Finding** | • **_Within 24 hours_** by phone to authorizing VAMC point of contact<br>• A newly identified suicide risk in a Veteran *not referred* for inpatient mental health should be considered a Critical Finding |

**TriWest Healthcare Alliance**

| Service | VCP and PC3 Submission Maximum Timeframe Requirements |
|---------|-------------------------------------------------------|
| Cancer Diagnosis<br>*Critical Finding* | • ***Within 48 hours*** by phone to authorizing VAMC point of contact<br>• Although less urgent, a new diagnosis of cancer should be considered a Critical Finding |
| Urgent Follow-Up/Additional Care | • ***Within 24 hours*** by phone to authorizing VAMC point of contact<br>• If provider determines urgent follow-up is needed after completion of care, OR urgent additional care needed during episode of care. |
| Pathology | • ***Within 5 business days*** of request for slides<br>• These are made available to VA for review/assessment |
| Gastroenterology Procedures | • Additional documentation for Gastroenterology procedures is required from the provider<br>• Please review the Gastroenterology Quick Reference Guide for details |
| Medical/ Radiation Oncology Services | • Additional documentation for Medical/Radiation Oncology services is required.<br>• Please review the Radiation Oncology Quick Reference Guide for details |
| Skilled Home Health Care | • ***Within 3 business days*** of start of care: submit initial assessment (OASIS)<br>• ***Within 5 business days*** of completion of episode of care: submit final discharge summary to your VAMC<br>• Please review the **Home Health Care Quick Reference Guide** for additional details |
| Inpatient Rehabilitation | • Within 30 calendar days after discharge<br>• Include functional status and status change from onset of treatment through discharge<br>• Use the CMS **Inpatient Rehabilitation Facility Patient Assessment** Instrument (IRF-PAI)<br>• The IRF-PAI example can be found at: **https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS10036.pdf** |
| Inpatient Mental Health | • Within 30 calendar days after discharge<br>• Suicide risk is a clinical issue, so the Veteran shall always be provided a written copy of their personal **Suicide Prevention Safety Plan**<br>• Please reference VA's planning manual: **http://www.mentalhealth.va.gov/docs/VA_Safety_planning_manual.pdf**<br>• The plan must include the Veterans Crisis Line telephone number, 1-800-273-8255 |

**TriWest Healthcare Alliance**

| Service | VCP and PC3 Submission Maximum Timeframe Requirements |
|---|---|
| Outpatient Mental and Behavioral Health | <ul><li>**Behavioral Health Forms** to speed submission are available online from TriWest. If requested to submit using these forms, please download them from TriWest's Payer Space within Availity or from the TriWest Provider portal (www.triwest.com/provider)</li><li>As soon as possible, but _**no less than 30 days from the session**_, an Initial Assessment and a Completion of Episode of Care (EoC) should be submitted<ul><li>If an extension or addition to authorized care/therapy is required, submit a Behavioral Health RFS (VA) or fax a SAR (TriWest) as soon as possible</li><li>With additional authorized care, VA may require ongoing Progress Summaries</li></ul></li><li>Providers **should never** submit psychotherapy process notes with contents of a private session. This is a HIPAA violation.</li><li>Providers **should** submit Clinical Progress notes. These are considered part of the Veterans medical record.</li><li>For additional documentation requirements, please read the **Mental Health Quick Reference Guide (QRG)**</li></ul> |
| Home Health and Home Infusion Therapy (HIT) | <ul><li>An initial plan of care (CMS 485) should be submitted within **three business days**</li><li>An end EoC record should be submitted within **five business days**</li><li>Infusion therapy requires nursing notes and delivery tickets that support all services and medications billed</li><li>Please refer to the **Home Health Quick Reference Guide** for additional information</li></ul> |

## What should you include in your medical records for VA or TriWest?

Minimum requirements for content of medical documentation or records, **as applicable to the care**, may include:

- An executive summary of the encounter to include any procedures performed and recommendations for further testing or follow-up (i.e. discharge summary for inpatient);
- Results of community testing or imaging such as MRI, CT scan;
- Actual results of any ancillary studies/procedures which would impact recommended follow-up such as biopsy results (i.e. positive biopsy results from EoC GI provider who recommends a follow up such as surgery); and
- Any recommended prescriptions, durable medical equipment (DME) and treatment plans.

Submission of clinical records and documentation allow VA to ensure Veterans are receiving care that is both clinically sound and cost effective. If records are not submitted, VA will contact you to ensure that these records are submitted.



View a map of PC3 and VCP Regions

# EXHIBIT  K

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

IDSA GUIDELINE

# Practice Guidelines for the Diagnosis and Management of Skin and Soft Tissue Infections: 2014 Update by the Infectious Diseases Society of America

Dennis L. Stevens,[1] Alan L. Bisno,[2] Henry F. Chambers,[3] E. Patchen Dellinger,[4] Ellie J. C. Goldstein,[5] Sherwood L. Gorbach,[6] Jan V. Hirschmann,[7] Sheldon L. Kaplan,[8] Jose G. Montoya,[9] and James C. Wade[10]

[1]Division of Infectious Diseases, Department of Veterans Affairs, Boise, Idaho; [2]Medical Service, Miami Veterans Affairs Health Care System, Florida; [3]San Francisco General Hospital, University of California; [4]Division of General Surgery, University of Washington, Seattle; [5]University of California, Los Angeles, School of Medicine, and R. M. Alden Research Laboratory, Santa Monica, California; [6]Department of Community Health, Tufts University, Boston, Massachusetts; [7]Medical Service, Puget Sound Veterans Affairs Medical Center, Seattle, Washington; [8]Department of Pediatrics, Baylor College of Medicine, Houston, Texas; [9]Department of Medicine, Stanford University, California; and [10]Geisinger Health System, Geisinger Cancer Institute, Danville, Pennsylvania

A panel of national experts was convened by the Infectious Diseases Society of America (IDSA) to update the 2005 guidelines for the treatment of skin and soft tissue infections (SSTIs). The panel's recommendations were developed to be concordant with the recently published IDSA guidelines for the treatment of methicillin-resistant *Staphylococcus aureus* infections. The focus of this guideline is the diagnosis and appropriate treatment of diverse SSTIs ranging from minor superficial infections to life-threatening infections such as necrotizing fasciitis. In addition, because of an increasing number of immunocompromised hosts worldwide, the guideline addresses the wide array of SSTIs that occur in this population. These guidelines emphasize the importance of clinical skills in promptly diagnosing SSTIs, identifying the pathogen, and administering effective treatments in a timely fashion.

## EXECUTIVE SUMMARY

Summarized below are the recommendations made in the new guidelines for skin and soft tissue infections (SSTIs). Figure 1 was developed to simplify the management of localized purulent staphylococcal infections such as skin abscesses, furuncles, and carbuncles in

Received 17 April 2014; accepted 21 April 2014.

It is important to realize that guidelines cannot always account for individual variation among patients. They are not intended to supplant physician judgment with respect to particular patients or special clinical situations. IDSA considers adherence to these guidelines to be voluntary, with the ultimate determination regarding their application to be made by the physician in the light of each patient's individual circumstances.

Correspondence: Dennis L. Stevens, PhD, MD, Infectious Diseases Section, VA Medical Center, 500 W Fort St, Bldg 45, Boise, ID 83702 (dlsteven@mindspring.com).

**Clinical Infectious Diseases   2014;59(2):e10–52**
© The Author 2014. Published by Oxford University Press on behalf of the Infectious Diseases Society of America. All rights reserved. For Permissions, please e-mail: journals.permissions@oup.com.
DOI: 10.1093/cid/ciu296

the age of methicillin-resistant *Staphylococcus aureus* (MRSA). In addition, Figure 2 is provided to simplify the approach to patients with surgical site infections. The panel followed a process used in the development of other Infectious Diseases Society of America (IDSA) guidelines, which included a systematic weighting of the strength of recommendation and quality of evidence using the GRADE (Grading of Recommendations Assessment, Development, and Evaluation) system (Table 1) [1–4]. A detailed description of the methods, background, and evidence summaries that support each of the recommendations can be found in the full text of the guidelines.

### I. What Is Appropriate for the Evaluation and Treatment of Impetigo and Ecthyma?

*Recommendations*

1.  Gram stain and culture of the pus or exudates from skin lesions of impetigo and ecthyma are

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019



**Figure 1.**   Purulent skin and soft tissue infections (SSTIs). Mild infection: for purulent SSTI, incision and drainage is indicated. Moderate infection: patients with purulent infection with systemic signs of infection. Severe infection: patients who have failed incision and drainage plus oral antibiotics or those with systemic signs of infection such as temperature >38°C, tachycardia (heart rate >90 beats per minute), tachypnea (respiratory rate >24 breaths per minute) or abnormal white blood cell count (<12 000 or <400 cells/µL), or immunocompromised patients. Nonpurulent SSTIs. Mild infection: typical cellulitis/erysipelas with no focus of purulence. Moderate infection: typical cellulitis/erysipelas with systemic signs of infection. Severe infection: patients who have failed oral antibiotic treatment or those with systemic signs of infection (as defined above under purulent infection), or those who are immunocompromised, or those with clinical signs of deeper infection such as bullae, skin sloughing, hypotension, or evidence of organ dysfunction. Two newer agents, tedizolid and dalbavancin, are also effective agents in SSTIs, including those caused by methicillin-resistant *Staphylococcus aureus*, and may be approved for this indication by June 2014. Abbreviations: C & S, culture and sensitivity; I & D, incision and drainage; MRSA, methicillin-resistant *Staphylococcus aureus*; MSSA, methicillin-susceptible *Staphylococcus aureus*; Rx, treatment; TMP/SMX, trimethoprim-sulfamethoxazole.

recommended to help identify whether *Staphylococcus aureus* and/or a β-hemolytic *Streptococcus* is the cause (strong, moderate), but treatment without these studies is reasonable in typical cases (strong, moderate).

2.  Bullous and nonbullous impetigo can be treated with oral or topical antimicrobials, but oral therapy is recommended for patients with numerous lesions or in outbreaks affecting several people to help decrease transmission of infection. Treatment for ecthyma should be an oral antimicrobial.

(a)  Treatment of bullous and nonbullous impetigo should be with either mupirocin or retapamulin twice daily (bid) for 5 days (strong, high).

(b)  Oral therapy for ecthyma or impetigo should be a 7-day regimen with an agent active against *S. aureus* unless cultures yield streptococci alone (when oral penicillin is the recommended agent) (strong, high). Because *S. aureus* isolates from impetigo and ecthyma are usually methicillin susceptible, dicloxacillin or cephalexin is recommended. When MRSA is suspected or confirmed, doxycycline, clindamycin, or sulfamethoxazole-trimethoprim (SMX-TMP) is recommended (strong, moderate).

(c)  Systemic antimicrobials should be used for infections during outbreaks of poststreptococcal glomerulonephritis to help eliminate nephritogenic strains of *S. pyogenes* from the community (strong, moderate).

# Wound Infection Algorithm



Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

**Figure 2.** Algorithm for the management and treatment of surgical site infections (SSIs). *For patients with type 1 (anaphylaxis or hives) allergy to β-lactam antibiotics. If Gram stain not available, open and debride if purulent drainage present. Where the rate of infection with methicillin-resistant *Staphylococcus aureus* infection is high, consider vancomycin, daptomycin, or linezolid, pending results of culture and susceptibility tests. Adapted and modified with permission from Dellinger et al [96]. Abbreviations: GI, gastrointestinal; MRSA, methicillin-resistant *Staphylococcus aureus*; WBC, white blood cell count.

## II. What Is the Appropriate Evaluation and Treatment for Purulent SSTIs (Cutaneous Abscesses, Furuncles, Carbuncles, and Inflamed Epidermoid Cysts)?

### Recommendations

3. Gram stain and culture of pus from carbuncles and abscesses are recommended, but treatment without these studies is reasonable in typical cases (strong, moderate).

4. Gram stain and culture of pus from inflamed epidermoid cysts are not recommended (strong, moderate).

5. Incision and drainage is the recommended treatment for inflamed epidermoid cysts, carbuncles, abscesses, and large furuncles, mild (Figure 1) (strong, high).

6. The decision to administer antibiotics directed against *S. aureus* as an adjunct to incision and drainage should be

**Table 1.   Strength of Recommendations and Quality of the Evidence**

| Strength of Recommendation and Quality of Evidence | Clarity of Balance Between Desirable and Undesirable Effects | Methodological Quality of Supporting Evidence (Examples) | Implications |
|---|---|---|---|
| Strong recommendation, high-quality evidence | Desirable effects clearly outweigh undesirable effects, or vice versa | Consistent evidence from well-performed RCTs or exceptionally strong evidence from unbiased observational studies | Recommendation can apply to most patients in most circumstances. Further research is unlikely to change our confidence in the estimate of effect |
| Strong recommendation, moderate quality evidence | Desirable effects clearly outweigh undesirable effects, or vice versa | Evidence from RCTs with important limitations (inconsistent results, methodological flaws, indirect, or imprecise) or exceptionally strong evidence from unbiased observational studies | Recommendation can apply to most patients in most circumstances. Further research (if performed) is likely to have an important impact on our confidence in the estimate of effect and may change the estimate |
| Strong recommendation, low-quality quality evidence | Desirable effects clearly outweigh undesirable effects, or vice versa | Evidence for at least 1 critical outcome from observational studies, RCTs with serious flaws or indirect evidence | Recommendation may change when higher-quality evidence becomes available. Further research (if performed) is likely to have an important impact on our confidence in the estimate of effect and is likely to change the estimate |
| Strong recommendation, very low-quality evidence (very rarely applicable) | Desirable effects clearly outweigh undesirable effects, or vice versa | Evidence for at least 1 critical outcome from unsystematic clinical observations or very indirect evidence | Recommendation may change when higher-quality evidence becomes available; any estimate of effect for at least 1 critical outcome is very uncertain. |
| Weak recommendation, high-quality evidence | Desirable effects closely balanced with undesirable effects | Consistent evidence from well-performed RCTs or exceptionally strong evidence from unbiased observational studies | The best action may differ depending on circumstances or patient's or societal values. Further research is unlikely to change our confidence in the estimate of effect |
| Weak recommendation, moderate-quality evidence | Desirable effects closely balanced with undesirable effects | Evidence from RCTs with important limitations (inconsistent results, methodological flaws, indirect, or imprecise) or exceptionally strong evidence from unbiased observational studies | Alternative approaches likely to be better for some patients under some circumstances. Further research (if performed) is likely to have an important impact on our confidence in the estimate of effect and may change the estimate |
| Weak recommendation, low-quality evidence | Uncertainty in the estimates of desirable effects, harms, and burden; desirable effects, harms, and burden may be closely balanced | Evidence for at least 1 critical outcome from observational studies, from RCTs with serious flaws or indirect evidence | Other alternatives may be equally reasonable. Further research is very likely to have an important impact on our confidence in the estimate of effect and is likely to change the estimate |
| Weak recommendation, very low-quality evidence | Major uncertainty in the estimates of desirable effects, harms, and burden; desirable effects may or may not be balanced with undesirable effects | Evidence for at least 1 critical outcome from unsystematic clinical observations or very indirect evidence | Other alternatives may be equally reasonable. Any estimate of effect, for at least 1 critical outcome, is very uncertain |

Abbreviation: RCT, randomized controlled trial.

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

made based upon presence or absence of systemic inflammatory response syndrome (SIRS), such as temperature >38°C or <36°C, tachypnea >24 breaths per minute, tachycardia >90 beats per minute, or white blood cell count >12 000 or <400 cells/μL (moderate; Figure 1) (strong, low). An antibiotic active against MRSA is recommended for patients with carbuncles or abscesses who have failed initial antibiotic treatment or have markedly impaired host defenses or in patients with SIRS and hypotension (severe; Figure 1 and Table 2) (strong, low).

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

**Table 2.   Antimicrobial Therapy for Staphylococcal and Streptococcal Skin and Soft Tissue Infections**

| Disease Entity | Antibiotic | Dosage, Adults | Dosage, Children[a] | Comment |
|---|---|---|---|---|
| Impetigo[b] (*Staphylococcus* and *Streptococcus*) | Dicloxacillin | 250 mg qid po | N/A | N/A |
| | Cephalexin | 250 mg qid po | 25–50 mg/kg/d in 3–4 divided doses po | N/A |
| | Erythromycin | 250 mg qid po[c] | 40 mg/kg/d in 3–4 divided doses po | Some strains of *Staphylococcus aureus* and *Streptococcus pyogenes* may be resistant. |
| | Clindamycin | 300–400 mg qid po | 20 mg/kg/d in 3 divided doses po | N/A |
| | Amoxicillin-clavulanate | 875/125 mg bid po | 25 mg/kg/d of the amoxicillin component in 2 divided doses po | N/A |
| | Retapamulin ointment | Apply to lesions bid | Apply to lesions bid | For patients with limited number of lesions |
| | Mupirocin ointment | Apply to lesions bid | Apply to lesions bid | For patients with limited number of lesions |
| MSSA SSTI | Nafcillin or oxacillin | 1–2 g every 4 h IV | 100–150 mg/kg/d in 4 divided doses | Parental drug of choice; inactive against MRSA |
| | Cefazolin | 1 g every 8 h IV | 50 mg/kg/d in 3 divided doses | For penicillin-allergic patients except those with immediate hypersensitivity reactions. More convenient than nafcillin with less bone marrow suppression |
| | Clindamycin | 600 mg every 8 h IV or 300–450 mg qid po | 25–40 mg/kg/d in 3 divided doses IV or 25–30 mg/kg/d in 3 divided doses po | Bacteriostatic; potential of cross-resistance and emergence of resistance in erythromycin-resistant strains; inducible resistance in MRSA |
| | Dicloxacillin | 500 mg qid po | 25–50 mg/kg/d in 4 divided doses po | Oral agent of choice for methicillin-susceptible strains in adults. Not used much in pediatrics |
| | Cephalexin | 500 mg qid po | 25–50 mg/kg/d 4 divided doses po | For penicillin-allergic patients except those with immediate hypersensitivity reactions. The availability of a suspension and requirement for less frequent dosing |
| | Doxycycline, minocycline | 100 mg bid po | Not recommended for age <8 y[d] | Bacteriostatic; limited recent clinical experience |
| | Trimethoprim-sulfamethoxazole | 1–2 double-strength tablets bid po | 8–12 mg/kg (based on trimethoprim component) in either 4 divided doses IV or 2 divided doses po | Bactericidal; efficacy poorly documented |
| MRSA SSTI | Vancomycin | 30 mg/kg/d in 2 divided doses IV | 40 mg/kg/d in 4 divided doses IV | For penicillin allergic patients; parenteral drug of choice for treatment of infections caused by MRSA |
| | Linezolid | 600 mg every 12 h IV or 600 mg bid po | 10 mg/kg every 12 h IV or po for children <12 y | Bacteriostatic; limited clinical experience; no cross-resistance with other antibiotic classes; expensive |
| | Clindamycin | 600 mg every 8 h IV or 300–450 mg qid po | 25–40 mg/kg/d in 3 divided doses IV or 30–40 mg/kg/d in 3 divided doses po | Bacteriostatic; potential of cross-resistance and emergence of resistance in erythromycin-resistant strains; inducible resistance in MRSA. Important option for children |
| | Daptomycin | 4 mg/kg every 24 h IV | N/A | Bactericidal; possible myopathy |
| | Ceftaroline | 600 mg bid IV | N/A | Bactericidal |
| | Doxycycline, minocycline | 100 mg bid po | Not recommended for age <8 y[d] | Bacteriostatic; limited recent clinical experience |
| | Trimethoprim-sulfamethoxazole | 1–2 double-strength tablets bid po | 8–12 mg/kg/d (based on trimethoprim component) in either 4 divided doses IV or 2 divided doses po | Bactericidal; limited published efficacy data |

*Table 2 continued.*

| Disease Entity | Antibiotic / Adult dosage | Pediatric dosage | Antimicrobial agents for patients with severe penicillin hypersensitivity | Comment |
|---|---|---|---|---|
| | | | *(Dosage, Children[a])* | |
| Non-purulent SSTI (cellulitis) | | | N/A | N/A |
| Streptococcal skin infections | Penicillin 2–4 million units every 4–6 h IV; Clindamycin 600–900 mg every 8 h IV; Nafcillin 1–2 g every 4–6 h IV; Cefazolin 1 g every 8 h IV; Penicillin VK 250–500 mg every 6 h po; Cephalexin 500 mg every 6 h po | Penicillin 60–100 000 units/kg/dose every 6 h; Clindamycin 10–13 mg/kg dose every 8 h IV; 50 mg/kg/dose every 6 h; 33 mg/kg/dose every 8 h IV | Clindamycin, vancomycin, linezolid, daptomycin, or televancin. Clindamycin resistance is <1% but may be increasing in Asia | |

Abbreviations: bid, twice daily; IV, intravenous; MRSA, methicillin-resistant *Staphylococcus aureus*; MSSA, methicillin-susceptible *Staphylococcus aureus*; N/A, not applicable; po, by mouth; qid, 4 times daily; SSTI, skin and soft tissue infection; tid, 3 times daily.

[a] Doses listed are not appropriate for neonates. Refer to the report by the Committee on Infectious Diseases, American Academy of Pediatrics [246], for neonatal doses.

[b] Infection due to *Staphylococcus* and *Streptococcus* species. Duration of therapy is 7 days, depending on the clinical response.

[c] Adult dosage of erythromycin ethylsuccinate is 400 mg 4 times/d po.

[d] See [246] for alternatives in children.

## III. What Is the Appropriate Treatment for Recurrent Skin Abscesses?

### Recommendations

7. A recurrent abscess at a site of previous infection should prompt a search for local causes such as a pilonidal cyst, hidradenitis suppurativa, or foreign material (strong, moderate).

8. Recurrent abscesses should be drained and cultured early in the course of infection (strong, moderate).

9. After obtaining cultures of recurrent abscess, treat with a 5- to 10-day course of an antibiotic active against the pathogen isolated (weak, low).

10. Consider a 5-day decolonization regimen twice daily of intranasal mupirocin, daily chlorhexidine washes, and daily decontamination of personal items such as towels, sheets, and clothes for recurrent *S. aureus* infection (weak, low).

11. Adult patients should be evaluated for neutrophil disorders if recurrent abscesses began in early childhood (strong, moderate).

## IV. What Is Appropriate for the Evaluation and Treatment of Erysipelas and Cellulitis?

### Recommendations

12. Cultures of blood or cutaneous aspirates, biopsies, or swabs are not routinely recommended (strong, moderate).

13. Cultures of blood are recommended (strong, moderate), and cultures and microscopic examination of cutaneous aspirates, biopsies, or swabs should be considered in patients with malignancy on chemotherapy, neutropenia, severe cell-mediated immunodeficiency, immersion injuries, and animal bites (weak, moderate).

14. Typical cases of cellulitis without systemic signs of infection should receive an antimicrobial agent that is active against streptococci (mild; Figure 1) (strong, moderate). For cellulitis with systemic signs of infection (moderate nonpurulent; Figure 1), systemic antibiotics are indicated. Many clinicians could include coverage against methicillin-susceptible *S. aureus* (MSSA) (weak, low). For patients whose cellulitis is associated with penetrating trauma, evidence of MRSA infection elsewhere, nasal colonization with MRSA, injection drug use, or SIRS (severe nonpurulent; Figure 1), vancomycin or another antimicrobial effective against both MRSA and streptococci is recommended (strong, moderate). In severely compromised patients as defined in question 13 (severe nonpurulent; Figure 1), broad-spectrum antimicrobial coverage may be considered (weak, moderate). Vancomycin plus either piperacillin-tazobactam or imipenem/meropenem is recommended as a reasonable empiric regimen for severe infections (strong, moderate).

15. The recommended duration of antimicrobial therapy is 5 days, but treatment should be extended if the infection has not improved within this time period (strong, high).

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

16.   Elevation of the affected area and treatment of predisposing factors, such as edema or underlying cutaneous disorders, are recommended (strong, moderate).

17.   In lower-extremity cellulitis, clinicians should carefully examine the interdigital toe spaces because treating fissuring, scaling, or maceration may eradicate colonization with pathogens and reduce the incidence of recurrent infection (strong, moderate).

18.   Outpatient therapy is recommended for patients who do not have SIRS, altered mental status, or hemodynamic instability (mild nonpurulent; Figure 1) (strong, moderate). Hospitalization is recommended if there is concern for a deeper or necrotizing infection, for patients with poor adherence to therapy, for infection in a severely immunocompromised patient, or if outpatient treatment is failing (moderate or severe nonpurulent; Figure 1) (strong, moderate).

### V. Should Anti-inflammatory Agents Be Used to Complement Antibiotic Treatment of Cellulitis?

**Recommendation**

19.   Systemic corticosteroids (eg, prednisone 40 mg daily for 7 days) could be considered in nondiabetic adult patients with cellulitis (weak, moderate).

### VI. What Is the Preferred Evaluation and Management of Patients With Recurrent Cellulitis?

**Recommendations**

20.   Identify and treat predisposing conditions such as edema, obesity, eczema, venous insufficiency, and toe web abnormalities (strong, moderate). These practices should be performed as part of routine patient care and certainly during the acute stage of cellulitis (strong, moderate).

21.   Administration of prophylactic antibiotics, such as oral penicillin or erythromycin bid for 4–52 weeks, or intramuscular benzathine penicillin every 2–4 weeks, should be considered in patients who have 3–4 episodes of cellulitis per year despite attempts to treat or control predisposing factors (weak, moderate). This program should be continued so long as the predisposing factors persist (strong, moderate).

### VII. What Is the Preferred Management of Surgical Site Infections?

**Recommendations**

22.   Suture removal plus incision and drainage should be performed for surgical site infections (strong, low).

23.   Adjunctive systemic antimicrobial therapy is not routinely indicated, but in conjunction with incision and drainage may be beneficial for surgical site infections associated with a significant systemic response (Figure 2), such as erythema and induration extending >5 cm from the wound edge, temperature >38.5°C, heart rate >110 beats/minute, or white blood cell (WBC) count >12 000/μL (weak, low).

24.   A brief course of systemic antimicrobial therapy is indicated in patients with surgical site infections following clean operations on the trunk, head and neck, or extremities that also have systemic signs of infection (strong, low).

25.   A first-generation cephalosporin or an antistaphylococcal penicillin for MSSA, or vancomycin, linezolid, daptomycin, telavancin, or ceftaroline where risk factors for MRSA are high (nasal colonization, prior MRSA infection, recent hospitalization, recent antibiotics), is recommended (strong, low). See also Tables 2 and 3.

26.   Agents active against gram-negative bacteria and anaerobes, such as a cephalosporin or fluoroquinolone in combination with metronidazole, are recommended for infections following operations on the axilla, gastrointestinal tract, perineum, or female genital tract (strong, low). See also Table 3.

### VIII. What Is the Preferred Evaluation and Treatment of Necrotizing Fasciitis, Including Fournier Gangrene?

**Recommendations**

27.   Prompt surgical consultation is recommended for patients with aggressive infections associated with signs of systemic toxicity or suspicion of necrotizing fasciitis or gas gangrene (severe nonpurulent; Figure 1) (strong, low).

28.   Empiric antibiotic treatment should be broad (eg, vancomycin or linezolid plus piperacillin-tazobactam or a carbapenem; or plus ceftriaxone and metronidazole), as the etiology can be polymicrobial (mixed aerobic–anaerobic microbes) or monomicrobial (group A streptococci, community-acquired MRSA) (strong, low). See also Table 4.

29.   Penicillin plus clindamycin is recommended for treatment of documented group A streptococcal necrotizing fasciitis (strong, low). See Figures 1, 2, and Table 4.

### IX. What Is the Appropriate Approach to the Management of Pyomyositis?

**Recommendations**

30.   Magnetic resonance imaging (MRI) is the recommended imaging modality for establishing the diagnosis of pyomyositis. Computed tomography (CT) scan and ultrasound studies are also useful (strong, moderate).

31.   Cultures of blood and abscess material should be obtained (strong, moderate).

32.   Vancomycin is recommended for initial empirical therapy. An agent active against enteric gram-negative bacilli should be added for infection in immunocompromised patients or following open trauma to the muscles (strong, moderate).

33.   Cefazolin or antistaphylococcal penicillin (eg, nafcillin or oxacillin) is recommended for treatment of pyomyositis caused by MSSA (strong, moderate). See Table 2.

34.   Early drainage of purulent material should be performed (strong, high).

35.   Repeat imaging studies should be performed in the patient with persistent bacteremia to identify undrained foci of infection (strong, low).

36.   Antibiotics should be administered intravenously initially, but once the patient is clinically improved, oral antibiotics are appropriate for patients in whom bacteremia cleared promptly and there is no evidence of endocarditis or metastatic abscess. Two to 3 weeks of therapy is recommended (strong, low).

## X. What Is the Appropriate Approach to the Evaluation and Treatment of Clostridial Gas Gangrene or Myonecrosis?

*Recommendations*

37.   Urgent surgical exploration of the suspected gas gangrene site and surgical debridement of involved tissue should be performed (severe nonpurulent; Figure 1) (strong, moderate).

38.   In the absence of a definitive etiologic diagnosis, broad-spectrum treatment with vancomycin plus either piperacillin/tazobactam, ampicillin/sulbactam, or a carbapenem antimicrobial is recommended (strong, low). Definitive antimicrobial therapy with penicillin and clindamycin (Figure 1) is recommended for treatment of clostridial myonecrosis (strong, low).

39.   Hyperbaric oxygen (HBO) therapy is not recommended because it has not been proven as a benefit to the patient and may delay resuscitation and surgical debridement (strong, low).

## XI. What Is the Role of Preemptive Antimicrobial Therapy to Prevent Infection for Dog or Cat Bites?

*Recommendations*

40.   Preemptive early antimicrobial therapy for 3–5 days is recommended for patients who (a) are immunocompromised; (b) are asplenic; (c) have advanced liver disease; (d) have preexisting or resultant edema of the affected area; (e) have moderate to severe injuries, especially to the hand or face; or (f) have injuries that may have penetrated the periosteum or joint capsule (strong, low).

41.   Postexposure prophylaxis for rabies may be indicated; consultation with local health officials is recommended to determine if vaccination should be initiated (strong, low).

## XII. What Is the Treatment for Infected Animal Bite–Related Wounds?

*Recommendation*

42.   An antimicrobial agent or agents active against both aerobic and anaerobic bacteria such as amoxicillin-clavulanate (Table 5) should be used (strong, moderate).

## XIII. Should Tetanus Toxoid Be Administered for Animal Bite Wounds?

*Recommendation*

43.   Tetanus toxoid should be administered to patients without toxoid vaccination within 10 years. Tetanus, diptheria, and tetanus (Tdap) is preferred over Tetanus and diptheria (Td) if the former has not been previously given (strong, low).

## XIV. In Which Patients Is Primary Wound Closure Appropriate for Animal Bite Wounds?

*Recommendation*

44.   Primary wound closure is not recommended for wounds, with the exception of those to the face, which should be managed with copious irrigation, cautious debridement, and preemptive antibiotics (strong, low). Other wounds may be approximated (weak, low).

## XV. What Is the Appropriate Treatment of Cutaneous Anthrax?

*Recommendations*

45.   Oral penicillin V 500 mg 4 times daily (qid) for 7–10 days is the recommended treatment for naturally acquired cutaneous anthrax (strong, high).

46.   Ciprofloxacin 500 mg by mouth (po) bid or levofloxacin 500 mg intravenously (IV)/po every 24 hours × 60 days is recommended for bioterrorism cases because of presumed aerosol exposure (strong, low).

## XVI. What Is the Appropriate Approach for the Evaluation and Treatment of Bacillary Angiomatosis and Cat Scratch Disease?

*Recommendations*

47.   Azithromycin is recommended for cat scratch disease (strong, moderate) according to the following dosing protocol:

(a)   Patients >45 kg: 500 mg on day 1 followed by 250 mg for 4 additional days (strong, moderate).

(b)   Patients <45 kg: 10 mg/kg on day 1 and 5 mg/kg for 4 more days (strong, moderate).

48.   Erythromycin 500 mg qid or doxycycline 100 mg bid for 2 weeks to 2 months is recommended for treatment of bacillary angiomatosis (strong, moderate).

## XVII. What Is the Preferred Treatment for Erysipeloid?

*Recommendation*

49.   Penicillin (500 mg qid) or amoxicillin (500 mg 3 times daily [tid]) for 7–10 days is recommended for treatment of erysipeloid (strong, high).

## XVIII. What Is the Appropriate Treatment of Glanders?

*Recommendation*

50.   Ceftazidime, gentamicin, imipenem, doxycycline, or ciprofloxacin is recommended based on in vitro susceptibility (strong, low).

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

## XIX. What Is the Appropriate Diagnosis and Treatment of Bubonic Plague?

### Recommendation

51. Bubonic plague should be diagnosed by Gram stain and culture of aspirated material from a suppurative lymph node (strong, moderate). Streptomycin (15 mg/kg intramuscularly [IM] every 12 hours) or doxycycline (100 mg bid po) is recommended for treatment of bubonic plague (strong, low). Gentamicin could be substituted for streptomycin (weak, low).

## XX. What Is Appropriate for Diagnosis and Treatment for Tularemia?

### Recommendations

52. Serologic tests are the preferred method of diagnosing tularemia (weak, low).

53. Streptomycin (15 mg/kg every 12 hours IM) or gentamicin (1.5 mg/kg every 8 hours IV) is recommended for treatment of severe cases of tularemia (strong, low).

54. Tetracycline (500 mg qid) or doxycycline (100 mg bid po) is recommended for treatment of mild cases of tularemia (strong, low).

55. Notify the microbiology laboratory if tularemia is suspected (strong, high).

## XXI. What Is the Appropriate Approach to Assess SSTIs in Immunocompromised Patients?

### Recommendations

56. In addition to infection, differential diagnosis of skin lesions should include drug eruption, cutaneous infiltration with the underlying malignancy, chemotherapy- or radiation-induced reactions, Sweet syndrome, erythema multiforme, leukocytoclastic vasculitis, and graft-vs-host disease among allogeneic transplant recipients (strong, high).

57. Differential diagnosis for infection of skin lesions should include bacterial, fungal, viral, and parasitic agents (strong, high).

58. Biopsy or aspiration of the lesion to obtain material for histological and microbiological evaluation should always be implemented as an early diagnostic step (strong, high).

## XXII. What Is the Appropriate Approach to Assess SSTIs in Patients With Fever and Neutropenia?

### Recommendations

59. Determine whether the current presentation of fever and neutropenia is the patient's initial episode of fever and neutropenia, or persistent unexplained fever of their initial episode (after 4–7 days) or a subsequent episode of fever and neutropenia (recurrent) (strong, low).

60. Aggressively determine the etiology of the SSTI by aspiration and/or biopsy of skin and soft tissue lesions and submit these for thorough cytological/histological assessments, microbial staining, and cultures (strong, low).

61. Risk-stratify patients with fever and neutropenia according to susceptibility to infection: high-risk patients are those with anticipated prolonged (>7 days) and profound neutropenia (absolute neutrophil count <100 cells/μL) or with a Multinational Association for Supportive Care (MASCC) score of <21; low-risk patients are those with anticipated brief (<7 days) periods of neutropenia and few comorbidities (strong, low) or with a MASCC score of ≥21 (strong, moderate).

62. Determine the extent of infection through a thorough physical examination, blood cultures, chest radiograph, and additional imaging (including chest CT) as indicated by clinical signs and symptoms (strong, low).

## XXIII. What Is the Appropriate Antibiotic Therapy for Patients With SSTIs During the Initial Episode of Fever and Neutropenia?

### Recommendations

63. Hospitalization and empiric antibacterial therapy with vancomycin plus antipseudomonal antibiotics such as cefepime, a carbapenem (imipenem-cilastatin or meropenem or doripenem) or piperacillin-tazobactam is recommended (strong, high).

64. Documented clinical and microbiologic SSTIs should be treated based on antimicrobial susceptibilities of isolated organisms (strong, high).

65. It is recommended that the treatment duration for most bacterial SSTIs should be 7–14 days (strong, moderate).

66. Surgical intervention is recommended for drainage of soft tissue abscess after marrow recovery or for a progressive polymicrobial necrotizing fasciitis or myonecrosis (strong, low).

67. Adjunct colony-stimulating factor therapy (granulocyte colony-stimulating factor [G-CSF], granulocyte macrophage colony-stimulating factor [GM-CSF]) or granulocyte transfusions are not routinely recommended (weak, moderate).

68. Acyclovir should be administered to patients suspected or confirmed to have cutaneous or disseminated varicella zoster virus (herpes simplex virus [HSV] or varicella zoster virus [VZV]) infection (strong, moderate).

## XXIV. What Is the Appropriate Antimicrobial Therapy for Patients With SSTIs During Persistent or Recurrent Episodes of Fever and Neutropenia?

### Recommendations

69. Yeasts and molds remain the primary cause of infection-associated with persistent and recurrent fever and neutropenia; therefore, empiric antifungal therapy (Table 6) should be added to the antibacterial regimen (strong, high).

(a) Empiric administration of vancomycin or other agents with gram-positive activity (linezolid, daptomycin, or ceftaroline, Table 7) should be added if not already being administered (strong, high).

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

(b) *Candida* species SSTIs should be treated with an echinocandin or, if *Candida parapsilosis* has been isolated, lipid formulation amphotericin B (strong, high) with fluconazole as an acceptable alternative (strong, moderate). Treatment should be administered for 2 weeks after clearance of bloodstream infection or resolution of skin lesions (strong, moderate).

(c) *Aspergillus* SSTIs should be treated with voriconazole (strong, high), or alternatively, lipid formulations of amphotericin B, posaconazole, or echinocandin for 6–12 weeks (strong, low). *Mucor/Rhizopus* infections should be treated with lipid formulation amphotericin B (strong, moderate) or posaconazole (strong, low) (Table 6). The addition of an echinocandin could be considered based on synergy in murine models of mucormycosis, and observational clinical data (weak, low).

(d) *Fusarium* species infections should be treated with high-dose IV voriconazole or posaconazole (strong, low).

(e) Begin treatment for antibiotic-resistant bacterial organisms (Table 7), in patients currently on antibiotics (strong, moderate).

(f) Intravenous acyclovir should be added to the patient's antimicrobial regimen for suspected or confirmed cutaneous or disseminated HSV or VZV infections (strong, moderate).

70. Blood cultures should be obtained and skin lesions in this population of patients should be aggressively evaluated by culture aspiration, biopsy, or surgical excision, as they may be caused by resistant microbes, yeast, or molds (strong, moderate).

71. The sensitivity of a single-serum fungal antigen test (1,3-β-ᴅ-glucan or galactomannan tests) is low particularly in patients receiving antifungal agents, and benefits from laboratory tests for fungal antigen or DNA detection remain inconsistent (strong, moderate).

72. Polymerase chain reaction (PCR) in peripheral blood for HSV and VZV might be helpful in establishing a diagnosis of disseminated infection in patients with unexplained skin lesions (weak, moderate).

### XXV. What Is the Appropriate Approach to Assess SSTIs in Patients With Cellular Immunodeficiency?

#### Recommendations

73. Consider immediate consultation with a dermatologist familiar with cutaneous manifestations of infection in patients with cellular immune defects (eg, those with lymphoma, lymphocytic leukemia, recipients of organ transplants, or those receiving immunosuppressive drugs such as anti–tumor necrosis factors or certain monoclonal antibodies) (weak, low).

74. Consider biopsy and surgical debridement early in the management of these patients (weak, low).

75. Empiric antibiotics, antifungals, and/or antivirals should be considered in life-threatening situations (weak, moderate). The use of specific agents should be decided with the input of the primary team, dermatology, infectious disease, and other consulting teams (strong, moderate).

## INTRODUCTION

This practice guideline provides recommendations for the diagnosis and management of skin and soft tissue infections (SSTIs) in otherwise healthy hosts and compromised hosts of all age groups. These recommendations take on new importance because of a dramatic increase in the frequency and severity of infections and the emergence of resistance to many of the antimicrobial agents commonly used to treat SSTIs in the past. For example, there was a 29% increase in the total hospital admissions for these infections between 2000 and 2004 [5]. In addition, 6.3 million physician's office visits per year are attributable to SSTIs [6]. Similarly, between 1993 and 2005, annual emergency department visits for SSTIs increased from 1.2 million to 3.4 million patients [7]. Some of this increased frequency is related to the emergence of community-associated methicillin-resistant *Staphylococcus aureus* (MRSA) [5].

These infections have diverse etiologies that depend, in part, on different epidemiological settings. As a result, obtaining a careful history that includes information about the patient's immune status, geographic locale, travel history, recent trauma or surgery, previous antimicrobial therapy, lifestyle, hobbies, and animal exposure or bites is essential when developing an adequate differential diagnosis and an appropriate index of suspicion for specific etiological agents. Recognition of the physical examination findings and understanding the anatomical relationships of skin and soft tissue are crucial for establishing the correct diagnosis. In some cases, this information is insufficient and biopsy or aspiration of tissue may be necessary. In addition, radiographic procedures may be critical in a small subset of patients to determine the level of infection and the presence of gas, abscess, or a necrotizing process. Last, surgical exploration or debridement is an important diagnostic, as well as therapeutic, procedure in patients with necrotizing infections or myonecrosis and may be important for selected immunocompromised hosts.

Clinical evaluation of patients with SSTI aims to establish the cause and severity of infection and must take into account pathogen-specific and local antibiotic resistance patterns. Many different microbes can cause soft tissue infections, and although specific bacteria may cause a particular type of infection, considerable overlaps in clinical presentation occur. Clues to the diagnosis and algorithmic approaches to diagnosis are covered in detail in the text to follow. Specific recommendations for therapy are given, each with a rating that indicates the strength of and evidence for recommendations according to the Infectious Diseases Society of America (IDSA)/US Public Health Service grading system for rating recommendations in clinical

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

guidelines (Table 1) [2]. The following 24 clinical questions are answered:

(I)   What is appropriate for the evaluation and treatment of impetigo and ecthyma?

(II)   What is the appropriate evaluation and treatment for cutaneous abscesses, furuncles, carbuncles, and inflamed epidermoid cysts?

(III)   What is the appropriate treatment for recurrent skin abscesses?

(IV)   What is appropriate for the evaluation and treatment of erysipelas and cellulitis?

(V)   Should corticosteroids be used to complement antibiotic treatment of cellulitis?

(VI)   What is the preferred evaluation and management of patients with recurrent cellulitis?

(VII)   What is the preferred management of surgical site infections?

(VIII)   What is the preferred evaluation and treatment of necrotizing fasciitis, including Fournier gangrene?

(IX)   What is the appropriate approach to the management of pyomyositis?

(X)   What is the appropriate approach to the evaluation and treatment of clostridial gas gangrene or myonecrosis?

(XI)   What is the role of preemptive antimicrobial therapy to prevent infection for dog or cat bites?

(XII)   What is the treatment for infected animal bite–related wounds?

(XIII)   Should tetanus toxoid be administered for animal bite wounds?

(XIV)   In which patients is primary wound closure appropriate for animal bite wounds?

(XV)   What is the appropriate treatment of cutaneous anthrax?

(XVI)   What is the appropriate approach for the evaluation and treatment of bacillary angiomatosis and cat scratch disease?

(XVII)   What is the preferred treatment for erysipeloid?

(XVIII)   What is appropriate treatment of glanders?

(XIX)   What is the appropriate diagnosis and treatment of bubonic plague?

(XX)   What is appropriate for diagnosis and treatment for tularemia?

(XXI)   What is the appropriate approach to assess SSTIs in immunocompromised patients?

(XXII)   What is the appropriate approach to assess SSTIs in patients with fever and neutropenia?

(XXIII)   What is the appropriate antibiotic therapy for patients with SSTIs during the initial episode of fever and neutropenia?

(XXIV)   What is the appropriate antimicrobial therapy for patients with SSTIs during persistent or recurrent episodes of fever and neutropenia?

(XXV)   What is the appropriate approach to assess SSTIs in patients with cellular immunodeficiency?

## PRACTICE GUIDELINES

"Practice guidelines are systematically developed statements to assist practitioners and patients in making decisions about appropriate health care for specific clinical circumstances" [8]. Attributes of high-quality guidelines include validity, reliability, reproducibility, clinical applicability, clinical flexibility, clarity, multidisciplinary process, review of evidence, and documentation [8].

## METHODOLOGY

### Panel Composition

A panel of 10 multidisciplinary experts in the management of SSTIs in children and adults was convened in 2009. Efforts were made to include representatives from diverse geographic areas, pediatric and adult practitioners, and a wide breadth of specialties. The panel consisted of 10 members of IDSA. Representation included 8 adult infectious disease physicians, 1 pediatric infectious disease physician, and 1 general surgeon. Panel members were selected based on their clinical and research expertise on diverse SSTIs including infections in compromised hosts, necrotizing fasciitis, gas gangrene, cellulitis, and cutaneous abscesses and infections following surgery and animal and human bites. Finally, some members were selected on the basis of their expertise for specific microbes such as staphylococci, streptococci, *Clostridium* species, and anaerobes. Two members were selected to provide congruency with the IDSA/MRSA Guidelines Panel.

### Literature Review and Analysis

The recommendations in this guideline have been developed following a review of studies published in English, although foreign-language articles were included in some of the Cochrane reviews summarized in this guideline. Studies were identified through Library of Congress, LISTA (EBSCO), and PubMed searches with no date restrictions using subject headings. Examples of keywords used to conduct literature searches were as follows: skin abscess (recurrent and relapsing), dog bites, skin and soft tissue infections, cellulitis, erysipelas, surgical site infections, wounds, staphylococcus, streptococcus, cat bites, tetanus, bite wounds (care and closure), irrigation, amoxicillin, amoxicillin clavulanate, cefuroxime, levofloxacin, moxifloxacin, sulfamethoxazole-trimethoprim, erythromycin, azithromycin.

### Process Overview

To evaluate evidence, the panel followed a process consistent with other IDSA guidelines. The process for evaluating the

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

evidence was based on the IDSA Handbook on Clinical Practice Guideline Development and involved a systematic weighting of the quality of the evidence and the grade of recommendation using the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) system (Table 1) [1–4, 9, 10]. GRADE is a newly created system for grading the quality of evidence and strength of recommendations for healthcare [2, 11].

Panel members were divided into pairs, consisting of primary and secondary authors. Each author was asked to review the literature, evaluate the evidence, and determine the strength of the recommendations along with an evidence summary supporting each recommendation. The panel reviewed all recommendations, their strength, and quality of evidence. Discrepancies were discussed and resolved, and all panel members are in agreement with the final recommendations.

### Consensus Development Based on Evidence
The panel met twice for face-to-face meetings and conducted teleconferences on 6 occasions to complete the work of the guideline. The purpose of the teleconferences was to discuss the clinical questions to be addressed, assign topics for review and writing of the initial draft, and discuss recommendations. The panel as a whole reviewed all individual sections. The guideline was reviewed and approved by the IDSA Standards and Practice Guidelines Committee (SPGC) and Board of Directors and endorsed by the Pediatric Infectious Diseases Society (PIDS).

### Guidelines and Conflicts of Interest
The expert panel complied with the IDSA policy on conflicts of interest, which requires disclosure of any financial or other interest that might be construed as constituting an actual, potential, or apparent conflict. Panel members were provided IDSA's conflicts of interest disclosure statement and were asked to identify ties to companies developing products that might be affected by promulgation of the guideline. Information was requested regarding employment, consultancies, stock ownership, honoraria, research funding, expert testimony, and membership on company advisory committees. Decisions were made on a case-by-case basis as to whether an individual's role should be limited as a result of a conflict. Potential conflicts of interests are listed in the Acknowledgments section.

### Revision Dates
At annual intervals, the panel chair, the SPGC liaison advisor, and the chair of the SPGC will determine the need for revisions to the guideline based on an examination of current literature. If necessary, the entire panel will reconvene to discuss potential changes. When appropriate, the panel will recommend revision of the guideline to the SPGC and IDSA board and other collaborating organizations for review and approval.

# RECOMMENDATIONS FOR IMPETIGO AND ECTHYMA

### I. What Is Appropriate for the Evaluation and Treatment of Impetigo and Ecthyma?
*Recommendations*

1. Gram stain and culture of the pus or exudates from skin lesions of impetigo and ecthyma are recommended to help identify whether *Staphylococcus aureus* and/or a β-hemolytic *Streptococcus* is the cause (strong, moderate), but treatment without these studies is reasonable in typical cases (strong, moderate).

2. Bullous and nonbullous impetigo can be treated with oral or topical antimicrobials, but oral therapy is recommended for patients with numerous lesions or in outbreaks affecting several people to help decrease transmission of infection. Treatment for ecthyma should be an oral antimicrobial.

   (a) Treatment of bullous and nonbullous impetigo should be with either topical mupirocin or retapamulin twice daily (bid) for 5 days (strong, high).

   (b) Oral therapy for ecthyma or impetigo should be a 7-day regimen with an agent active against *S. aureus* unless cultures yield streptococci alone (when oral penicillin is the recommended agent) (strong, high). Because *S. aureus* isolates from impetigo and ecthyma are usually methicillin susceptible, dicloxacillin or cephalexin is recommended. When MRSA is suspected or confirmed, doxycycline, clindamycin, or sulfamethoxazole-trimethoprim (SMX-TMP) is recommended (strong, moderate).

   (c) Systemic antimicrobials should be used for infections during outbreaks of poststreptococcal glomerulonephritis to help eliminate nephritogenic strains of *Streptococcus pyogenes* from the community (strong, moderate).

### Evidence Summary
Impetigo can be either bullous or nonbullous [12]. Bullous impetigo is caused by strains of *S. aureus* that produce a toxin that cleaves the dermal-epidermal junction to form fragile, thin-roofed vesicopustules. These lesions may rupture, creating crusted, erythematous erosions, often surrounded by a collar of the roof's remnants. Nonbullous impetigo can occur from infections with β-hemolytic streptococci or *S. aureus*, or both in combination [12]. Impetigo begins as erythematous papules that rapidly evolve into vesicles and pustules that rupture, with the dried discharge forming honey-colored crusts on an erythematous base.

Ecthyma is a deeper infection than impetigo, and *S. aureus* and/or streptococci may be the cause. Lesions begin as vesicles that rupture, resulting in circular, erythematous ulcers with adherent crusts, often with surrounding erythematous edema. Unlike impetigo, ecthyma heals with scarring [12].

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

Cultures of the vesicle fluid, pus, erosions, or ulcers establish the cause. Unless cultures yield streptococci alone, antimicrobial therapy should be active against both *S. aureus* and streptococci [12]. Oral penicillinase–resistant penicillin or first-generation cephalosporins are usually effective as most staphylococcal isolates from impetigo and ecthyma are methicillin susceptible [13]. Alternatives for penicillin-allergic patients or infections with MRSA include doxycycline, clindamycin, or SMX-TMP. When streptococci alone are the cause, penicillin is the drug of choice, with a macrolide or clindamycin as an alternative for penicillin-allergic patients. Topical treatment with mupirocin [12] or retapamulin [14] is as effective as oral antimicrobials for impetigo. Clinical experience suggests that systemic therapy is preferred for patients with numerous lesions or in outbreaks affecting several people, to help decrease transmission of infection [15] (Table 2).

## RECOMMENDATIONS FOR PURULENT SKIN AND SOFT TISSUE INFECTIONS

### II. What Is the Appropriate Evaluation and Treatment for Purulent SSTIs (Cutaneous Abscesses, Furuncles, Carbuncles, and Inflamed Epidermoid Cysts)? (Figure 1)

*Recommendations*

3.  Gram stain and culture of pus from carbuncles and abscesses are recommended, but treatment without these studies is reasonable in typical cases (strong, moderate).

4.  Gram stain and culture of pus from inflamed epidermoid cysts are not recommended (strong, moderate).

5.  Incision and drainage is the recommended treatment for inflamed epidermoid cysts, carbuncles, abscesses, and large furuncles (strong, high).

6.  The decision to administer antibiotics directed against *S. aureus* as an adjunct to incision and drainage should be made based on the presence or absence of systemic inflammatory response syndrome (SIRS) such as temperature >38°C or <36°C, tachypnea >24 breaths per minute, tachycardia >90 beats per minute, or white blood cell count >12 000 or <400 cells/μL (moderate; Figure 1) (strong, low). An antibiotic active against MRSA is recommended for patients with carbuncles or abscesses who have markedly impaired host defenses and in patients with SIRS (Figure 1, Table 2) (strong, low).

*Evidence Summary*

*Cutaneous Abscesses*.   Cutaneous abscesses are collections of pus within the dermis and deeper skin tissues. They are usually painful, tender, and fluctuant red nodules, often surmounted by a pustule and encircled by a rim of erythematous swelling. Cutaneous abscesses can be polymicrobial, containing regional skin flora or organisms from the adjacent mucous membranes, but *S. aureus* alone causes a large percentage of skin abscesses, with a substantial number due to MRSA strains [16–18].

Epidermoid (or epidermal inclusion) cysts, often erroneously labeled sebaceous cysts, ordinarily contain skin flora in a cheesy keratinous material. When inflammation and purulence occur, they are a reaction to rupture of the cyst wall and extrusion of its contents into the dermis, rather than an actual infectious process [19].

Incision, evacuation of pus and debris, and probing of the cavity to break up loculations provides effective treatment of cutaneous abscesses and inflamed epidermoid cysts. A randomized trial comparing incision and drainage of cutaneous abscesses to ultrasonographically guided needle aspiration of the abscesses showed that aspiration was successful in only 25% of cases overall and <10% with MRSA infections [20]. Accordingly, this form of treatment is not recommended. Simply covering the surgical site with a dry dressing is usually the easiest and most effective treatment of the wound [21, 22]. Some clinicians close the wound with sutures or pack it with gauze or other absorbent material. One small study, however, found that packing caused more pain and did not improve healing when compared to just covering the incision site with sterile gauze [23].

The addition of systemic antibiotics to incision and drainage of cutaneous abscesses does not improve cure rates [17, 21, 22, 24, 25], even in those due to MRSA, but did have a modest effect on the time to recurrence of other abscesses [17, 25]. However, systemic antibiotics should be given to patients with severely impaired host defenses or signs or symptoms of systemic infection (Figure 1, Table 2). In addition, multiple abscesses, extremes of age, and lack of response to incision and drainage alone are additional settings in which systemic antimicrobial therapy should be considered.

*Furuncles and Carbuncles*.   Furuncles (or "boils") are infections of the hair follicle, usually caused by *S. aureus*, in which suppuration extends through the dermis into the subcutaneous tissue, where a small abscess forms. They differ from folliculitis, in which the inflammation is more superficial and pus is limited to the epidermis. Clinically, furuncles are inflammatory nodules with overlying pustules through which hair emerges. Infection involving several adjacent follicles produces a carbuncle, a coalescent inflammatory mass with pus draining from multiple follicular orifices. Carbuncles develop most commonly on the back of the neck, especially in individuals with diabetes. These are typically larger and deeper than furuncles.

Furuncles often rupture and drain spontaneously or following treatment with moist heat. Most large furuncles and all carbuncles should be treated with incision and drainage. Systemic antimicrobials are usually unnecessary, unless fever or other evidence of systemic infection is present (Figure 1).

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

# RECOMMENDATIONS FOR RECURRENT SKIN ABSCESSES

### III. What Is the Appropriate Treatment for Recurrent Skin Abscesses?

*Recommendations*

7.   A recurrent abscess at a site of previous infection should prompt a search for local causes such as a pilonidal cyst, hidradenitis suppurativa, or foreign material (strong, moderate).

8.   Recurrent abscesses should be drained and cultured early in the course of infection (strong, moderate).

9.   Culture recurrent abscess and treat with a 5- to 10-day course of an antibiotic active against the pathogen isolated (weak, low).

10.   Consider a 5-day decolonization regimen twice daily of intranasal mupirocin, daily chlorhexidine washes, and daily decontamination of personal items such as towels, sheets, and clothes for recurrent *S. aureus* infection (weak, low).

11.   Adult patients should be evaluated for neutrophil disorders if recurrent abscesses began in early childhood (strong, moderate).

### Evidence Summary

A recurrent abscess at a previous site of infection may be caused by local factors such as foreign material, hidradenitis suppurativa, or pilonidal cyst [26, 27], eradication of which can be curative. Incision and drainage should be performed for recurrent abscesses. The benefits of adjunctive antimicrobial therapy in preventing recurrences are unknown. Older randomized trials showed that twice-daily intranasal mupirocin for 5 days each month [28] or a 3-month program of oral clindamycin 150 mg daily [29] reduced the rate of further infections. Whether such regimens are effective in the current era of community-acquired MRSA is unclear [30]. In one randomized trial, twice-daily application of nasal mupirocin for 5 days among military personnel who carried MRSA in the nose did not reduce the frequency of subsequent skin infections [30, 31]. Scrubbing the body thrice weekly with chlorhexidine-impregnated cloths after showering was also deemed ineffective [32]. A 5-day decolonization with twice-daily intranasal mupirocin and daily bathing with chlorhexidine [32] or dilute bleach (1/4–1/2 cup of bleach per full bath) for prevention of recurrences may be considered, but data about efficacy are sparse. One uncontrolled study reported termination of an epidemic of furunculosis in a village by use of mupirocin, antibacterial hand cleanser, and daily washing of towels, sheets, combs, and razors [33]. A recent study in children found employing preventive measures for the patient and the household contacts resulted in significantly fewer recurrences in the patient than employing the measures in the patient only [34]. Because patients with neutrophil dysfunction develop recurrent abscesses in early childhood, patients who develop abscesses during adulthood do not need evaluation of neutrophil function.

# RECOMMENDATIONS FOR ERYSIPELAS AND CELLULITIS

### IV. What Is Appropriate for the Evaluation and Treatment of Erysipelas and Cellulitis?

*Recommendations*

12.   Cultures of blood or cutaneous aspirates, biopsies, or swabs are not routinely recommended (strong, moderate).

13.   Cultures of blood are recommended (strong, moderate), and cutaneous and microscopic examination of cutaneous aspirates, biopsies, or swabs should be considered in patients with malignancy on chemotherapy, neutropenia, severe cell-mediated immunodeficiency, immersion injuries, and animal bites (weak, moderate).

14.   Typical cases of cellulitis without systemic signs of infection should receive an antimicrobial agent that is active against streptococci (mild; Figure 1) (strong, moderate). For cellulitis with systemic signs of infection (moderate nonpurulent SSTI; Figure 1) systemic antibiotics are indicated. Many clinicians could include coverage against MSSA (weak, low). For patients whose cellulitis is associated with penetrating trauma, evidence of MRSA infection elsewhere, nasal colonization with MRSA, injection drug use, purulent drainage, or SIRS (severe nonpurulent), vancomycin or another antimicrobial effective against both MRSA and streptococci is recommended (strong, moderate). In severely compromised patients (as defined in question 13), broad-spectrum antimicrobial coverage may be considered (weak, moderate). Vancomycin plus either piperacillin-tazobactam or imipenem-meropenem is recommended as a reasonable empiric regimen for severe infection (strong, moderate).

15.   The recommended duration of antimicrobial therapy is 5 days, but treatment should be extended if the infection has not improved within this time period (strong, high).

16.   Elevation of the affected area and treatment of predisposing factors, such as edema or underlying cutaneous disorders, are recommended (strong, moderate).

17.   In lower extremity cellulitis, clinicians should carefully examine the interdigital toe spaces because treating fissuring, scaling, or maceration may eradicate colonization with pathogens and reduce the incidence of recurrent infection (strong, moderate).

18.   Outpatient therapy is recommended for patients who do not have SIRS, altered mental status, or hemodynamic instability (mild nonpurulent; Figure 1) (strong, moderate). Hospitalization is recommended if there is concern for a deeper or necrotizing infection, for patients with poor adherence to therapy, for infection in a severely immunocompromised patient, or

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

if outpatient treatment is failing (moderate or severe nonpuru-
lent; Figure 1) (strong, moderate).

### Evidence Summary

"Cellulitis" and "erysipelas" refer to diffuse, superficial, spread-
ing skin infections. The term "cellulitis" is not appropriate for
cutaneous inflammation associated with collections of pus, such
as in septic bursitis, furuncles, or skin abscesses. For example,
when cutaneous redness, warmth, tenderness, and edema en-
circle a suppurative focus such as an infected bursa, the appro-
priate terminology is "septic bursitis with surrounding
inflammation," rather than "septic bursitis with surrounding
cellulitis." This distinction is clinically crucial, for the primary
treatment of cellulitis is antimicrobial therapy, whereas for pu-
rulent collections the major component of management is
drainage of the pus, with antimicrobial therapy either being un-
necessary or having a subsidiary role (Figure 1 and Table 2).

The term "erysipelas" has 3 different meanings: (1) for some,
erysipelas is an infection limited to the upper dermis, including
the superficial lymphatics, whereas cellulitis involves the deeper
dermis and subcutaneous fat, and on examination erysipelas
putatively has more clearly delineated borders of inflammation
than cellulitis; (2) for many, erysipelas has been used to refer to
cellulitis involving the face only; and (3) for others, especially in
European countries, cellulitis and erysipelas are synonyms [35].

These infections cause rapidly spreading areas of erythema,
swelling, tenderness, and warmth, sometimes accompanied by
lymphangitis and inflammation of the regional lymph nodes.
The skin surface may resemble an orange peel (*peau d'orange*)
due to superficial cutaneous edema surrounding hair follicles
and causing skin dimpling because the follicles remain tethered
to the underlying dermis. Vesicles, bullae, and cutaneous hem-
orrhage in the form of petechiae or ecchymoses may develop.
Systemic manifestations are usually mild, but fever, tachycardia,
confusion, hypotension, and leukocytosis are sometimes pre-
sent and may occur hours before the skin abnormalities appear.

These infections arise when microbes breach the cutaneous
surface, especially in patients with fragile skin or diminished
local host defenses from such conditions as obesity, previous
cutaneous trauma (including surgery), prior episodes of cellu-
litis, and edema from venous insufficiency or lymphedema
[36, 37]. The origin of the disrupted skin surface may be obvi-
ous, such as trauma, ulceration, and preexisting cutaneous in-
flammation, but often the breaks in the skin are small and
clinically unapparent. These infections are most common on
the lower legs. Blood cultures are generally positive in ≤5% of
cases [38]. The yield of cultures of needle aspirations of the in-
flamed skin ranges from ≤5% to approximately 40% [39–46].
The differences in diagnostic sensitivity and specificity are
due to the variety of patient populations studied, the definitions
of cellulitis, the inclusion or exclusion of cases with associated

abscesses, and the determination of whether isolates are patho-
gens or contaminants.

Cultures of punch biopsy specimens yield an organism in
20%–30% of cases [39, 47], but the concentration of bacteria
in the tissues is usually quite low [47]. Combined data from
specimen cultures, serologic studies [41, 48–51], and other
methods (eg, immunohistochemical staining to detect antigens
in skin biopsies [51, 52]), suggests that the vast majority of these
infections arise from streptococci, often group A, but also from
other groups, such as B, C, F, or G. The source of these patho-
gens is frequently unclear, but in many cases of leg cellulitis, the
responsible streptococci reside in macerated, scaly, or fissured
interdigital toe spaces [53, 54]. This observation underscores
the importance of detecting and treating tinea pedis, erythras-
ma, and other causes of toe web abnormalities. Occasionally,
the reservoir of streptococci is the anal canal [55] or the vagina,
especially for group B streptococcal cellulitis in patients with
previous gynecologic cancer treated with surgery and radiation
therapy. *Staphylococcus aureus* less frequently causes cellulitis,
but cases due to this organism are typically associated with an
open wound or previous penetrating trauma, including sites of
illicit drug injection. Several other organisms can cause celluli-
tis, but usually only in special circumstances, such as animal
bites, freshwater or saltwater immersion injuries, neutropenia,
or severe cell-mediated immunodeficiency.

Cultures of blood, tissue aspirates, or skin biopsies are unnec-
essary for typical cases of cellulitis. Blood cultures should be ob-
tained and cultures of skin biopsy or aspirate considered for
patients with malignancy, severe systemic features (such as
high fever and hypotension), and unusual predisposing factors,
such as immersion injury, animal bites, neutropenia, and severe
cell-mediated immunodeficiency [42].

Therapy for typical cases of cellulitis should include an antibi-
otic active against streptococci (Table 2). A large percentage of
patients can receive oral medications from the start for typical
cellulitis [56], and suitable antibiotics for most patients include
penicillin, amoxicillin, amoxicillin-clavulanate, dicloxacillin,
cephalexin, or clindamycin. In cases of uncomplicated cellulitis,
a 5-day course of antimicrobial therapy is as effective as a 10-day
course, if clinical improvement has occurred by 5 days [57]. In a
retrospective study of cellulitis and abscesses requiring hospital-
ization, the average duration of treatment was 2 weeks and only
about one-third of patients received specific treatment for gram-
positive pathogens [58]. Two-thirds received very-broad-spec-
trum treatment, and the failure rate of 12% was not different re-
gardless of spectrum of treatment. In some patients, cutaneous
inflammation and systemic features worsen after initiating ther-
apy, probably because sudden destruction of the pathogens re-
leases potent enzymes that increase local inflammation.

MRSA is an unusual cause of typical cellulitis. A prospective
study of patients with cellulitis in a medical center with a high

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

incidence of other MRSA-related SSTIs demonstrated that treatment with β-lactams, such as cefazolin or oxacillin, was successful in 96% of patients, suggesting that cellulitis due to MRSA is uncommon and treatment for that organism is usually unnecessary [50]. However, coverage for MRSA may be prudent in cellulitis associated with penetrating trauma, especially from illicit drug use, purulent drainage, or with concurrent evidence of MRSA infection elsewhere. Options for treatment of MRSA in those circumstances (Table 2) include intravenous drugs (vancomycin, daptomycin, linezolid, or telavancin) or oral therapy with doxycycline, clindamycin, or SMX-TMP. If coverage for both streptococci and MRSA is desired for oral therapy, options include clindamycin alone or the combination of either SMX-TMP or doxycycline with a β-lactam (eg, penicillin, cephalexin, or amoxicillin). The activity of doxycycline and SMX-TMP against β-hemolytic streptococci is not known, and in the absence of abscess, ulcer, or purulent drainage, β-lactam monotherapy is recommended. This is further substantiated by a recent double-blind study showing that a combination of SMX-TMP plus cephalexin was no more efficacious than cephalexin alone in pure cellulitis [59]. Elevation of the affected area hastens improvement by promoting gravity drainage of edema and inflammatory substances. Patients should also receive therapy for any predisposing conditions, such as tinea pedis, trauma, or venous eczema ("stasis dermatitis").

## V. Should Anti-inflammatory Agents Be Used to Complement Antibiotic Treatment of Cellulitis?

### Recommendation

19.   Systemic corticosteroids (eg, prednisone 40 mg daily for 7 days) could be considered in nondiabetic adult patients with cellulitis (weak, moderate).

### Evidence Summary

Treating the inflammation in these infections by combining antimicrobial therapy with either a nonsteroidal anti-inflammatory agent (ibuprofen 400 mg 4 times daily [qid] for 5 days) or systemic corticosteroids significantly hastens clinical improvement compared with antimicrobial therapy alone [60, 61]. A randomized, double-blind, placebo-controlled trial involving 108 adult nondiabetic patients, demonstrated that an 8-day course of oral corticosteroids in combination with antimicrobial therapy led to a significantly more rapid clinical resolution of cellulitis (primarily of the legs) than antimicrobial therapy alone [61, 62]. Long-term follow-up of these patients showed no difference in relapse or recurrence [61, 62]. The benefits of systemic corticosteroids in this situation are consistent with their efficacy and safety as adjunctive treatment in other infections [63]. The clinician must ensure that a deeper infection such as necrotizing fasciitis is not present.

Most patients can receive treatment without hospitalization [63, 64]. Hospitalization is indicated for suspicion of necrotizing infection or for patients with severe systemic features, such as fever, delirium, or hypotension. Other indications include poor response to outpatient therapy, severe immunocompromise, and problems with a patient's adherence to treatment.

## RECOMMENDATIONS FOR PATIENTS WITH RECURRENT CELLULITIS

### VI. What Is the Preferred Evaluation and Management of Patients with Recurrent Cellulitis?

### Recommendations

20.   Identify and treat predisposing conditions such as edema, obesity, eczema, venous insufficiency, and toe web abnormalities (strong, moderate). These practices should be performed as part of routine patient care and certainly during the acute stage of cellulitis (strong, moderate).

21.   Administration of prophylactic antibiotics, such as oral penicillin or erythromycin bid for 4–52 weeks, or intramuscular benzathine penicillin every 2–4 weeks, should be considered in patients who have 3–4 episodes of cellulitis per year despite attempts to treat or control predisposing factors (weak, moderate). This program should be continued so long as the predisposing factors persist (strong, moderate).

### Evidence Summary

Patients with a previous attack of cellulitis, especially involving the legs, have annual recurrences rates of about 8%–20% [65–67]. The infection usually occurs in the same area as the previous episode. Edema, especially lymphedema and other local risk factors such as venous insufficiency, prior trauma (including surgery) to the area, and tinea pedis or other toe web abnormalities [65–71], increase the frequency of recurrences. Other predisposing conditions include obesity, tobacco use, a history of cancer, and homelessness [66, 67, 71]. Addressing these factors might decrease the frequency of recurrences, but evidence for any such a benefit is sparse. For patients with recurrences despite such efforts, antimicrobial prophylaxis may reduce the frequency of future episodes. Two randomized trials using twice-daily oral penicillin or erythromycin demonstrated a substantial reduction in recurrences among the antibiotic recipients compared to controls [72, 73]. An observational trial of monthly intramuscular injections of 1.2 million units of benzathine penicillin found that this regimen was beneficial only in the subgroup of patients who had no identifiable predisposing factors for recurrence [74]. In a study of patients with recurrent cellulitis involving arm lymphedema caused by breast cancer treatment, 2.4 million units of biweekly intramuscular benzathine penicillin seemed to reduce the frequency of episodes, but there was no control group [75]. The duration of therapy is indefinite, and infections may recur once prophylaxis is discontinued. For example, a recent double-blind comparative trial demonstrated that phenoxymethyl-penicillin given as 250 mg

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

twice daily for 12 months increased the time to recurrence to 626 days compared with 532 days in the control group and decreased the frequency of recurrence from 37% to 22% [76].

# RECOMMENDATIONS FOR SURGICAL SITE INFECTIONS

### VII. What Is the Preferred Management of Surgical Site Infections?

*Recommendations*

22.  Suture removal plus incision and drainage should be performed for surgical site infections (strong, low).

23.  Adjunctive systemic antimicrobial therapy is not routinely indicated, but in conjunction with incision and drainage may be beneficial for surgical site infections associated with a significant systemic response (Figure 2) such as erythema and induration extending >5 cm from the wound edge, temperature >38.5° C, heart rate >110 beats/minute, or white blood cell (WBC) count >12 000/μL (weak, low).

24.  A brief course of systemic antimicrobial therapy is indicated in patients with surgical site infections following clean operations on the trunk, head and neck, or extremities that also have systemic signs of infection (strong, low).

25.  A first-generation cephalosporin or an antistaphylococcal penicillin for methicillin-susceptible *Staphylococcus aureus* (MSSA) or vancomycin, linezolid, daptomycin, telavancin, or ceftaroline where risk factors for MRSA are high (nasal colonization, prior MRSA infection, recent hospitalization, recent antibiotics) is recommended (strong, low).

26.  Agents active against gram-negative bacteria and anaerobes, such as a cephalosporin or fluoroquinolone in combination with metronidazole are recommended for infections following operations on the axilla, gastrointestinal (GI) tract, perineum, or female genital tract (Table 2) (strong, low).

### Evidence Summary

Wound infections, or surgical site infections (SSIs) are the most common adverse event affecting hospitalized surgical patients [77]. Data from the National Nosocomial Infection Surveillance System (NNIS) show an average incidence of SSI of 2.6%, accounting for 38% of nosocomial infections in surgical patients [78]. The frequency of SSI is clearly related to the category of operation, with clean and low-risk operations (by NNIS classification) having the lowest incidence, and contaminated and high-risk operations having higher infection rates [79]. Unfortunately, there are no studies that have objectively compared treatments for SSI.

SSIs are divided into the categories of superficial incisional SSI, deep incisional SSI, and organ/space SSI [78]. Superficial incisional SSIs involve only the subcutaneous space, between the skin and underlying muscular fascia, occur within 30 days

of the surgery, and are documented with at least 1 of the following: (1) purulent incisional drainage, (2) positive culture of aseptically obtained fluid or tissue from the superficial wound, (3) local signs and symptoms of pain or tenderness, swelling, and erythema after the incision is opened by the surgeon (unless culture negative), or (4) diagnosis of SSI by the attending surgeon or physician based on their experience and expert opinion. A deep incisional infection involves the deeper soft tissue (eg, fascia and muscle), and occurs within 30 days of the operation or within 1 year if a prosthesis was inserted and has the same findings as described for a superficial incisional SSI. An organ/space SSI has the same time constraints and evidence for infection as a deep incisional SSI, and it may involve any part of the anatomy (organs or spaces) other than the original surgical incision [78]. Examples would include postoperative peritonitis, empyema, or joint space infection. Any deep SSI that does not resolve in the expected manner following treatment should be investigated as a possible superficial manifestation of a deeper organ/space infection. Diagnosis and treatment of organ space infections in the abdomen are discussed in other guidelines. Tedizolid and dalbavancin are also effective treatments of SSTI including those caused by MRSA and may be approved by the US Food and Drug Administration (FDA) in June 2014.

Local signs of pain, swelling, erythema, and purulent drainage provide the most reliable information in diagnosing an SSI. In morbidly obese patients or in those with deep, multilayer wounds such as after thoracotomy, external signs of SSI may be delayed. While many patients with a SSI will develop fever, it usually does not occur immediately postoperatively, and in fact, most postoperative fevers are not associated with an SSI [80]. Flat, erythematous skin changes can occur around or near a surgical incision during the first week without swelling or wound drainage. Most resolve without any treatment. The cause is unknown but may relate to tape sensitivity or other local tissue insult not involving bacteria. Numerous experimental studies and clinical trials demonstrate that antibiotics begun immediately postoperatively or continued for long periods after the procedure do not prevent or cure this inflammation or infection [81–88]. Therefore, the suspicion of possible SSI does not justify use of antibiotics without a definitive diagnosis and the institution of other therapeutic measures such as opening the wound (Figure 2).

SSIs rarely occur during the first 48 hours after surgery, and fever during that period usually arises from noninfectious or unknown causes. SSIs that do occur in this time frame are almost always due to *S. pyogenes* or *Clostridium* species. After 48 hours, SSI is a more common source of fever, and careful inspection of the wound is indicated; by 4 days after surgery, a fever is equally likely to be caused by an SSI or by another infection or other unknown sources [80]. Later infections are less

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

likely, but surveillance standards mandate 30 days of follow-up for operations without placement of prosthetic material and for 1 year for operations where a prosthesis was inserted.

Accordingly, fever or systemic signs during the first several postoperative days should be followed by direct examination of the wound to rule out signs suggestive of streptococcal or clostridial infection (see section on necrotizing soft tissue infections and clostridial myonecrosis), but should not otherwise cause further manipulation of the wound. Patients with an early infection due to streptococci or clostridia have wound drainage with the responsible organisms present on Gram stain (Figure 2). White blood cells may not be evident in the drainage in most clostridial and some early streptococcal infections. Another rare cause of early fever and systemic signs following operation is staphylococcal wound toxic shock syndrome [89, 90]. In these cases the wound is often deceptively benign in appearance. Erythroderma occurs early and desquamation occurs late. Fever, hypotension, abnormal hepatic and renal blood studies, and diarrhea are early findings. Appropriate treatment is to open the incision, perform culture, and begin antistaphylococcal treatment.

The most important therapy for an SSI is to open the incision, evacuate the infected material, and continue dressing changes until the wound heals by secondary intention. Most textbooks of surgery, infectious diseases, or even surgical infectious diseases extensively discuss the epidemiology, prevention, and surveillance of SSIs, but not their treatment [91–97]. Two contain simple, unreferenced, recommendations to open an infected wound without using antibiotics [96, 98]. Thus, if there is <5 cm of erythema and induration, and if the patient has minimal systemic signs of infection (temperature <38.5°C, WBC count <12 000 cells/μL, and pulse <100 beats/minute), antibiotics are unnecessary [99]. Studies of subcutaneous abscesses found little or no benefit for antibiotics when combined with drainage [18, 21, 100, 101]. The single published trial of antibiotic administration for SSI specifically found no clinical benefit [99]. Incision and drainage of superficial abscesses rarely causes bacteremia [102], and thus prophylactic antibiotics are not recommended.

Patients with temperature >38.5°C or heart rate >110 beats/minute or erythema extending beyond the wound margins for >5 cm may require a short course (eg, 24–48 hours) of antibiotics, as well as opening of the suture line (Figure 2). The antibiotic choice is usually empiric but can be supported by Gram stain, culture of the wound contents (Table 2), and the site of surgery. For example, an SSI following an operation on the intestinal tract or female genitalia has a high probability of a mixed gram-positive and gram-negative flora with both facultative and anaerobic organisms. Antibiotics considered suitable for treatment of intra-abdominal infection are appropriate. If the operation was a clean procedure that did not enter the

intestinal or genital tracts, *S. aureus* and streptococcal species are the most common organisms. If the institution in which the operation was performed has a significant proportion of infections with MRSA or the patient has had prior MRSA infection, nasal colonization or was previously on antibiotics, the initial antibiotic should include vancomycin, linezolid, daptomycin, telavancin, or ceftaroline for MRSA coverage as well as one of the following for gram-negative and anaerobic coverage: (1) piperacillin-tazobactam, (2) a carbapenem, or (3) ceftriaxone and metronidazole (Table 3).

Infections following surgical operations on the axilla also have a significant recovery of gram-negative organisms, and those in the perineum have a higher incidence of gram-negative organisms and anaerobes [100, 103, 104]; antibiotic selections should provide coverage for these organisms (Table 3). Figure 2 presents a schematic algorithm to approach patients with suspected SSIs and includes specific antibiotic recommendations [105]. Infections developing after surgical procedures involving nonsterile areas such as colonic, vaginal, biliary, or respiratory mucosa may be caused by a combination of aerobic and anaerobic bacteria [18, 87, 88, 101]. These infections can rapidly progress and involve deeper structures than just the skin, such as fascia, fat, or muscle (Tables 3 and 4).

## RECOMMENDATIONS FOR EVALUATION AND TREATMENT OF NECROTIZING FASCIITIS

### VIII. What Is the Preferred Evaluation and Treatment of Necrotizing Fasciitis, Including Fournier Gangrene?
*Recommendations*

27.  Prompt surgical consultation is recommended for patients with aggressive infections associated with signs of systemic toxicity or suspicion of necrotizing fasciitis or gas gangrene (severe nonpurulent; Figure 1) (strong, low).

28.  Empiric antibiotic treatment should be broad (eg, vancomycin or linezolid plus piperacillin-tazobactam or plus a carbapenem, or plus ceftriaxone and metronidazole), as the etiology can be polymicrobial (mixed aerobic-anaerobic microbes) or monomicrobial (group A *Streptococcus*, community-acquired MRSA) (strong, low).

29.  Penicillin plus clindamycin is recommended for treatment of documented group A streptococcal necrotizing fasciitis (strong, low).

### Evidence Summary
Necrotizing SSTIs differ from the milder, superficial infections by clinical presentation, coexisting systemic manifestations, and treatment strategies (Table 4). These deep infections involve the fascial and/or muscle compartments and are potentially devastating due to major tissue destruction and death. They usually develop from an initial break in the skin related to trauma or

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

**Table 3. Antibiotics for Treatment of Incisional Surgical Site Infections**

| |
|---|
| Surgery of Intestinal or Genitourinary Tract |
| Single-drug regimens |
| Ticarcillin-clavulanate 3.1 g every 6 h IV |
| Piperacillin-tazobactam 3.375 g every 6 h or 4.5 g every 8 h IV |
| Imipenem-cilastatin 500 mg every 6 h IV |
| Meropenem 1 g every 8 h IV |
| Ertapenem 1 g every 24 h IV |
| Combination regimens |
| Ceftriaxone 1 g every 24 h + metronidazole 500 mg every 8 h IV |
| Ciprofloxacin 400 mg IV every 12 h or 750 mg po every 12 h + metronidazole 500 mg every 8 h IV |
| Levofloxacin 750 mg IV every 24 h + metronidazole 500 mg every 8 h IV |
| Ampicillin-sulbactam 3 g every 6 h + gentamicin or tobramycin 5 mg/kg every 24 h IV |
| Surgery of trunk or extremity away from axilla or perineum |
| Oxacillin or nafcillin 2 g every 6 h IV |
| Cefazolin 0.5–1 g every 8 h IV |
| Cephalexin 500 mg every 6 h po |
| SMX-TMP 160–800 mg po every 6 h |
| Vancomycin 15 mg/kg every 12 h |
| Surgery of axilla or perineum[a] |
| Metronidazole 500 mg every 8 h IV |
| plus |
| Ciprofloxacin 400 mg IV every 12 h or 750 mg po every 12 h IV po |
| Levofloxacin 750 mg every 24 h IV po |
| Ceftriaxone 1 g every 24 h |

Abbreviations: IV, intravenous; po, by mouth; SMX-TMP, sulfamethoxazole-trimethoprim.

[a] May also need cover for methicillin-resistant *Staphylococcus aureus* with vancomycin 15 mg/kg every 12 h.

surgery. They can be monomicrobial, usually from streptococci or less commonly community-acquired MRSA, *Aeromonas hydrophila*, or *Vibrio vulnificus*, or polymicrobial, involving a mixed aerobe–anaerobe bacterial flora. Although many specific variations of necrotizing soft tissue infections have been described based on etiology, microbiology, and specific anatomic location of the infection, the initial approach to diagnosis, antimicrobial treatment, and surgical intervention is similar for all forms and is more important than determining the specific variant. Early in the course, distinguishing between a cellulitis that should respond to antimicrobial treatment alone and a necrotizing infection that requires operative intervention is critical but may be difficult.

**Necrotizing Fasciitis**

Necrotizing fasciitis is an aggressive subcutaneous infection that tracks along the superficial fascia, which comprises all the tissue between the skin and underlying muscles [106, 107]. The term "fasciitis" sometimes leads to the mistaken impression that the muscular fascia or aponeurosis is involved, but in fact it is the superficial fascia that is most commonly involved.

*Clinical Features*

Extension from a skin lesion is seen in most cases. The initial lesion can be trivial, such as a minor abrasion, insect bite, injection site (as in drug addicts), or boil, and a small minority of patients have no visible skin lesion. The initial presentation is that of cellulitis, which can advance rapidly or slowly. As it progresses, there is systemic toxicity, often including high temperatures, disorientation, and lethargy. Examination of the local site typically reveals cutaneous inflammation, edema, and discoloration or gangrene and anesthesia. A distinguishing clinical feature is the wooden-hard induration of the subcutaneous tissues. In cellulitis, the subcutaneous tissues are palpable and yielding; in fasciitis the underlying tissues are firm, and the fascial planes and muscle groups cannot be discerned by palpation. A broad erythematous tract is sometimes evident along the route of the infection, as it advances proximally in an extremity. If there is an open wound, probing the edges with a blunt instrument permits ready dissection of the superficial fascial planes well beyond the wound margins.

*Bacteriology*

In the monomicrobial form, the usual pathogens are *S. pyogenes*, *S. aureus*, *V. vulnificus*, *A. hydrophila*, and anaerobic streptococci (*Peptostreptococcus*). Infection with staphylococci and hemolytic streptococci can occur simultaneously. Most infections are community acquired and present in the limbs, with approximately two-thirds in the lower extremities. There is often a predisposing condition, such as diabetes, arteriosclerotic vascular disease, venous insufficiency with edema, venous stasis or vascular insufficiency, ulcer, or injection drug use. Cases of necrotizing fasciitis that arise after varicella or trivial injuries, such as minor scratches or insect bites, are usually due to *S. pyogenes* or, far less commonly, community-acquired MRSA [108]. The mortality in patients with group A streptococcal necrotizing fasciitis, hypotension, and organ failure is high, ranging from 30% to 70% [109, 110]. Nearly 50% of patients with necrotizing fasciitis caused by *S. pyogenes* have no portal of entry but develop deep infection at the exact site of nonpenetrating trauma such as a bruise or muscle strain. Some cases are associated with child delivery and involve the uterus or episiotomy site. Severe pain may be the initial clinical symptom with little cutaneous evidence due to the deep infection.

Polymicrobial infection is most commonly associated with 4 clinical settings: (1) perianal abscesses, penetrating abdominal trauma, or surgical procedures involving the bowel; (2) decubitus ulcers; (3) injection sites in illicit drug users; and (4) spread from a genital site such as Bartholin abscess, episiotomy wound, or a minor vulvovaginal infection. In the polymicrobial form,

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

**Table 4.  Treatment of Necrotizing Infections of the Skin, Fascia, and Muscle**

| Type of Infection | First-line Antimicrobial Agent | Adult Dosage | Pediatric Dosage Beyond the Neonatal Period | Antimicrobial Agent for Patients With Severe Penicillin Hypersensitivity |
|---|---|---|---|---|
| Mixed infections | Piperacillin-tazobactam plus vancomycin | 3.37 g every 6–8 h IV 30 mg/kg/d in 2 divided doses | 60–75 mg/kg/dose of the piperacillin component every 6 h IV 10–13 mg/kg/dose every 8 h IV | Clindamycin or metronidazole[a] with an aminoglycoside or fluoroquinolone |
| | Imipenem-cilastatin | 1 g every 6–8 h IV | N/A | N/A |
| | Meropenem | 1 g every 8 h IV | 20 mg/kg/dose every 8 h IV | |
| | Ertapenem | 1 g daily IV | 15 mg/kg/dose every 12 h IV for children 3 mo-12 y | |
| | Cefotaxime plus metronidazole or clindamycin | 2 g every 6 h IV 500 mg every 6 h IV 600–900 mg every 8 h IV | 50 mg/kg/dose every 6 h IV 7.5 mg/kg/dose every 6 h IV 10–13 mg/kg/dose every 8 h IV | N/A |
| *Streptococcus* | Penicillin plus clindamycin | 2–4 million units every 4–6 h IV (adult) 600–900 mg every 8 h IV | 60 000–100 000 units/kg/dose every 6 h IV 10–13 mg/kg/dose every 8 h IV | Vancomycin, linezolid, quinupristin/dalfopristin, daptomycin |
| *Staphylococcus aureus* | Nafcillin | 1–2 g every 4 h IV | 50 mg/kg/dose every 6 h IV | Vancomycin, linezolid, quinupristin/dalfopristin, daptomycin |
| | Oxacillin | 1–2 g every 4 h IV | 50 mg/kg/dose every 6 h IV | |
| | Cefazolin | 1 g every 8 h IV | 33 mg/kg/dose every 8 h IV | |
| | Vancomycin (for resistant strains) | 30 mg/kg/d in 2 divided doses IV | 15 mg/kg/dose every 6 h IV | |
| | Clindamycin | 600–900 mg every 8 h IV | 10–13 mg/kg/dose every 8 h IV | Bacteriostatic; potential cross-resistance and emergence of resistance in erythromycin-resistant strains; inducible resistance in MRSA[b] |
| *Clostridium* species | Clindamycin plus penicillin | 600–900 mg every 8 h IV 2–4 million units every 4–6 h IV (adult) | 10–13 mg/kg/dose every 8 h IV 60 000–100 00 units/kg/dose every 6 h IV | N/A |
| *Aeromonas hydrophila* | Doxycycline plus ciprofloxacin or ceftriaxone | 100 mg every 12 h IV 500 mg every 12 h IV 1 to 2 g every 24 h IV | Not recommended for children but may need to use in life-threatening situations | N/A |
| *Vibrio vulnificus* | Doxycycline plus ceftriaxone or cefotaxime | 100 mg every 12 h IV 1 g qid IV 2 g tid IV | Not recommended for children but may need to use in life-threatening situations | N/A |

Abbreviations: IV, intravenous; MRSA, methicillin-resistant *Staphylococcus aureus*; N/A, not applicable; qid, 4 times daily; tid, 3 times daily.

[a] If staphylococcus present or suspected, add an appropriate agent.

[b] If MRSA is present or suspected, add vancomycin not to exceed the maximum adult daily dose.

numerous different anaerobic and aerobic organisms can be cultured from the involved fascial plane, with an average of 5 pathogens in each wound. Most of the organisms originate from the bowel or genitourinary flora (eg, coliforms and anaerobic bacteria).

### Diagnosis

The diagnosis of fasciitis may not be apparent upon first seeing the patient. Overlying cutaneous inflammation may resemble cellulitis. However, features that suggest involvement of deeper tissues include (1) severe pain that seems disproportional to the clinical findings; (2) failure to respond to initial antibiotic therapy; (3) the hard, wooden feel of the subcutaneous tissue, extending beyond the area of apparent skin involvement; (4) systemic toxicity, often with altered mental status; (5) edema or tenderness extending beyond the cutaneous erythema; (6) crepitus, indicating gas in the tissues; (7) bullous lesions; and (8) skin necrosis or ecchymoses.

Computed tomography (CT) or magnetic resonance imaging (MRI) may show edema extending along the fascial plane, although the sensitivity and specificity of these imaging studies are ill defined. CT or MRI also may delay definitive diagnosis and treatment. In practice, clinical judgment is the most important element in diagnosis. The most important diagnostic feature of necrotizing fasciitis is the appearance of the subcutaneous tissues or fascial planes at operation. The fascia at the time of direct visual examination is swollen and dull gray in appearance with stringy areas of necrosis; a thin, brownish exudate may be present. Even after deep dissection, there is typically no true pus detected. Extensive undermining of surrounding tissues is usually present, and the tissue planes can be readily dissected with a gloved finger or a blunt instrument. Several clinical scoring systems have been proposed, but all of these are more useful for excluding necrotizing soft tissue infections than identifying them. A high index of suspicion remains paramount [111].

A definitive bacteriologic diagnosis is best established by culture and Gram stain of deep tissue obtained at operation or by positive blood cultures. Cultures of the superficial wound may be misleading because results may not reflect organisms in the deep tissue infection. Direct needle aspiration of an area of cutaneous inflammation may yield fluid for Gram stain and culture. In suspected cases a small, exploratory incision made in the area of maximum suspicion can be useful for excluding or confirming the diagnosis. Gram stains of the exudate will demonstrate the pathogens and provide an early guide to antimicrobial therapy. Gram-positive cocci in chains suggest *Streptococcus* (either group A or anaerobic). Large gram-positive cocci in clusters suggest *S. aureus*. If a necrotizing infection is present, it will be obvious from the findings described above. If there is no necrosis on exploratory incision, the procedure can be terminated with very little risk or morbidity to the patient. Biopsy for frozen section analysis may also be used to make the diagnosis, but, if enough suspicion exists to do a biopsy, the diagnosis is usually evident on gross inspection without histologic confirmation. In addition, sampling errors of biopsy alone may produce a false-negative result.

### Treatment

Surgical intervention is the primary therapeutic modality in cases of necrotizing fasciitis and is indicated when this infection is confirmed or suspected. Features suggestive of necrotizing fasciitis include (1) the clinical findings described above; (2) failure of apparently uncomplicated cellulitis to respond to antibiotics after a reasonable trial; (3) profound toxicity; fever, hypotension, or advancement of the SSTI during antibiotic therapy; (4) skin necrosis with easy dissection along the fascia by a blunt instrument; or (5) presence of gas in the soft tissues.

Most patients with necrotizing fasciitis should return to the operating room 24–36 hours after the first debridement and daily thereafter until the surgical team finds no further need for debridement. Although discrete pus is usually absent, these wounds can discharge copious amounts of tissue fluid, and aggressive fluid administration is a necessary adjunct.

In the absence of definitive clinical trials, antimicrobial therapy should be administered until further debridement is no longer necessary, the patient has improved clinically, and fever has been absent for 48–72 hours. Empiric treatment of polymicrobial necrotizing fasciitis should include agents effective against both aerobes, including MRSA, and anaerobes (Table 4). Among the many choices is vancomycin, linezolid, or daptomycin combined with one of the following options: (1) piperacillin-tazobactam, (2) a carbapenem (imipenem-cilastatin, meropenem, and ertapenem), (3) ceftriaxone plus metronidazole, or (4) a fluoroquinolone plus metronidazole (Table 4). Once the microbial etiology has been determined, the antibiotic coverage should be appropriately modified.

Necrotizing fasciitis and/or streptococcal toxic shock syndrome caused by group A streptococci should be treated with both clindamycin and penicillin. Clindamycin suppresses streptococcal toxin and cytokine production. Clindamycin was found to be superior to penicillin in animal models, and 2 observational studies show greater efficacy for clindamycin than β-lactam antibiotics [112, 113]. Penicillin should be added because of potential resistance of group A streptococci to clindamycin. Macrolide resistance in the United States is <5.0% among group A streptococci [114], but in Germany macrolide resistance is 8.2%, and in Spain 18.3% [115, 116]. Some of these strains are also clindamycin resistant. Interestingly, in the United States, no resistance to clindamycin was found from invasive strains of group A streptococci in Chicago [117].

The efficacy of intravenous immunoglobulin (IVIG) in treating streptococcal toxic shock syndrome has not been

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

definitively established. As extracellular streptococcal toxins have a role in organ failure, shock, and tissue destruction, neutralization of these toxins theoretically could be beneficial. Because a standardized antitoxin is unavailable, IVIG has been studied. However, there is considerable batch-to-batch variation of IVIG in terms of the quantity of neutralizing antibodies, and clinical data of efficacy are lacking [118]. One observational study demonstrated better outcomes in patients receiving IVIG, but this report was confounded because IVIG recipients were more likely to have had surgery and to have received clindamycin than the historical controls [119]. A double-blind, placebo-controlled trial from Northern Europe in which both groups were similar in terms of surgery and clindamycin treatment showed no statistically significant improvement in survival and a statistically nonsignificant reduction in the median time to no further progression of necrotizing fasciitis or cellulitis (20 hours for the IVIG group vs 24 hours for the placebo group) [120]. Additional studies of the efficacy of IVIG are necessary before a recommendation can be made supporting its use in this setting.

### Fournier Gangrene

This variant of necrotizing soft tissue infection involves the scrotum and penis or vulva [121, 122]. The average age at onset is 50–60 years. Eighty percent of patients have significant underlying diseases, particularly diabetes mellitus.

### Clinical Features

Fournier gangrene usually occurs from a perianal or retroperitoneal infection that has spread along fascial planes to the genitalia; a urinary tract infection, most commonly secondary to a urethral stricture, that involves the periurethral glands and extends into the penis and scrotum; or previous trauma to the genital area, providing access of organisms to the subcutaneous tissues.

### Bacteriology

The pace of infection can begin insidiously or abruptly with fever and pain, erythema, and swelling in the genitalia [121, 122]. As the disease progresses, cutaneous necrosis and crepitus, indicating gas in the soft tissue, may develop. The gangrene is usually limited to skin and subcutaneous tissue. The testes, glans penis, and spermatic cord are typically spared, as they have a separate blood supply. The infection may extend to the perineum and the anterior abdominal wall. Most cases are caused by mixed aerobic and anaerobic flora. *Staphylococcus aureus* and *Pseudomonas* species are sometimes present, usually in mixed culture. *Staphylococcus aureus* is known to cause this infection as the sole pathogen.

### Treatment

As with other necrotizing infections, prompt, aggressive surgical debridement is necessary to remove all necrotic tissue, sparing the deeper structures when possible.

# PYOMYOSITIS

### IX. What Is the Appropriate Approach to the Management of Pyomyositis?

#### Recommendations

30. MRI is the recommended imaging modality for establishing the diagnosis of pyomyositis. CT scan and ultrasound studies are also useful (strong, moderate).

31. Cultures of blood and abscess material should be obtained (strong, moderate).

32. Vancomycin is recommended for initial empirical therapy. An agent active against enteric gram-negative bacilli should be added for infection in immunocompromised patients or following open trauma to the muscles (strong, moderate).

33. Cefazolin or antistaphylococcal penicillin (eg, nafcillin or oxacillin) is recommended for treatment of pyomyositis caused by MSSA (strong, moderate).

34. Early drainage of purulent material should be performed (strong, high).

35. Repeat imaging studies should be performed in the patient with persistent bacteremia to identify undrained foci of infection (strong, low).

36. Antibiotics should be administered intravenously initially, but once the patient is clinically improved, oral antibiotics are appropriate for patients whose bacteremia cleared promptly and those with no evidence of endocarditis or metastatic abscess. Two to 3 weeks of therapy is recommended (strong, low).

### Evidence Summary

Pyomyositis is the presence of pus within individual muscle groups, caused mainly by *S. aureus*. Due to geographical distribution, this condition is often called tropical pyomyositis, but cases can occur in temperate climates, especially in patients with human immunodeficiency virus (HIV) infection or diabetes mellitus [123]. Presenting findings are localized pain in a single muscle group, muscle tenderness, and fever. The disease typically occurs in an extremity, but any muscle group can be involved, including the psoas or trunk muscles. Initially, it may not be possible to palpate a discrete fluctuance because the infection is deep within the muscle, but the area may have a firm, "woody" feel, along with pain and tenderness. In more advanced cases, a bulging abscess may become clinically apparent. Local trauma or vigorous use of muscles may precede this infection.

*Staphylococcus aureus* accounts for about 90% of pathogens causing pyomyositis; community-acquired MRSA isolates in this infection have been reported in many nontropical communities [124–126]. Group A streptococci, *Streptococcus pneumoniae*, and gram-negative enteric bacteria are other possible etiologic agents [127]. Blood cultures are positive in 5%–30% of patients. Serum creatine kinase concentrations are typically

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

normal in patients with a single area of pyomyositis related to hematogenous seeding of muscle [124].

MRI is the imaging modality that demonstrates pyomyositis most effectively [128, 129]. Muscle inflammation and abscess formation are readily noted; other sites of infection such as osteomyelitis or septic arthritis may also be observed or a venous thrombosis detected [130, 131]. In patients with disseminated *S. aureus* infection, multiple small areas of pyomyositis may become apparent. If an MRI cannot be performed, a CT scan can be useful, but it lacks the detail seen with MRI. Ultrasound is helpful if the infected muscle groups are superficial. Plain radiographs are sometimes used, but may demonstrate only soft tissue swelling.

In most cases of abscess, drainage is critical for optimal therapy [132]. Given the prevalence of community-acquired MRSA in the United States [124, 132], vancomycin is recommended for initial empirical therapy. Other agents active against MRSA (eg, linezolid, daptomycin, telavancin, or ceftaroline; clindamycin for susceptible isolates) may also be effective; however, clinical data are lacking because pyomyositis was an exclusion in randomized trials comparing these agents to vancomycin in treating complicated SSTIs [133–135]. Cefazolin or antistaphylococcal penicillin is recommended for definitive therapy of pyomyositis caused by MSSA. A broader spectrum of organisms causes pyomyositis in patients with underlying conditions [126], and empirical coverage with vancomycin plus 1 of the following is recommended: (a) piperacillin-tazobactam, (b) ampicillin-sulbactam, or (c) a carbapenem antimicrobial.

## RECOMMENDATIONS FOR EVALUATION AND TREATMENT OF CLOSTRIDIAL GAS GANGRENE AND MYONECROSIS

### X. What Is the Appropriate Approach to the Evaluation and Treatment of Clostridial Gas Gangrene or Myonecrosis?

*Recommendations*

37.   Urgent surgical exploration of the suspected gas gangrene site and surgical debridement of involved tissue should be performed (severe nonpurulent; Figure 1) (strong, moderate).

38.   In the absence of a definitive etiologic diagnosis, broad-spectrum treatment with vancomycin plus either piperacillin-tazobactam, ampicillin-sulbactam, or a carbapenem antimicrobial is recommended (strong, low). Definitive antimicrobial therapy along with penicillin and clindamycin is recommended for treatment of clostridial myonecrosis (strong, low).

39.   Hyperbaric oxygen (HBO) therapy is not recommended because it has not been proven as a benefit to the patient and may delay resuscitation and surgical debridement (strong, low).

### Evidence Summary

Clostridial gas gangrene or myonecrosis is most commonly caused by *Clostridium perfringens*, *Clostridium novyi*, *Clostridium histolyticum*, or *Clostridium septicum*. *Clostridium perfringens* is the most frequent cause of trauma-associated gas gangrene [136]. Increasingly severe pain beginning within 24 hours at the injury site is the first reliable clinical symptom. The skin may initially appear pale, but quickly changes to bronze, then purplish-red. The infected region becomes tense and tender, and bullae filled with reddish-blue fluid appear. Gas in the tissue, detected as crepitus or by imaging, is usually present by this late stage. Signs of systemic toxicity, including tachycardia, fever, and diaphoresis, develop rapidly, followed by shock and multiple organ failure.

Spontaneous gangrene, in contrast to trauma-associated gangrene, is principally associated with the more aerotolerant *C. septicum* and occurs predominantly in patients with neutropenia or gastrointestinal malignancy. It develops in normal soft tissue in the absence of trauma as a result of hematogenous spread from a colonic lesion, usually cancer. A rather innocuous early lesion evolves over the course of 24 hours into an infection with all of the cardinal manifestations of gas gangrene. The diagnosis is frequently not considered until gas is detected in tissue or systemic signs of toxicity appear. Early surgical inspection and debridement are necessary, and tissue Gram stain shows large, gram-positive or gram-variable rods at the site of infection [136].

Clostridial gas gangrene is a fulminant infection that requires meticulous intensive care, supportive measures, emergent surgical debridement, and appropriate antibiotics. Because bacteria other than clostridia produce tissue gas, initial coverage should be broad as for necrotizing fasciitis until the diagnosis is established by culture or Gram stain. Treatment of experimental gas gangrene has demonstrated that tetracycline, clindamycin, and chloramphenicol are more effective than penicillin [137, 138]. Because 5% of strains of *C. perfringens* are clindamycin resistant, the combination of penicillin plus clindamycin is the recommended antibiotic treatment [137, 138].

The value of adjunctive HBO treatment for gas gangrene is controversial [139]. HBO is advocated on the basis of laboratory studies showing that it suppressed log-phase growth of *C. perfringens*, but not the more aerotolerant *C. septicum* [140, 141]. Studies in animal models demonstrate little efficacy of HBO when used alone, whereas antibiotics alone, especially those that inhibit bacterial protein synthesis, have marked benefit [139].

Clinical data for a role of HBO are very poor quality and are entirely based on uncontrolled, observational case series [142]. The absence of criteria to identify patients who may benefit from HBO therapy, the appropriate time to initiate therapy, and its association with serious adverse events are additional concerns [142, 143].

Emergent and aggressive surgical debridement and administration of systemic antimicrobials are the cornerstones of

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

effective therapy and crucial to ensure survival [144–146]. Unnecessary delay because of ancillary procedures such as CT scans or MRI should be avoided. Some trauma centers associated with HBO units may have greater expertise in managing these aggressive infections, but proximity and speed of transfer should be carefully considered before transporting the patient to HBO units, which may delay potentially life-saving surgical intervention.

## RECOMMENDATIONS FOR ANIMAL AND HUMAN BITE WOUNDS PREVENTION AND TREATMENT

### XI. What Is the Role of Preemptive Antimicrobial Therapy to Prevent Infection for Dog or Cat Bites?

**Recommendations**

40.   Preemptive early antimicrobial therapy for 3–5 days is recommended for patients who (a) are immunocompromised, (b) are asplenic, (c) have advanced liver disease, (d) have preexisting or resultant edema of the affected area, (e) have moderate to severe injuries, especially to the hand or face, or (f) have injuries that may have penetrated the periosteum or joint capsule (strong, low).

41.   Postexposure prophylaxis for rabies may be indicated; consultation with local health officials is recommended to determine if vaccination should be initiated (strong, low).

### Evidence Summary

Numerous studies highly variable in quality and employing diverse and nonstandardized approaches to basic wound care and a variety of antimicrobial agents, have failed to definitively determine who should receive early, preemptive therapy for bite wounds. Consequently, the decision to give "prophylactic" antibiotics should be based on wound severity and host immune competence [147, 148].

Prophylactic or early preemptive therapy seems to provide marginal benefit to wound care for patients with dog bites who present within 12–24 hours after injury, particularly in low-risk wounds—that is, those that are not associated with puncture wounds; those in patients with no history of an immunocompromising disorder or use of immunosuppressive drugs; or wounds not involving the face, hand, or foot [149–152]. A meta-analysis of 8 randomized trials of dog bite wounds found a cumulative incidence of infection of 16%, with a relative risk of infection in patients treated with antibiotics compared with controls to be 0.56 [153]. The authors concluded that antibiotics reduced the risk of infection in dog bite wounds but suggested limiting this to "high risk" wounds. Amoxicillin-clavulanate administered in one study for a variety of full-skin thickness animal bites in patients presenting >9 hours after the bite resulted in a lower infection rate [144]. A Cochrane

review supported a recommendation to limit prophylactic antibiotics in mammalian bites to only those with hand injuries and human bites [145, 154, 155]. However, the 8 studies analyzed in the review had serious limitations including small numbers of patients (range, 12–190), inappropriate choices of empiric antibiotics, failure to perform intention-to-treat analysis (4 of 8 studies), and unspecified method of randomization (4 of 8 studies) [155]. Proper selection of patients benefiting from prophylaxis could reduce the incidence of infection and save drug costs and diminish side effects. Unfortunately, some patients who may benefit from therapy may not receive it in a timely fashion and become infected. Research with controlled aspects of wound care and standard definitions for inclusion would help further define the role of wound care compared with antimicrobial agents for prevention of infection. The need for rabies prophylaxis and/or therapy should be addressed.

### XII. What Is the Treatment for Infected Animal Bite–Related Wounds?

**Recommendation**

42.   An antimicrobial agent or agents active against both aerobic and anaerobic bacteria such as amoxicillin-clavulanate (Table 5) should be used (strong, moderate).

### Evidence Summary

Purulent bite wounds and abscess are more likely to be polymicrobial (mixed aerobes and anaerobes), whereas nonpurulent wounds commonly yield staphylococci and streptococci [156, 157]. *Pasteurella* species are commonly isolated from both nonpurulent wounds with or without lymphangitis and from abscesses. Additionally, nonpurulent wound infections may also be polymicrobial [156].

Based on this bacteriology, amoxicillin-clavulanate is appropriate oral therapy that covers the most likely aerobes and anaerobes found in bite wounds. Alternative therapies could include second-generation cephalosporins (intravenously [IV] or by mouth [po]) (eg, cefuroxime, other second- or third-generation cephalosporins), plus anaerobic coverage (clindamycin or metronidazole) if required (Table 5). A carbapenem, moxifloxacin, or doxycycline is also appropriate. If SMX-TMP or levofloxacin is used, anaerobic coverage with either clindamycin or metronidazole should be added (Table 5). Unless no alternative agents are available, macrolides should be avoided due to variable activity against *Pasteurella multocida* and fusobacteria. Pregnancy is a relative contraindication for use of tetracyclines and fluoroquinolones, whereas SMX-TMP may be safely prescribed except in the third trimester of pregnancy [140, 141, 143, 156–160].

Human bites may occur from accidental injuries, purposeful biting, or closed-fist injuries. The bacteriologic characteristics of these wounds are complex, but include aerobic bacteria, such as

**Table 5. Recommended Therapy for Infections Following Animal or Human Bites**

| Antimicrobial Agent by Type of Bite | Therapy Type | | |
|---|---|---|---|
| | Oral | Intravenous | Comments |
| Animal bite | | | |
| Amoxicillin-clavulanate | 875/125 mg bid | . . . | Some gram-negative rods are resistant; misses MRSA |
| Ampicillin-sulbactam | . . . | 1.5–3.0 g every 6–8 h | Some gram-negative rods are resistant; misses MRSA |
| Piperacillin-tazobactam | . . . | 3.37 g every 6–8 h | Misses MRSA |
| Carbapenems | | See individual info. | Misses MRSA |
| Doxycycline | 100 mg bid | 100 mg every 12 h | Excellent activity against *Pasteurella multocida*; some streptococci are resistant |
| Penicillin plus dicloxacillin | 500 mg qid/500 mg qid | . . . | |
| SMX-TMP | 160–800 mg bid | 5–10 mg/kg/day of TMP component | Good activity against aerobes; poor activity against anaerobes |
| Metronidazole | 250–500 mg tid | 500 mg every 8 h | Good activity against anaerobes; no activity against aerobes |
| Clindamycin | 300 mg tid | 600 mg every 6–8 h | Good activity against staphylococci, streptococci, and anaerobes; misses *P. multocida* |
| Second-generation cephalosporin | | | Good activity against *P. multocida*; misses anaerobes |
| Cefuroxime | 500 mg bid | 1 g every 12 h | |
| Cefoxitin | . . . | 1 g every 6–8 h | |
| Third-generation cephalosporin | | | |
| Ceftriaxone | . . . | 1 g every 12 h | |
| Cefotaxime | . . . | 1–2 g every 6–8 h | |
| Fluoroquinolones | | | Good activity against *P. multocida;* misses MRSA and some anaerobes |
| Ciprofloxacin | 500–750 mg bid | 400 mg every 12 h | |
| Levofloxacin | 750 mg daily | 750 mg daily | |
| Moxifloxacin | 400 mg daily | 400 mg daily | Monotherapy; good for anaerobes also |
| Human bite | | | |
| Amoxicillin-clavulanate | 875/125 mg bid | . . . | Some gram-negative rods are resistant; misses MRSA |
| Ampicillin-sulbactam | . . . | 1.5–3.0 g every 6 h | Some gram-negative rods are resistant; misses MRSA |
| Carbapenems | | | Misses MRSA |
| Doxycycline | 100 mg bid | . . . | Good activity against *Eikenella* species, staphylococci, and anaerobes; some streptococci are resistant |

Abbreviations: bid, twice daily; MRSA, methicillin-resistant *Staphylococcus aureus*; qid, 4 times daily; SMX-TMP, sulfamethoxazole-trimethoprim; tid, 3 times daily.

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

streptococci, *S. aureus*, and *Eikenella corrodens*, as well as with multiple anaerobic organisms, including *Fusobacterium*, *Peptostreptococcus*, *Prevotella*, and *Porphyromonas* species. *Eikenella corrodens* is resistant to first-generation cephalosporins, macrolides, clindamycin, and aminoglycosides (Table 5). Therefore, treatment with amoxicillin-clavulanate, ampicillin-sulbactam, or ertapenem is recommended; if there is history of hypersensitivity to β-lactams, a fluoroquinolone, such as ciprofloxacin or levofloxacin plus metronidazole, or moxifloxacin as a single agent is recommended. Broader empirical coverage for abscesses might yield better therapeutic results. Additionally, a more focused therapy for nonpurulent infected wounds could allow narrower therapy. Cultures are often not done on wounds, and empirical therapy might miss pathogens. The bacteriology of these wounds can differentiate the number of isolates per wound and whether additional coverage for anaerobes is required.

## XIII. Should Tetanus Toxoid Be Administered for Animal Bite Wounds?

### Recommendation

43.    Tetanus toxoid should be administered to patients without toxoid vaccination within 10 years. Tetanus, diptheria, and pertussis (Tdap) is preferred over Tetanus and diptheria (Td) if the former has not been previously given (strong, low).

### Evidence Summary

Tetanus is a severe and often fatal disease preventable through routine vaccination (ie, primary series and decennial boosters). The incidence of tetanus in the United States has declined

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

steadily since introduction of tetanus toxoid vaccines [146], and all 50 states have legal requirements that children receive at least a primary series (ie, 3 doses) of tetanus toxoid before entering school. Although no recent cases of tetanus from a bite have been reported, dogs and cats are coprophagic and could potentially transmit tetanus. Administering tetanus vaccine/toxoid after animal bite wounds is predicated upon the Advisory Committee on Immunization Practices (ACIP) recommendations [142]. The benefits of regular tetanus toxoid boosters in adults who have had a primary series have been questioned although its use in "dirty wounds" seems sensible [161, 162]. Persons who have not completed the vaccine series should do so. A booster dose of tetanus toxoid vaccine should be administered for dirty wounds if >5 years has elapsed since the last dose and for clean wounds, if >10 years. Tdap is preferred over Td if the former has not been previously given.

### XIV. In Which Patients Is Primary Wound Closure Appropriate for Animal Bite Wounds?
#### Recommendation

44.    Primary wound closure is not recommended for wounds with the exception of those to the face, which should be managed with copious irrigation, cautious debridement, and preemptive antibiotics (strong, low). Other wounds may be approximated (weak, low).

#### Evidence Summary

Although initial wound care is deemed to be an important element in bite wound management, limited randomized controlled studies have addressed the issue of wound closure following animal bites. In one study, primary closure of dog bite lacerations and perforations was associated with an infection rate of <1% [163], but closing wounds of the hand may be associated with a higher infection rate than other locations [164]. Based on their 10-year experience with 116 patients, Schultz and McMaster recommend that excised wounds, but not puncture wounds, should be closed [164]. Anecdotal reports of infection following closure suggest against closure, although approximation may be acceptable [165]. These reports and recommendations have major limitations including lack of a control group and their anecdotal nature, and lack of standardization of the type of wound, its location, severity, or circumstances surrounding the injury. Bite wounds to the face that are copiously irrigated and treated with preemptive antimicrobial therapy may be closed [166].

### XV. What Is the Appropriate Treatment of Cutaneous Anthrax?
#### Recommendations

45.    Oral penicillin V 500 mg qid for 7–10 days is the recommended treatment for naturally acquired cutaneous anthrax (strong, high).

46.    Ciprofloxacin 500 mg po bid or levofloxacin 500 mg IV/po every 24 hours × 60 days is recommended for bioterrorism cases because of presumed aerosol exposure (strong, low).

#### Evidence Summary

One of several clinical manifestations of anthrax is a cutaneous lesion. After an incubation period of 1–12 days, pruritus begins at the entry site, followed by a papule, development of vesicles on top of the papule, and, finally, a painless ulcer with a black scab. This eschar generally separates and sloughs after 12–14 days. Variable amounts of swelling that range from minimal to severe ("malignant edema") surround the lesion. Mild to moderate fever, headaches, and malaise often accompany the illness. Regional lymphadenopathy is common, but pus in the lesion is absent unless a secondary infection occurs. White blood cell counts are generally normal, but mild leukocytosis can occur. Blood cultures are almost always negative. Cultures of untreated lesions, depending upon the stage of evolution, are positive >80% of the time. Methods of specimen collection for culture depend on the type of lesion. Regarding vesicles, the blister should be unroofed and 2 dry swabs soaked in the fluid. At a later stage, 2 moist swabs should be rotated in the ulcer base or beneath the eschar's edge. Patients who have previously received antimicrobials or have negative studies, but still have suspected cutaneous anthrax, should undergo a punch biopsy that can be submitted for special studies (eg, immunohistochemical staining and/or polymerase chain reaction [PCR]). When obtaining specimens, lesions should not be squeezed to produce material for culture. Additional diagnostic methods may include serological and skin tests.

No randomized, controlled trials of therapy of cutaneous anthrax exist. Most published data indicate that penicillin is effective therapy and will "sterilize" most lesions within a few hours to 3 days but does not accelerate healing. Its value seems to be primarily in reducing mortality from as high as 20% to zero. Based on even less evidence, tetracyclines, chloramphenicol, and erythromycin also appear effective.

Suggested antimicrobials and dosages derive from 3 publications [167–169]. The optimal duration of treatment is uncertain, but 7–10 days appears adequate in naturally acquired cases. Sixty days of treatment is recommended when associated with bioterrorism as concomitant inhalation may have occurred. Until susceptibilities are available, ciprofloxacin is rational empiric therapy for bioterrorism-related cases. Other fluoroquinolones such as levofloxacin, gatifloxacin, or moxifloxacin are also likely to be effective. Initiation of intravenous vs oral therapy depends upon the severity of the illness, particularly the degree of edema.

Some have suggested systemic corticosteroids for patients who develop malignant edema, especially of the head and neck, but studies supporting this recommendation are lacking.

Airway compromise requiring intubation or tracheostomy may occur with malignant edema.

# RECOMMENDATIONS FOR EVALUATION AND TREATMENT OF BACILLARY ANGIOMATOSIS AND CAT SCRATCH DISEASE

### XVI. What Is the Appropriate Approach for the Evaluation and Treatment of Bacillary Angiomatosis and Cat Scratch Disease?
*Recommendations*

47.   Azithromycin is recommended for cat scratch disease (strong, moderate) according to the following dosing protocol:

(a)   Patients >45 kg: 500 mg on day 1 followed by 250 mg for 4 additional days (strong, moderate).
(b)   Patients <45 kg: 10 mg/kg on day 1 and 5 mg/kg for 4 more days (strong, moderate).

48.   Erythromycin 500 mg qid or doxycycline 100 mg bid for 2 weeks to 2 months is recommended for treatment of bacillary angiomatosis (strong, moderate).

*Evidence Summary*

In classic cat scratch disease, a papule or pustule develops from 3–30 days following a scratch or a bite. Lymph nodes that drain the infected area enlarge about 3 weeks after inoculation. The disease course varies, but lymphadenopathy generally resolves within 1–6 months. In about 10% of cases, the nodes suppurate. Extranodal disease (eg, central nervous system, liver, spleen, bone, and lung) develops in ≤2% of cases. *Bartonella henselae* causes most cases of cat scratch disease in immunocompetent hosts. Bacillary angiomatosis, seen in immunocompromised patients, especially with AIDS, can occur from either *B. henselae* or *Bartonella quintana.*

Bacillary angiomatosis typically occurs in individuals with AIDS and has 2 clinical appearances: (1) red papules that vary in size from a millimeter to several centimeters, numbering from 1 to >1000; (2) subcutaneous, painful nodules with the overlying skin having a normal or dusky hue.

Diagnosis of *Bartonella* infections may be difficult because the organism is fastidious and difficult to grow in culture. Serological testing supports the diagnosis, although there is cross-reactivity between *B. henselae* and *B. quintana* as well as with a few other organisms. PCR is a diagnostic option. A positive Warthin-Starry silver stain of infected lymph node tissue is useful to confirm the diagnosis, although it cannot differentiate species of *Bartonella.*

Treatment of cat scratch disease with antimicrobial agents has had variable, but rarely dramatic, results. A single, double-blind placebo-controlled study involved 29 patients, 14 of whom received azithromycin [170]. The lymph node size regressed by 80% at 30 days more frequently in the azithromycin-treated patients (*P* = .02). The recommended dose of

azithromycin for patients weighing ≥45.5 kg (100 lb) is 500 mg on day 1, then 250 mg once daily for 4 additional days; for those weighing <45.5 kg, the dose is 10 mg/kg orally on day 1, then 5 mg/kg on days 2–5 [124]. Cutaneous bacillary angiomatosis therapy has not been systematically examined. Based on case reports and small series, either erythromycin (500 mg qid) or doxycycline (100 mg bid) appears effective [171]. The duration of initial therapy, while not standardized, should be for 2 weeks to 2 months. With relapses, retreatment with prolonged therapy (months) should be entertained until immunocompetence returns. HIV-infected patients may require lifelong treatment [171].

### XVII. What Is the Preferred Treatment for Erysipeloid?
*Recommendation*

49.   Penicillin (500 mg qid) or amoxicillin (500 mg 3 times daily [tid]) for 7–10 days is recommended for treatment of erysipeloid (strong, high).

*Evidence Summary*

Erysipeloid is a cutaneous infection caused by *Erysipelothrix rhusiopathiae* a thin, pleomorphic, non-spore-forming gram-positive rod. It is a zoonosis acquired by handling fish, marine animals, swine, or poultry. One day to 7 days after exposure, a red maculopapular lesion develops, usually on fingers or hands. Erythema spreads centrifugally, with central clearing. A blue ring with a peripheral red halo may appear, giving the lesion a target appearance. Regional lymphangitis/lymphadenopathy occurs in about one-third of cases. A severe generalized cutaneous variety also occurs. Systemic symptoms and leukocytosis are unusual. Culture of an aspirate and/or biopsy of the lesion establish the diagnosis; blood cultures are rarely positive. Untreated erysipeloid resolves over about 3–4 weeks, but treatment probably hastens healing and may reduce systemic complications. Based on in vitro susceptibilities and anecdotal experiences, penicillin is appropriate. Cephalosporins, clindamycin, or fluoroquinolones should be effective for those intolerant of penicillin. *Erysipelothrix rhusiopathiae* is resistant to vancomycin, teicoplanin, and daptomycin [133, 134, 172, 173].

### XVIII. What Is the Appropriate Treatment of Glanders?
*Recommendation*

50.   Ceftazidime, gentamicin, imipenem, doxycycline, or ciprofloxacin is recommended based on in vitro susceptibility (strong, low).

*Evidence Summary*

Glanders, characterized by ulcerating nodular lesions of the skin and mucous membrane, is caused by the aerobic gram-negative rod *Burkholderia mallei.* Glanders is mainly a disease mainly of solipeds (eg, horses and mules). Humans become accidental hosts either by inhalation or skin contact. Although other organs may be involved, pustular skin lesions and

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

lymphadenopathy with suppurative nodes can be a prominent feature. Optimal therapy of glanders is poorly defined. The organism is susceptible to ceftazidime, gentamicin, imipenem, doxycycline, and ciprofloxacin [174]. A recent laboratory-acquired case was successfully treated with imipenem and doxycycline for 2 weeks, followed by azithromycin and doxycycline for an additional 6 months [175].

### XIX. What Is the Appropriate Diagnosis and Treatment of Bubonic Plague?

*Recommendation*

51.   Bubonic plague should be diagnosed by Gram stain and culture of aspirated material from a suppurative lymph node (strong, moderate). Streptomycin (15 mg/kg intramuscularly [IM] every 12 hours) or doxycycline (100 mg bid po) is recommended for treatment of bubonic plague (strong, low). Gentamicin could be substituted for streptomycin (strong, low).

*Evidence Summary*

Plague results from infection with *Yersinia pestis*, a facultative anaerobic gram-negative coccobacillus. It primarily affects rodents, being maintained in nature by several species of fleas that feed on them. Three plague syndromes occur in humans: septicemic, pneumonic, and bubonic. Bubonic plague, the most common and classic form, develops when humans are bitten by infected fleas or have a breach in the skin when handling infected animals. Domestic cat scratches or bites may also transmit bubonic plague. Patients usually develop fever, headache, chills, and tender regional lymphadenopathy 2–6 days after contact with the organism. A skin lesion at the portal of entry is sometimes present. Patients with bubonic plague may develop septicemia and secondary plague pneumonia, which is transmissible person-to-person. Diagnosis can be made by blood cultures and by aspirating lymph nodes for staining and culture. PCR is available at reference laboratories. Serologic tests may provide retrospective confirmation.

No controlled comparative trials of therapy for plague exist. Streptomycin 15 mg/kg every 12 hours (adjusted for renal function) is the treatment of choice, although tetracycline and chloramphenicol are also considered appropriate therapy [175, 176]. Gentamicin is a reasonable substitute for streptomycin if the latter is not available, although there is but limited experience with gentamicin in the treatment of plague. Based on in vitro susceptibilities and murine models, fluoroquinolones are another option. Ciprofloxacin has been suggested as a drug for both treatment and prevention of plague due to biowarfare agents despite a lack of documented efficacy in humans. The optimal duration for treating bubonic plague is unknown, but 10–14 days is probably adequate. Patients with bubonic plague may develop secondary pneumonic plague and should be placed in respiratory isolation until after 48 hours of effective drug therapy.

### XX. What Is Appropriate for Diagnosis and Treatment for Tularemia?

*Recommendations*

52.   Serologic tests are the preferred method of diagnosing tularemia (weak, low).

53.   Streptomycin (15 mg/kg every 12 hours IM) or gentamicin (1.5 mg/kg every 8 hours IV) is recommended for treatment of severe cases of tularemia (strong, low).

54.   Tetracycline (500 mg qid) or doxycycline (100 mg bid given by mouth) is recommended for treatment of mild cases of tularemia (strong, low).

55.   Notify the microbiology laboratory if tularemia is suspected (strong, high).

*Evidence Summary*

*Francisella tularensis*, while hardy and persistent in nature, is a fastidious, aerobic, gram-negative coccobacillus. Illness can often be categorized into several fairly distinct syndromes: ulceroglandular, glandular, typhoidal, pneumonic, and oculoglandular or oropharyngeal. The glandular varieties are generally acquired by handling infected animals, by tick bites, and sometimes by animal bites, especially cats. Biting flies occasionally transmit the illness in the United States, while mosquitoes are common vectors in Europe. After an incubation period of 3–10 days, the patient typically develops a skin lesion (ulcer eschar) at the entry site of the organism along with tender adenopathy in regional lymph nodes, hence the name ulceroglandular. In some patients, the skin lesion is inconspicuous or healed by the time they seek medical care, resulting in "glandular" tularemia. The illness is often associated with substantial fever, chills, headache, and malaise.

Confirmation of the diagnosis is usually serological. Routine cultures are often negative unless cysteine-supplemented media are utilized. The laboratory should be notified when tularemia is suspected because of the health risks posed to laboratory personnel. Unsuspected growth of *F. tularemia* can cause laboratory-acquired disease. PCR may also be useful for diagnosis.

No prospective controlled or randomized trials of therapy for tularemia have been performed, nor has the optimal duration of treatment been established. Streptomycin has been considered the drug of choice for tularemia for several decades [130]. Since then, a few patients have been received fluoroquinolones. *Francisella* is resistant to most β-lactam antibiotics, which should be avoided. When static drugs such as tetracyclines or chloramphenicol are used, relapses may be more common, but often the patients have received brief therapy (ie, <7–10 days).

Acutely ill adults or children should receive an aminoglycoside, preferably streptomycin or possibly gentamicin. For adults, the regimen for streptomycin is 30 mg/kg/day in 2 divided doses (no more than 2 g daily) or gentamicin 1.5 mg/kg every 8 hours, with appropriate dose adjustment based on renal

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

function. For children, streptomycin should be administered at 30 mg/kg/day in 2 divided doses or gentamicin at 6 mg/kg/day in 3 divided doses [130]. Although no data exist, treatment with a parenteral agent until the acute illness is controlled, followed by an oral agent, seems rational for the duration of 7–10 days. Treatment of severe cases should be extended to 14 days.

For mild to moderate disease, oral tetracycline (500 mg qid) or doxycycline (100 mg bid) is appropriate. A few cases have been treated with fluoroquinolones with mixed results [177]. Oral levofloxacin (500 mg daily) or ciprofloxacin (750 mg bid) in adults may be reasonable in mild to moderate illness. For oral regimens, patients should receive at least 14 days of therapy. Despite clinical responses and appropriate treatment in one study from France, 38.6% of patients relapsed [177].

## XXI. What Is the Appropriate Approach to Assess SSTIs in Immunocompromised Patients?

### Recommendations

56.   In addition to infection, differential diagnosis of skin lesions should include drug eruption, cutaneous infiltration with the underlying malignancy, chemotherapy- or radiation-induced reactions, Sweet syndrome, erythema multiforme, leukocytoclastic vasculitis, and graft-vs-host disease among allogeneic transplant recipients (strong, high).

57.   Differential diagnosis for infection of skin lesions should include bacterial, fungal, viral, and parasitic agents (strong, high).

58.   Biopsy or aspiration of the lesion to obtain material for histological and microbiological evaluation should always be implemented as an early diagnostic step (strong, high).

### Executive Summary

Skin and soft tissues are common sites of infection for HIV-negative patients with a compromised immune system, posing a major diagnostic challenge [178, 179], as the differential diagnosis is broad and includes drug eruption, skin or soft tissue infiltration with the underlying malignancy, chemotherapy- or radiation-induced skin reactions, graft-vs-host disease among allogeneic transplant recipients, Sweet syndrome, erythema multiforme, and leukocytoclastic vasculitis [180, 181]. Because the intensity and type of immune defect diminishes or alters dermatological findings, cutaneous lesions that appear localized or innocuous may actually be a manifestation of a systemic or potentially life-threatening infection. The differential diagnosis for SSTIs in immunocompromised patients is usually wider than that for immunocompetent patients and often includes bacterial, viral, fungal, and parasitic agents. Organisms that cause these infections will vary based on the underlying immune defects (eg neutropenia, cellular immune defects, iatrogenic related to the use of intravascular catheters), and many of the infecting organisms are not typically considered

pathogenic in normal hosts (opportunistic organisms such as *Aspergillus fumigatus*). However, infectious agents commonly found in immunocompetent patients (eg, *S. pyogenes*, *S. aureus*) still need to be entertained in the differential diagnosis of skin and soft tissue lesions in immunocompromised patients even if the dermatological findings are atypical for these common organisms. A careful epidemiologic history (eg, exposure to raw seafood, pets, and travel) should also be obtained in these patients to consider organisms potentially associated with these exposures when appropriate (eg, *V. vulnificus*, *B. henselae*, cutaneous leishmaniasis). Use of antimicrobial prophylaxis in these patients has shown to ultimately impact the pathogens that will be isolated when infection develops, and this information should be available to the clinician when assessing immunocompromised patients with skin and soft tissue lesions [182, 183].

After considering the important specific factors concerning the patient's immunocompromised status (eg, neutropenia or neutrophil defects, cellular immune defect, presence of intravascular catheters) [180, 181], the gross morphologic characteristics of the skin lesion(s) should be characterized, the extent of the infection determined (eg, localized vs disseminated), and appropriate diagnostic tests undertaken to identify the infecting pathogen. Although blood cultures, tests for detection of antigens in blood or vesicular fluid, or nucleic acid amplification techniques in body fluids or tissues may be helpful, the most specific method for an expedited diagnosis is biopsy or aspiration of the lesion to obtain material for histological and microbiological evaluation. The use of newer molecular methods (eg, gene amplification and sequencing) will likely impact the management algorithms of immunocompromised patients with skin and soft tissue lesions and result in the earlier use of pathogen-directed antimicrobial therapy [184, 185]. Peripheral blood biomarkers such as galactomannan and 1,3-β-D-glucan has been well studied over the past 20 years and has been reported to be useful in the diagnosis of disseminated fungal infections by several European investigators. However, sensitivity of these tests can be significantly affected by the use of antifungal drugs, and in the United States their sensitivity has been reported to be lower than in Europe in various populations of immunocompromised patients [186].

Empiric antimicrobial therapy should be initiated immediately in these patients on the basis of their underlying disease, primary immune defect, morphology of skin lesions, use of prior antimicrobial prophylaxis, allergy history, and inherent and local profiles of antimicrobial resistance. Despite aggressive empiric therapy, treatment failure may occur, and the reasons for this lack of response include the following: (1) the initial diagnosis and/or treatment chosen is incorrect; (2) the etiologic pathogen is already resistant to the antimicrobial agent; (3) resistance develops during treatment; (4) if indicated, surgical

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

debridement has not taken place; and/or (5) the patient's immune deficiency is profound and cannot be reversed. The early identification of an etiologic agent in immunocompromised hosts with SSTIs is essential when deciding whether surgical debridement is warranted because microbial resistance makes dogmatic empiric treatment regimens difficult, if not dangerous. For this reason, skin biopsy material should be obtained by an experienced dermatologist and evaluated in conjunction with a pathologist who is familiar with this patient population.

# RECOMMENDATIONS FOR SKIN AND SOFT TISSUE INFECTIONS IN CANCER PATIENTS WITH NEUTROPENIA

## XXII. What Is the Appropriate Approach to Assess SSTIs in Patients With Fever and Neutropenia?

### Recommendations

59.   Determine whether the current presentation of fever and neutropenia is the patient's initial episode of fever and neutropenia, or persistent unexplained fever of their initial episode (after 4–7 days) or a subsequent episode of fever and neutropenia (recurrent) (strong, low).

60.   Aggressively determine the etiology of the SSTI by aspiration and/or biopsy of skin and soft tissue lesions and submit these for thorough cytological/histological assessments, microbial staining, and cultures (strong, low).

61.   Risk-stratify patients with fever and neutropenia according to susceptibility to infection: high-risk patients are those with anticipated prolonged (>7 days) and profound neutropenia (absolute neutrophil count [ANC] <100 cells/μL) or with a Multinational Association for Supportive Care (MASCC) score of <21; low-risk patients are those with anticipated brief (<7 days) periods of neutropenia and few comorbidities (strong, low) or with a MASCC score of ≥21 (strong, moderate).

62.   Determine the extent of infection through a thorough physical examination, blood cultures, chest radiograph, and additional imaging (including chest CT) as indicated by clinical signs and symptoms (strong, low).

### Evidence Summary

SSTIs in patients with fever and neutropenia have rarely been carefully studied as a "separate entity." Rather, recommendations for these infections are extrapolated from broad group guidelines that include references to SSTIs and have been developed by professional organizations including IDSA, the National Comprehensive Cancer Network (NCCN), American Society of Blood and Marrow Transplantation, the American Society of Clinical Oncology, and the Centers for Disease Control and Prevention [187–193]. These guidelines are focused on the diagnosis and management of specific patient groups (eg, fever and

neutropenia, infection in recipients of hematopoietic stem cell transplant), specific infections (eg, candidiasis, aspergillosis), and iatrogenic infections (eg, intravascular catheter–related infection). They are based on published clinical trials, descriptive studies, or reports of expert committees, and the clinical experience and opinions of respected authorities. Therefore, this section of the SSTI guideline will focus on existing recommendations that demand reinforcement, or that are truly specific to SSTIs.

Neutropenia is defined as an ANC <500 cells/μL, or a neutrophil count that is expected to decrease to <500 cells/μL within 48 hours [187–189]. The development of fever during treatment-associated neutropenia is common, but many patients do not have an infectious etiology determined [184, 194]. More than 20% of patients with chemotherapy-induced neutropenia develop a clinically documented infection involving the skin and soft tissues, but many are due to hematogenous dissemination [179].

Cancer patients with fever and neutropenia can be divided into low- and high-risk groups [187]. The determination of differences in patient risk of infection and infectious complications levels (high risk and low risk) during the period of neutropenia has been recognized and further validated since this clinical guideline was last updated [195, 196]. The MASCC developed and validated a scoring method that formally differentiates between high-risk and low-risk patients [195, 196]. High-risk patients have a MASCC score <21. Low-risk patients have a MASCC score ≥21. Disseminated or complex SSTIs are more likely to occur among high-risk patients.

## Clinical, Laboratory, and Radiological Evaluation of Patients With Febrile Neutropenia Who Present With Skin and Soft Tissue Lesions

Signs and symptoms of inflammation and infection are often diminished or absent in patients with neutropenia. Skin lesions, no matter how small or innocuous in appearance, should be carefully evaluated. Early involvement of an infectious diseases specialist, a surgeon, and a dermatologist familiar with these patients may result in improved outcome. Initial clinical impressions should be supplemented with a systemic approach to enhance the diagnosis and management of infection. Blood cultures are critical, and at least 2 sets should be obtained. Radiographic imaging should be performed as clinically indicated, but can be helpful to define the extent of SSTIs when patients are neutropenic. Chest/sinus radiologic imaging may identify the silent or subtle pulmonary site of infection that has resulted in dissemination to skin or soft tissues.

The most specific method for evaluating SSTIs is biopsy or aspiration of the lesion(s) to obtain material for histological, cytological, and microbiological evaluation. Prospective studies evaluating the yield of skin biopsy or aspiration have not been

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

performed in adult immunocompromised patients, but most clinicians who manage these patients combine blood cultures, serial antigen detection, nucleic acid amplification techniques, radiographic imaging, and a biopsy or aspiration of the abnormal skin or soft tissue lesion in the hope of increasing the recovery of the offending pathogen and directing pathogen-specific antimicrobial therapy.

This can occur during "initial" episode fever and neutropenia (first episode of neutropenic fever that requires systemic antimicrobial therapy) or during a "persisting episode" (persistent neutropenic fever unresponsive to broad-spectrum antimicrobial therapy beyond days 4–7) or during recurrent episodes of fever and neutropenia. This determination helps the clinician define the most likely pathogens and to construct the initial empiric treatment.

During the initial episode gram-negative bacteria should be primarily targeted by the initial antibiotic regimen because they are associated with high mortality rates. Although gram-positive bacteria are more common, the addition of antibiotics with gram-positive activity including MRSA is not recommended unless physical findings suggestive of inflammation in the skin and soft tissues are present, the patient is hemodynamically unstable, and risk factors for MRSA are present. For patients with a persistent episode of fever and neutropenia or recurrent episodes, antibiotic-resistant bacterial or fungal pathogens including *Candida* and molds become more common [197–199].

Dermatologic manifestations in patients with fever and neutropenia include erythematous maculopapular lesions, focal or progressive cellulitis, cutaneous nodules, "ecthyma gangrenosum," and, occasionally, necrotizing fasciitis or myonecrosis [179, 200]. Ecthyma gangrenosum is a cutaneous vasculitis caused by invasion of the media and adventitia of the vessel wall by bacteria, which may be visible on histologic stains of biopsy specimens. Ecthyma gangrenosum frequently begins as painless erythematous papule(s) that often progress and become painful and necrotic within 24 hours. These skin lesions may be discrete or multiple, are found preferentially between the umbilicus and the knees, and can increase in size from 1 cm to >10 cm in <24 hours. Ecthyma gangrenosum has classically been reported to occur with *Pseudomonas aeruginosa* infections, but similar lesions may be caused by other *Pseudomonas* species, *Aeromonas* species, *Serratia* species, *S. aureus*, *Stenotrophomonas maltophilia*, *S. pyogenes*, fungi including *Candida* species, *Aspergillus*, *Mucor*, and *Fusarium*, and even herpes simplex virus (HSV) [201].

In contrast to immunocompetent patients, necrotizing fasciitis and/or myonecrosis are more frequently associated with gram-negative or polymicrobial pathogens rather than a single gram-positive bacterium. Necrotizing fasciitis can present alone or concurrently with myonecrosis in the patient with fever and neutropenia. Rapidly progressive necrotizing SSTIs may

initially be clinically subtle in compromised patients, but MRI scans of the involved area may be helpful in defining the depth of infections. In such infections, immediate surgical exploration by a team experienced in the management of these patients and broad-spectrum antibiotic therapy targeted at gram-negative, gram-positive, and anaerobic bacteria are essential.

Gram-positive pathogens are now the most common bacterial organisms isolated from diagnostic cultures obtained from febrile neutropenic patients [197, 198]. These pathogens in order of decreasing prevalence include coagulase-negative staphylococci, viridans streptococci, enterococci, *S. aureus*, *Corynebacterium*, *Clostridium* species, and *Bacillus* species. SSTIs associated with these organisms usually begin as a focal area of tender cutaneous erythema, a macular or maculopapular eruption, or a classic cellulitis. Although rare, they can also cause ecthyma gangrenosum–like lesions that are often confused with "spider bites," superficial and deep abscesses that become apparent following marrow recovery, necrotizing fasciitis, myositis, and myonecrosis. Common infection sites are the groin, axilla, areas of cutaneous disruption (eg, vascular catheter or bone marrow aspiration sites), or other skin sites that are moist and frequently abraded. Hematogenous dissemination of gram-positive bacterial organisms to the skin and soft tissue is uncommon except for *S. aureus* and some *Clostridium* species. A toxic shock–like syndrome with associated diffuse erythroderma has been described with bacteremic toxin–producing streptococci. Painful myositis may also occur with *S. aureus* infections as a component of hematogenous dissemination.

HSV, varicella zoster virus (VZV), and enteroviruses are rare causes of cutaneous manifestations in patients with neutropenia [202]. Their presence usually reflects either a disseminated infection, or, in the case of HSV, the autoinoculation of virus from mucosal sites to adjacent or distant cutaneous sites. HSV and VZV in compromised patients may appear as vesicles similar to those in normal hosts, or as isolated or multiple benign-looking papules with a central eschar (ecthyma gangrenosum–like lesion). VZV in compromised hosts may present with the traditional unilateral dermatome distribution, but may also appear as discrete or multiple skin lesions in random distribution. Skin biopsy is the only reliable method to diagnose cutaneous or disseminated HSV or VZV infection; peripheral blood PCR for HSV or VZV can be helpful in these patients.

## XXIII. What Is the Appropriate Antibiotic Therapy for Patients With SSTIs During the Initial Episode of Fever and Neutropenia?
### Recommendations

63.   Hospitalization and empiric antibacterial therapy with vancomycin plus antipseudomonal antibiotics such as cefepime, a carbapenem (imipenem-cilastatin or meropenem or doripenem), or piperacillin-tazobactam are recommended (strong, high).

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

64.  Documented clinical and microbiologic SSTIs should be treated based on antimicrobial susceptibilities of isolated organisms (strong, high).

65.  It is recommended that the duration of treatment for most bacterial SSTIs should be for 7–14 days (strong, moderate).

66.  Surgical intervention is recommended for drainage of soft tissue abscess after marrow recovery or for a progressive polymicrobial necrotizing fasciitis or myonecrosis (strong, low).

67.  Adjunct colony-stimulating factor therapy (granulocyte colony-stimulating factor [G-CSF], granulocyte macrophage colony-stimulating factor [GM-CSF]) or granulocyte transfusions are not routinely recommended (weak, moderate).

68.  Acyclovir should be administered to patients suspected or confirmed to have cutaneous or disseminated HSV or VZV infection (strong, moderate).

### Evidence Summary

The appropriate antibiotics for patients with suspected or confirmed SSTI (initial infection) should be broad-spectrum agents administered at the first clinical signs or symptoms of infection [203]. No single empiric regimen is superior, but all recommended regimens should meet the following criteria: broad-spectrum antimicrobial activity including *P. aeruginosa*, bactericidal in the absence of circulating neutrophils, and low antibiotic-associated toxicity (Table 7). Infections caused by gram-negative bacilli including *P. aeruginosa* have been associated with the highest infection-associated mortality [198, 203]. Despite an increased prevalence of gram-positive bacteria, antibiotics specifically aimed against this group of organisms are not required [187, 189] unless patients exhibit physical findings of SSTI or catheter-associated infection or are hemodynamically unstable [204].

Antibiotic selection should follow the clinical care guidelines developed by IDSA and the NCCN [187, 189]. Excellent results have been reported for gram-negative infections using broad-spectrum monotherapy with carbapenems, cephalosporins that possess antipseudomonal activity, or piperacillin/tazobactam.

For patients in whom vancomycin may not be an option, daptomycin, ceftaroline, or linezolid should be added to the initial empiric regimen. Linezolid, daptomycin, or ceftaroline have activity against MRSA [204] and have received FDA approval for the treatment of SSTIs, but have not been comprehensively studied in patients with neutropenia. The use of linezolid in this patient population has been associated with delayed ANC recovery [205, 206].

The combination of ciprofloxacin and amoxicillin-clavulanate is the preferred oral antibiotic regimen for low-risk patients [207, 208]. Levofloxacin has better gram-positive activity than ciprofloxacin, but is less potent than ciprofloxacin against *P. aeruginosa*, causing some to suggest that a higher dose of levofloxacin therapy (750 mg daily) may be required.

Fluoroquinolone prophylaxis should preclude the use of fluoroquinolones for empiric therapy, and instead broad-spectrum β-lactam antibiotics should be considered. Intravenous acyclovir should be added to the empiric antimicrobial regimen of the rare patient who has not been receiving antiviral prophylaxis effective against HSV or VZV, but has developed skin lesions suspected or confirmed to be caused by these viruses.

### XXIV. What Is the Appropriate Antimicrobial Therapy for Patients With SSTIs During Persistent or Recurrent Episodes of Fever and Neutropenia?

#### Recommendations

69.  Yeasts and molds remain the primary cause of infection-associated with persistent or recurrent fever and neutropenia; therefore, empiric antifungal therapy (Table 6) should be added to the antibacterial regimen (strong, high).

(a)  Empiric administration of vancomycin or other agents with gram-positive activity (linezolid, daptomycin, or ceftaroline) should be added if not already being administered (Table 7) (strong, high).

(b)  *Candida* species SSTIs should be treated with an echinocandin or, if *Candida parapsilosis* has been isolated, lipid formulation amphotericin B (strong, high) with fluconazole as an acceptable alternative (strong, moderate). Treatment should be for 2 weeks after clearance of bloodstream infection or resolution of skin lesions (strong, moderate).

**Table 6.   Standard Doses of Antifungal Agents**

| Antifungal Agent | Oral Dose | IV Dose | Comments |
|---|---|---|---|
| Fluconazole | 100–400 mg every 24 h | 800 mg loading dose, then 400 mg daily | *Candida krusei* and *Candida glabrata* are resistant |
| Voriconazole[a] | 400 mg bid × 2 doses, then 200 mg every 12 h | 6 mg/kg IV every 12 h for 2 doses, followed by 4 mg/kg IV every 12 h | Accumulation of cyclodextrin vehicle with IV formulation with renal insufficiency |
| Posaconazole | 400 mg bid with meals | N/A | Covers *Mucorales* |
| Lipid complex amphotericin B | N/A | 5 mg/kg/d | Not active against fusaria |
| Liposomal amphotericin B | N/A | 3–5 mg/kg/d | Not active against fusaria |

Abbreviations: bid, twice daily; IV, intravenous; N/A, not applicable.

a  The use of patient-specific pharmacokinetics is recommended to improve clinical outcome [247].

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

**Table 7.  Standard Doses of Antimicrobial Agents Active Against Multidrug-Resistant Organisms**

| Antimicrobial | IV Dose | Comments |
| --- | --- | --- |
| Vancomycin | 30–60 mg/kg/d in 2–4 divided doses | Target serum trough concentrations of 15–20 µg/mL in severe infections |
| Daptomycin | 4–6 mg/kg/d | Covers VRE, strains nonsusceptible to vancomycin may be cross-resistant to daptomycin |
| Linezolid | 600 mg every 12 h | 100% oral bioavailability; so oral dose same as IV dose. Covers VRE and MRSA |
| Colistin | 5 mg/kg load, then 2.5 mg/kg every 12 h | Nephrotoxic; does not cover gram-positives or anaerobes, *Proteus, Serratia, Burkholderia* |

Abbreviations: IV, intravenous; MRSA, methicillin-resistant *Staphylococcus aureus*; VRE, vancomycin-resistant enterococci.

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

(c)  *Aspergillus* SSTIs should be treated with voriconazole (strong, high), or, alternatively, lipid formulations of amphotericin B, posaconazole, or echinocandin for 6–12 weeks (strong, low). *Mucor/Rhizopus* infections should be treated with lipid formulation amphotericin B (strong, moderate) or posaconazole (strong, low) (Table 6). The addition of an echinocandin could be considered based on synergy in murine models of mucormycosis and observational clinical data (weak, low).

(d)  *Fusarium* species infections should be treated with high-dose IV voriconazole or posaconazole (strong, low).

(e)  Begin treatment for antibiotic-resistant bacterial organisms, in patients currently on antibiotics (strong, moderate).

(f)  Intravenous acyclovir should be added to the patient's antimicrobial regimen for suspected or confirmed cutaneous or disseminated HSV or VZV infections (strong, moderate).

70.  Blood cultures should be obtained, and skin lesions in this population of patients should be aggressively evaluated by culture aspiration, biopsy, or surgical excision as they may be caused by resistant microbes, yeast, or molds (strong, moderate).

71.  The sensitivity of a single serum fungal antigen test (1,3-β-D-glucan or galactomannan tests) is low particularly in patients receiving antifungal agents, and benefits from laboratory tests for fungal antigen or DNA detection remain inconsistent (strong, moderate).

72.  PCR in peripheral blood for HSV and VZV might be helpful in establishing a diagnosis of disseminated infection in patients with unexplained skin lesions (weak, moderate).

### Evidence Summary

In patients with persistent unexplained fever of their first episode (after 4–7 days) or recurrent fever, yeast and molds are the major cause of infection-related morbidity and mortality (Table 7) [187, 189, 203]. These later infections are most common among high-risk patients with prolonged and profound neutropenia and they should be considered in any patient with neutropenia and skin and soft tissue lesions suggestive of infection. In addition, MRSA should also be considered if patients are not receiving antimicrobial agents with activity against MRSA (eg, vancomycin, linezolid, daptomycin, or ceftaroline) [209]. Multiple antibiotic-resistant gram-negative bacilli are more commonly being recovered from cultures of blood and soft tissues, and antibiotic modification is necessary when their presence is suspected or documented (Table 7) [204]. Treatment of yeast and mold infections should follow IDSA and NCCN guideline recommendations [187, 189].

Although skin and soft tissues are less frequent sites of infection in patients with persisting or recurrent fever and neutropenia (<10%), they often represent a site of infection dissemination. Among the responsible pathogens, 10%–15% are caused by antibiotic-resistant gram-negative bacilli; 30%–40% by antibiotic-resistant gram-positive organisms (coagulase-negative staphylococci, MRSA, and vancomycin-resistant enterococci), but most (>50%) are caused by yeast or molds [198, 210, 211]. In 2012, infections caused by yeast and molds were the major cause of associated morbidity and mortality in patients with prolonged and profound neutropenia [198, 210]. Diagnosis of fungal infections remains difficult, and benefits from fungal antigen or DNA detection remain inconsistent [212, 213]. However, recovery of fungi from aspiration or biopsy of skin or deep soft tissues warrants aggressive systemic antifungal therapy. Surgical treatment should be also considered in patients with skin and soft tissue changes caused by angioinvasive molds (eg, *Mucor, Rhizopus,* and *Aspergillus*).

The incidence of invasive candidiasis prior to the routine use of azole antifungal prophylaxis was 12% in patients with profound and prolonged neutropenia [214]. *Candida albicans* is the most frequently isolated species; however, fluconazole-resistant yeast (ie, *Candida krusei* and *Candida glabrata*) are increasingly common due to the widespread use of azole prophylaxis [214]. Superficial cutaneous candidiasis presents as intertrigo, vaginitis, balanitis, perleche, and paronychia [215] and rarely causes dissemination. However, up to 13% of patients with invasive disseminated candidiasis develop single or multiple nodular skin lesions [216, 217]. These lesions can appear as discrete pink to red papules (0.5–1.0 cm) and are usually found on the trunk and extremities [215, 217]. *Candida* skin lesions are usually nontender, but may develop central pallor, or become hemorrhagic if

the patient is thrombocytopenic. Painful myositis can develop as a consequence of hematogenous infection and is most common with *Candida tropicalis* [218, 219]. Muscle and soft tissue abscess formation is uncommon, but when identified it has usually occurred following marrow recovery.

*Trichosporon beigelii* is an uncommon but frequently fatal disseminated fungal infection that often involves the skin [220]. Dermatologic manifestations vary from multiple erythematous macules to maculopapular lesions. Biopsy often reveals a mixture of true hyphae, pseudohyphae, budding yeast, and arthroconidia that may be easily mistaken for *Candida* species

Cutaneous mold infections are unusual, but there could be local infections at sites of IV catheter insertion or at nail bed and cuticle junctions on fingers and toes, or secondary to hematogenous dissemination [221]. *Aspergillus*, *Rhizopus*, and *Mucor* species cause painful erythematous skin nodules that become necrotic and can resemble ecthyma gangrenosum because of their tendency for angioinvasion [222]. *Aspergillus* species infections occur in 10%–14% of patients with profound and prolonged neutropenia, and mortality remains high [223]. *Aspergillus fumigatus* is the most frequently isolated species [224]. Isolation of *Aspergillus flavus*, *Aspergillus niger*, and *Aspergillus terreus*. Isolation of *Aspergillus* from blood cultures is rare, but dissemination is commonly detected at autopsy [224]. Local *Mucor* infections have occurred as a consequence of contaminated bandages or other skin trauma, but patients with pulmonary *Mucor* infection may also develop secondary cutaneous involvement from presumed hematogenous dissemination [225, 226].

*Fusarium* species are frequently identified as the infecting pathogen among patients with prolonged and profound neutropenia [227]. Patients commonly present with myalgias and persistent fever despite antimicrobial therapy. Skin lesions are very common (60%–80% of infections), and often begin as multiple erythematous macules with central pallor that quickly evolve to papules and necrotic nodules. The lesions frequently may have a ring of erythema surrounding an area of central necrosis. Lesions localize preferentially to the extremities, especially the feet, but may also be found on the face and trunk. Blood cultures are frequently positive (40%–50%) when cutaneous lesions appear. Mortality from this infection remains high, although new azole antifungal agents appear promising [227].

## RECOMMENDATIONS FOR PATIENTS WITH CELLULAR IMMUNODEFICIENCY

### XXV. What Is the Appropriate Approach to Assess SSTIs in Patients With Cellular Immunodeficiency?
#### Recommendations
73. Consider immediate consultation with a dermatologist familiar with cutaneous manifestations of infection in patients with cellular immune defects (eg, those with lymphoma,

lymphocytic leukemia, recipients of organ transplants, or receiving immunosuppressive drugs such as anti–tumor necrosis factor (TNF) or certain monoclonal antibodies) (weak, low).

74. Consider biopsy and surgical debridement early in the management of these patients (weak, low).

75. Empiric antibiotics, antifungals, and/or antivirals should be considered in life-threatening situations (weak, moderate). The use of specific agents should be decided with the input of the primary team, dermatology, infectious disease, and other consulting teams (strong, moderate).

#### Evidence Summary
Patients with lymphoma or acute or chronic lymphocytic leukemia, recipients of hematopoietic stem cell transplant (HSCT) or solid organ transplant (SOT), patients receiving corticosteroids and other immunosuppressive drugs (eg, monoclonal antibodies, anti-TNF drugs), and patients with primary cellular immunodeficiencies are predisposed to infection. These patients are at increased risk for infection caused by a select group of bacteria, fungi, viruses, protozoa, and helminths, and some of these pathogens have the capacity to cause SSTIs. Infection should always be high in the differential of a skin lesion or skin lesions in patients with cellular immunodeficiency. These patients may not have systemic manifestations of infection, and the initial dermatological presentation may be atypical or misleading. Thus clinicians should have a very low threshold to obtain a skin biopsy (Table 6).

#### Nontuberculous Mycobacteria
Although most infections occur after primary inoculation at sites of skin disruption or trauma, hematogenous dissemination does occur. The most common manifestations of nontuberculous mycobacteria (NTM) infection in SOT recipients include cutaneous and pleuropulmonary disease, and, in HSCT recipients, catheter-related infection and bacteremia [228]. Disseminated infection with *Mycobacterium avium* complex occurs preferentially among patients with HIV disease, whereas bloodstream and cutaneous infections with *Mycobacterium fortuitum*, *Mycobacterium chelonae*, *Mycobacterium abscessus*, *Mycobacterium ulcerans*, *Mycobacterium kansasii*, *Mycobacterium haemophilum*, *Mycobacterium marinum*, or *Mycobacterium mucogenicum* are more frequent among non-HIV-immunocompromised hosts [228]. Dermatologic manifestations include a poorly resolving cellulitis, painless 1- to 2-cm nodules, necrotic ulcers, and subcutaneous abscesses.

Treatment of NTM infections of the skin and soft tissues requires prolonged combination therapy (duration, 6–12 weeks) that should consist of a macrolide antibiotic (eg, clarithromycin) and a second agent to which the isolate is susceptible. Surgical debridement is crucial for cultures and sensitivities and in addition is necessary to remove devitalized tissue and to promote skin and soft tissue healing. Definitive guidelines for treatment of these entities have been published [229].

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

### Nocardia

Cutaneous *Nocardia* infections usually represent metastatic foci of infection that have originated from a primary pulmonary source [230]. *Nocardia farcinica*, *Nocardia brasiliensis*, and other *Nocardia* species have been associated with cutaneous disease. The dermatologic manifestations are usually limited to subcutaneous nodules or abscesses and panniculitis. Soft tissue abscesses are frequently painless and are described as being cold to the touch. The incidence of local and disseminated *Nocardia* infections has decreased with the routine use of SMX-TMP prophylaxis for patients who experience prolonged periods of cellular immune deficiency. SMX-TMP remains the treatment of choice, but other sulfa antibiotics (eg, sulfadiazine and sulfasoxazole), amikacin, imipenem, meropenem, third-generation cephalosporins (ceftriaxone and cefotaxime), minocycline, extended-spectrum fluoroquinolones (eg, moxifloxacin), linezolid, and dapsone are effective in vitro and in animal models (Table 6). Combination therapy with other agents should be considered in patients with severe infections or profound and lasting immunodeficiency. Prolonged therapy is important, and the duration of treatment (6–24 months) should take into account the presence of disseminated disease and the extent of the patient's underlying immunosuppression. Surgical debridement is recommended for necrotic nodules or large subcutaneous abscesses.

### Fungi

Cutaneous mold infections have been increasingly reported in immunocompromised patients with primarily cellular immunodeficiency. Skin lesions can occur as a manifestation of a disseminated disease, a primary cutaneous inoculation, or in the skin site of a previous IV line [221, 230]. The most common molds causing cutaneous manifestations in these patients include *Aspergillus*, *Mucormycosis*, *Scedosporium*, and *Fusarium* species [231–234]. Skin lesions can present as papules, nodules, or ulcers, or with the dermatological appearance of ecthyma gangrenosum. Skin biopsy should be performed for diagnostic purposes and resection of the entire lesion or "debulking" procedures should be considered in cases where there is either a single lesion or localized disease is present. In instances of *Aspergillus* species, *Scedosporium apiospermum*, and *Fusarium* species infections, voriconazole is the best therapeutic option. Amphotericin B is an excellent alternative. Posaconazole is also a reasonable alternative in combination with amphotericin B or as a transition to oral therapy (Table 7).

Cryptococcal infections originate in the lungs, often with early hematogenous dissemination to the meninges and skin or soft tissues, but primary cutaneous cryptococcosis also occurs [235]. Single or multiple painless skin lesions involving the face and scalp develop in 5%–10% of clinically infected patients, and in some patients, these lesions may precede documented cryptococcal meningitis by several weeks. Cutaneous cryptococcal infections may appear as papules (often similar to molluscum contagiosum lesions), nodules, pustules, chronic draining necrotic ulcers, or, more subtly, as cellulitis [235]. Cryptococcal cellulitis has occurred in recipients of blood, bone marrow, or SOT, although the incidence has dramatically decreased with the prophylactic use of the newer azole agents, particularly fluconazole. Fluconazole is often used as initial treatment, for patients with mild infections, or to complete treatment after the patient has shown clinical and microbiologic improvement with amphotericin B and 5-flucytosine induction therapy [236]. Surgical debridement and/or drainage are not helpful in the management of skin or soft tissue cryptococcal infections.

Cutaneous manifestations of acute progressive disseminated histoplasmosis are rare and usually occur in patients with severe cellular immune deficiency [237, 238]. Skin lesions appear as nonspecific maculopapular eruptions that become hemorrhagic, but oral or cutaneous ulcers are sometimes present, particularly in the subacute, disseminated form of the disease. Histopathologic analysis of these skin lesions reveals necrosis surrounding the superficial dermal vessels, and with special stains, both intracellular and extracellular yeast may be seen. Prompt administration of amphotericin B therapy is the recommended treatment for patients with cellular immune deficiency and acute, life-threatening, progressive disseminated histoplasmosis. Patients often show a rapid clinical improvement within 1–2 weeks, and itraconazole can then replace amphotericin B to complete at least 6–12 months of treatment [237]. Patients with illnesses that result in profound and prolonged immune suppression should receive long-term suppressive therapy with itraconazole after the initial treatment course is complete.

### Viruses

VZV is one of the 2 most frequent herpesviruses to cause cutaneous infection in immunosuppressed patients [239]. Patients without a preceding history of VZV exposure are at significant risk of developing severe chickenpox if exposed, but herpes zoster (also known as shingles) with or without dissemination is a more frequent clinical concern. Between 65% and 70% of adult patients are seropositive for VZV, and this identifies those patients at risk for future reactivation infection. Herpes zoster occurs most frequently during the first year following chemotherapy treatment, or following receipt of an HSCT or a SOT. Depending on the intensity of treatment or type of transplant, 25%–45% of such patients develop dermatomal zoster, with a 10%–20% risk of developing dissemination without prompt and effective antiviral therapy. A few patients present initially with disseminated cutaneous infection that may mimic atypical varicella, but some patients may present with nonspecific lesions that do not initially have the vesicular

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/289545 by Washington Hospital Center user on 05 March 2019

appearance of varicella. Herpes zoster typically causes a unilateral, vesicular eruption with dermatomal pain that often precedes the skin findings by 24–72 hours (and sometimes longer). Early lesions are erythematous macules that rapidly evolve to papules and then to vesicles. The vesicles frequently coalesce, form bullae, and scab before healing. Lesions in otherwise healthy hosts continue to erupt for at least 4–6 days, with the entire disease duration being approximately 2 weeks. However, among immunocompromised hosts, skin lesions may continue to develop over a longer period (7–14 days) and generally heal more slowly unless effective antiviral therapy is administered. Without adequate treatment, some immunocompromised patients develop chronic ulcerations with persistent viral replication that is complicated by secondary bacterial and fungal superinfections.

High-dose IV acyclovir remains the treatment of choice for VZV infections in compromised hosts. Oral acyclovir, famciclovir, and valacyclovir are beneficial for VZV infections in otherwise healthy hosts, but oral therapy should be reserved for mild cases of VZV disease in patients with transient immune suppression or as treatment to complete therapy once the patient has shown a clinical response to IV acyclovir. Recipients of allogeneic blood and bone marrow transplants routinely take acyclovir (800 mg bid) or valacyclovir (500 mg bid) during the first year following transplant for the prevention of VZV and HSV reactivation [240]. Should skin lesions suspicious of VZV or HSV develop in patients already taking such antivirals, antiviral resistance should be investigated and taken into account in the selection of the empiric regimen.

HSV infections in compromised hosts are almost exclusively due to viral reactivation. Orofacial and genital sites are the most common cutaneous locations, but autoinoculation can occur in almost any area. Infections of the fingernail bed and cuticle (herpetic whitlow) occur because of inoculation of HSV at epidermal sites.

Skin lesions are often preceded by localized pain or a tingling sensation. Early skin lesions are usually focal, erythematous, and maculopapular lesions that evolve to form thin-walled vesicles and then pustulate before becoming small ulcers. Lesions frequently coalesce, and chronic, poorly healing ulcers are characteristic of HSV infections among immunocompromised hosts. Ulcerative lesions rarely include a vesicular component and thus make the clinical diagnosis of a chronic HSV infection difficult. Blood-borne HSV dissemination, manifested by multiple vesicles over a widespread area of the trunk or extremities, is uncommon, but when seen among compromised hosts, it is usually secondary to an HSV-2 infection. Acyclovir is the treatment of choice for HSV infections, although famciclovir and valacyclovir are also highly effective. The development of acyclovir-resistant HSV isolates is well described and occurs more frequently among immunocompromised patients [241].

Suppression of HSV reactivation or continued treatment until the ulcerated skin or mucosal lesions have totally healed may decrease the incidence of infections caused by acyclovir-resistant HSV strains.

The treatment of acyclovir-resistant HSV isolates requires a prolonged course of intravenous foscarnet, but continuous infusion of high-doses of acyclovir has been reported to be successful in HSCT patients [242]. Surgery should be avoided in patients with HSV infections, unless a documented bacterial or fungal abscess is identified.

### Parasites

The skin and soft tissue structures of immunosuppressed patients can also rarely be affected by parasites, including but not limited to *Strongyloides stercoralis* [242], free-living ameba (*Acanthamoeba* species and *Balamuthia* species) [243], *Trypanosoma cruzi* (Chagas disease) [244], and *Sarcoptes scabiei* (Norwegian scabies) [245]. A high index of suspicion, a careful medical history, and early skin biopsy are important for successful diagnosis and successful treatment.

## FUTURE DIRECTIONS

Highly specific treatment directed against an identified pathogen is the ultimate goal of clinical practitioners. In terms of diagnosis, we currently face major problems in the rapid identification of the pathogen and thus we must still rely on clinical skills and experience. The first decision pathway involves determining if the SSTI is caused by an endogenous or exogenous pathogen. Endogenous pathogens can be largely restricted to *S. aureus* or streptococcal species such as groups A, B, C, or G, and together these account for the vast majority of SSTIs. Previously, the empiric treatment of SSTIs of endogenous origin was relatively easy because semisynthetic penicillin, cephalosporins, erythromycin, and clindamycin were effective treatment of both *S. aureus* and streptococcal species. Recently, resistance of *S. aureus* to methicillin, erythromycin, clindamycin, tetracycline, and SMX-TMP has dramatically increased and resistance of streptococci to erythromycin and clindamycin has been reported as well. Therefore, in the future it will be more important than ever to base treatment on cultures and sensitivities. In nonpurulent cellulitis, the clinical isolation rate of a pathogen is <20%. This leaves the modern clinician with an unconfirmed diagnosis 80% of the time.

Therefore, this panel supports continued research into the rapid diagnosis of causes of cellulitis specifically, but SSTIs in general. This is of particular importance as the FDA has required inclusion of patients with cellulitis into clinical trials. This poses a dilemma for the pharmaceutical industry and investigators as identification of a specific pathogen, as part of the

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

inclusion criteria, is necessary for enrollment in the clinical trial.

The priorities for further research are as follows:

1. Rapid and specific diagnostic assays are needed for identification of microbes that cause cellulitis.

2. Inexpensive agents are needed that are effective against groups A, B, C, and G streptococci as well as staphylococci including MRSA.

3. Investigations are needed to determine the pathogenesis of soft tissue infections caused by streptococci. This should include the respective roles of toxins and host response molecules in the genesis of redness, swelling, pain, and edema.

4. Clinical trials should be performed that include patients with severe soft tissue infections (eg, necrotizing fasciitis and gas gangrene) and immunocompromised patients. The lack of evidence-based approaches results in clinical decisions being made based on physicians' best opinion, or extrapolation from other patient populations.

5. Investigations should determine host and pathogen factors that result in recurrent cellulitis.

6. Larger clinical trials should determine if anti-inflammatory agents are useful or detrimental in the treatment of cellulitis and erysipelas.

7. Definitive treatment of SSTIs caused by staphylococci and streptococci in terms of preferred agents, doses, and duration of therapy is needed to improve outcomes and potentially reduce antibiotic exposure.

## Notes

*Acknowledgments.* The expert panel expresses its gratitude to the external reviewers, Drs. Thomas File, Thomas M. Hooton, and George A. Pankey. The panel thanks the IDSA for supporting the development of this guideline and specifically, Vita Washington for her continued support throughout the guideline development process. We thank Irene Collie and Dr Amy E. Bryant for technical assistance in developing the algorithm in Figure 1.

*Financial support.* Support for these guidelines was provided by the Infectious Diseases Society of America.

*Potential conflicts of interest.* The following list is a reflection of what has been reported to IDSA. To provide thorough transparency, IDSA requires full disclosure of all relationships, regardless of relevancy to the guideline topic. Evaluation of such relationships as potential conflicts of interest is determined by a review process that includes assessment by the SPGC chair, the SPGC liaison to the development panel and the board of directors liaison to the SPGC, and, if necessary, the Conflict of Interest (COI) Task Force of the Board. This assessment of disclosed relationships for possible COI will be based on the relative weight of the financial relationship (ie, monetary amount) and the relevance of the relationship (ie, the degree to which an association might reasonably be interpreted by an independent observer as related to the topic or recommendation of consideration). The reader of these guidelines should be mindful of this when the list of disclosures is reviewed. D. L. S. has no current conflicts of interest and currently receives research support from the Department of Veterans Affairs and the National Institutes of Health. A. L. B. has received honoraria from UpToDate. H. F. C. has served as a consultant to Pfizer, AstraZeneca, Theravance, and Trius, and has received stocks/bonds from Merck and Trius. E. P. D. has served as a consultant; has received grants for clinical research and/or lectured

for honoraria from Bayer, Merck, Wyeth-Ayerst, AstraZeneca, Pfizer, Ortho-McNeil, Cubist, Vicuron, InterMune, Peninsula, Johnson & Johnson, Cepheid, Replidyne, Kimberley-Clark, Targanta, Schering-Plough, Enturia, Optimer Pharmaceuticals, Cadence, Implicit, Cardinal, Durata, 3M, Applied Medical, and BD-GeneOhm; and has received a clinical trial grant from Tetraphase. E. J. C. G. has served as a consultant to Schering-Plough, ViraPharm, Replidyne, Occulus Innovative Sciences, Theravance, Cerexa, Merck, and Optimer Pharmaceuticals; has received honoraria from Merck, Johnson & Johnson; and has received research grants from Replidyne, Occulus Innovative Sciences, Cubist, Theravance, Pfizer, Cerexa, Johnson & Johnson, Merck, and Optimer Pharmaceuticals. S. L. G. has received stocks/bonds from Optimer Pharmaceuticals, Cubist Pharmaceuticals, and Cempra Pharmaceuticals has received honoraria from IDSA (Editor, *Clinical Infectious Diseases*); has served as a consultant to Cempra Pharmaceuticals; and has received grants from the National Institutes of Health. S. L. K. has served as a consultant to Novartis, Pfizer, and Wyeth; has been a site PI for Cubist, Cerexa, and Optimer; and has received honoraria from UpToDate and Merck. All other authors report no potential conflicts.

All authors have submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest. Conflicts that the editors consider relevant to the content of the manuscript have been disclosed.

## References

1. Guyatt GH, Oxman AD, Kunz R, et al. Going from evidence to recommendations. BMJ **2008**; 336:1049–51.
2. Guyatt GH, Oxman AD, Vist GE, et al. GRADE: an emerging consensus on rating quality of evidence and strength of recommendations. BMJ **2008**; 336:924–6.
3. Guyatt GH, Oxman AD, Kunz R, Vist GE, Falck-Ytter Y, Schunemann HJ. What is "quality of evidence" and why is it important to clinicians? BMJ **2008**; 336:995–8.
4. Jaeschke R, Guyatt GH, Dellinger P, et al. Use of GRADE grid to reach decisions on clinical practice guidelines when consensus is elusive. BMJ **2008**; 337:a744.
5. Edelsberg J, Taneja C, Zervos M, et al. Trends in US hospital admissions for skin and soft tissue infections. Emerg Infect Dis **2009**; 15:1516–8.
6. Pallin DJ, Egan DJ, Pelletier AJ, Espinola JA, Hooper DC, Camargo CA Jr. Increased US emergency department visits for skin and soft tissue infections, and changes in antibiotic choices, during the emergence of community-associated methicillin-resistant *Staphylococcus aureus*. Ann Emerg Med **2008**; 51:291–8.
7. Pallin DJ, Espinola JA, Leung DY, Hooper DC, Camargo CA Jr. Epidemiology of dermatitis and skin infections in United States physicians' offices, 1993–2005. Clin Infect Dis **2009**; 49:901–7.
8. Field WJ, Lohr KN; Institute of Medicine. Committee to Advise the Public Health Service on Clinical Practice Guidelines, United States. Department of Health and Human Services. Clinical practice guidelines: directions for a new program. Washington, DC: National Academy Press, **1990**.
9. Guyatt GH, Oxman AD, Kunz R, et al. Incorporating considerations of resources use into grading recommendations. BMJ **2008**; 336:1170–3.
10. Schunemann HJ, Oxman AD, Brozek J, et al. Grading quality of evidence and strength of recommendations for diagnostic tests and strategies. BMJ **2008**; 336:1106–10.
11. Chow AW, Benninger MS, Brook I, et al. IDSA clinical practice guideline for acute bacterial rhinosinusitis in children and adults. Clin Infect Dis **2012**; 54:e72–e112.
12. Hirschmann JV. Impetigo: etiology and therapy. Curr Clin Top Infect Dis **2002**; 22:42–51.
13. Durupt F, Mayor L, Bes M, et al. Prevalence of *Staphylococcus aureus* toxins and nasal carriage in furuncles and impetigo. Br J Dermatol **2007**; 157:1161–7.

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

14. Koning S, van der Wouden JC, Chosidow O, et al. Efficacy and safety of retapamulin ointment as treatment of impetigo: randomized double-blind multicentre placebo-controlled trial. Br J Dermatol 2008; 158:1077–82.

15. Wasserzug O, Valinsky L, Klement E, et al. A cluster of ecthyma outbreaks caused by a single clone of invasive and highly infective Streptococcus pyogenes. Clin Infect Dis 2009; 48:1213–9.

16. Moran GJ, Krishnadasan A, Gorwitz RJ, et al. Methicillin-resistant S. aureus infections among patients in the emergency department. N Engl J Med 2006; 355:666–74.

17. Duong M, Markwell S, Peter J, Barenkamp S. Randomized, controlled trial of antibiotics in the management of community-acquired skin abscesses in the pediatric patient. Ann Emerg Med 2010; 55:401–7.

18. Rajendran PM, Young D, Maurer T, et al. Randomized, double-blind, placebo-controlled trial of cephalexin for treatment of uncomplicated skin abscesses in a population at risk for community-acquired methicillin-resistant Staphylococcus aureus infection. Antimicrob Agents Chemother 2007; 51:4044–8.

19. Diven DG, Dozier SE, Meyer DJ, Smith EB. Bacteriology of inflamed and uninflamed epidermal inclusion cysts. Arch Dermatol 1998; 134:49–51.

20. Gaspari RJ, Resop D, Mendoza M, Kang T, Blehar D. A randomized controlled trial of incision and drainage versus ultrasonographically guided needle aspiration for skin abscesses and the effect of methicillin-resistant Staphylococcus aureus. Ann Emerg Med 2011; 57:483–91.e1.

21. Macfie J, Harvey J. The treatment of acute superficial abscesses: a prospective clinical trial. Br J Surg 1977; 64:264–6.

22. Llera JL, Levy RC. Treatment of cutaneous abscess: a double-blind clinical study. Ann Emerg Med 1985; 14:15–9.

23. O'Malley GF, Dominici P, Giraldo P, et al. Routine packing of simple cutaneous abscesses is painful and probably unnecessary. Acad Emerg Med 2009; 16:470–3.

24. Rutherford WH, Hart D, Calderwood JW, Merrett JD. Antibiotics in surgical treatment of septic lesions. Lancet 1970; 1:1077–80.

25. Schmitz GR, Bruner D, Pitotti R, et al. Randomized controlled trial of trimethoprim-sulfamethoxazole for uncomplicated skin abscesses in patients at risk for community-associated methicillin-resistant Staphylococcus aureus infection. Ann Emerg Med 2010; 56:283–7.

26. Alikhan A, Lynch PJ, Eisen DB. Hidradenitis suppurativa: a comprehensive review. J Am Acad Dermatol 2009; 60:539–61; quiz 62–3.

27. Humphries AE, Duncan JE. Evaluation and management of pilonidal disease. Surg Clin North Am 2010; 90:113–24, table of contents.

28. Klempner MS, Styrt B. Prevention of recurrent staphylococcal skin infections with low-dose oral clindamycin therapy. JAMA 1988; 260:2682–5.

29. Raz R, Miron D, Colodner R, Staler Z, Samara Z, Keness Y. A 1-year trial of nasal mupirocin in the prevention of recurrent staphylococcal nasal colonization and skin infection. Arch Intern Med 1996; 156:1109–12.

30. Rahimian J, Khan R, LaScalea KA. Does nasal colonization or mupirocin treatment affect recurrence of methicillin-resistant Staphylococcus aureus skin and skin structure infections? Infect Control Hosp Epidemiol 2007; 28:1415–6.

31. Ellis MW, Griffith ME, Dooley DP, et al. Targeted intranasal mupirocin to prevent colonization and infection by community-associated methicillin-resistant Staphylococcus aureus strains in soldiers: a cluster randomized controlled trial. Antimicrob Agents Chemother 2007; 51:3591–8.

32. Whitman TJ, Herlihy RK, Schlett CD, et al. Chlorhexidine-impregnated cloths to prevent skin and soft-tissue infection in Marine recruits: a cluster-randomized, double-blind, controlled effectiveness trial. Infect Control Hosp Epidemiol 2010; 31:1207–15.

33. Wiese-Posselt M, Heuck D, Draeger A, et al. Successful termination of a furunculosis outbreak due to lukS-lukF-positive, methicillin-

34. susceptible Staphylococcus aureus in a German village by stringent decolonization, 2002–2005. Clin Infect Dis 2007; 44:e88–95.

34. Fritz SA, Hogan PG, Hayek G, et al. Household versus individual approaches to eradication of community-associated Staphylococcus aureus in children: a randomized trial. Clin Infect Dis 2012; 54:743–51.

35. Hirschmann JV, Raugi GJ. Lower limb cellulitis and its mimics: part I. Lower limb cellulitis. J Am Acad Dermatol 2012; 67:163 e1–12; quiz 75–6.

36. Dupuy A, Benchikhi H, Roujeau JC, et al. Risk factors for erysipelas of the leg (cellulitis): case-control study. BMJ 1999; 318:1591–4.

37. Bjornsdottir S, Gottfredsson M, Thorisdottir AS, et al. Risk factors for acute cellulitis of the lower limb: a prospective case-control study. Clin Infect Dis 2005; 41:1416–22.

38. Perl B, Gottehrer NP, Raveh D, Schlesinger Y, Rudensky B, Yinnon AM. Cost-effectiveness of blood cultures for adult patients with cellulitis. Clin Infect Dis 1999; 29:1483–8.

39. Hook EW 3rd, Hooton TM, Horton CA, Coyle MB, Ramsey PG, Turck M. Microbiologic evaluation of cutaneous cellulitis in adults. Arch Intern Med 1986; 146:295–7.

40. Sachs MK. The optimum use of needle aspiration in the bacteriologic diagnosis of cellulitis in adults. Arch Intern Med 1990; 150:1907–12.

41. Leppard BJ, Seal DV, Colman G, Hallas G. The value of bacteriology and serology in the diagnosis of cellulitis and erysipelas. Br J Dermatol 1985; 112:559–67.

42. Kielhofner MA, Brown B, Dall L. Influence of underlying disease process on the utility of cellulitis needle aspirates. Arch Intern Med 1988; 148:2451–2.

43. Sigurdsson AF, Gudmundsson S. The etiology of bacterial cellulitis as determined by fine-needle aspiration. Scand J Infect Dis 1989; 21:537–42.

44. Newell PM, Norden CW. Value of needle aspiration in bacteriologic diagnosis of cellulitis in adults. J Clin Microbiol 1988; 26:401–4.

45. Lebre C, Girard-Pipau F, Roujeau JC, Revuz J, Saiag P, Chosidow O. Value of fine-needle aspiration in infectious cellulitis. Arch Dermatol 1996; 132:842–3.

46. Lutomski DM, Trott AT, Runyon JM, Miyagawa CI, Staneck JL, Rivera JO. Microbiology of adult cellulitis. J Fam Pract 1988; 26:45–8.

47. Duvanel T, Auckenthaler R, Rohner P, Harms M, Saurat JH. Quantitative cultures of biopsy specimens from cutaneous cellulitis. Arch Intern Med 1989; 149:293–6.

48. Chartier C, Grosshans E. Erysipelas. Int J Dermatol 1990; 29:459–67.

49. Eriksson B, Jorup-Ronstrom C, Karkkonen K, Sjoblom AC, Holm SE. Erysipelas: clinical and bacteriologic spectrum and serological aspects. Clin Infect Dis 1996; 23:1091–8.

50. Jeng A, Beheshti M, Li J, Nathan R. The role of beta-hemolytic streptococci in causing diffuse, nonculturable cellulitis: a prospective investigation. Medicine (Baltimore) 2010; 89:217–26.

51. Bernard P, Toty L, Mounier M, Denis F, Bonnetblanc JM. Early detection of streptococcal group antigens in skin samples by latex particle agglutination. Arch Dermatol 1987; 123:468–70.

52. Bernard P, Bedane C, Mounier M, Denis F, Catanzano G, Bonnetblanc JM. Streptococcal cause of erysipelas and cellulitis in adults. A microbiologic study using a direct immunofluorescence technique. Arch Dermatol 1989; 125:779–82.

53. Semel JD, Goldin H. Association of athlete's foot with cellulitis of the lower extremities: diagnostic value of bacterial cultures of ipsilateral interdigital space samples. Clin Infect Dis 1996; 23:1162–4.

54. Baddour LM, Bisno AL. Recurrent cellulitis after coronary bypass surgery. Association with superficial fungal infection in saphenous venectomy limbs. JAMA 1984; 251:1049–52.

55. Eriksson BK. Anal colonization of group G beta-hemolytic streptococci in relapsing erysipelas of the lower extremity. Clin Infect Dis 1999; 29:1319–20.

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

56. Jorup-Ronstrom C, Britton S, Gavlevik A, Gunnarsson K, Redman AC. The course, costs and complications of oral versus intravenous penicillin therapy of erysipelas. Infection 1984; 12:390–4.

57. Hepburn MJ, Dooley DP, Skidmore PJ, Ellis MW, Starnes WF, Hasewinkle WC. Comparison of short-course (5 days) and standard (10 days) treatment for uncomplicated cellulitis. Arch Intern Med 2004; 164:1669–74.

58. Jenkins TC, Sabel AL, Sarcone EE, Price CS, Mehler PS, Burman WJ. Skin and soft-tissue infections requiring hospitalization at an academic medical center: opportunities for antimicrobial stewardship. Clin Infect Dis 2010; 51:895–903.

59. Pallin DJ, Binder WD, Allen MB, et al. Clinical trial: comparative effectiveness of cephalexin plus trimethoprim-sulfamethoxazole versus cephalexin alone for treatment of uncomplicated cellulitis: a randomized controlled trial. Clin Infect Dis 2013; 56:1754–62.

60. Dall L, Peterson S, Simmons T, Dall A. Rapid resolution of cellulitis in patients managed with combination antibiotic and anti-inflammatory therapy. Cutis 2005; 75:177–80.

61. Bergkvist PI, Sjobeck K. Antibiotic and prednisolone therapy of erysipelas: a randomized, double blind, placebo-controlled study. Scand J Infect Dis 1997; 29:377–82.

62. Bergkvist PI, Sjobeck K. Relapse of erysipelas following treatment with prednisolone or placebo in addition to antibiotics: a 1-year follow-up. Scand J Infect Dis 1998; 30:206–7.

63. McGee S, Hirschmann J. Use of corticosteroids in treating infectious diseases. Arch Intern Med 2008; 168:1034–46.

64. Goettsch WG, Bouwes Bavinck JN, Herings RM. Burden of illness of bacterial cellulitis and erysipelas of the leg in the Netherlands. J Eur Acad Dermatol Venereol 2006; 20:834–9.

65. Jorup-Ronstrom C, Britton S. Recurrent erysipelas: predisposing factors and costs of prophylaxis. Infection 1987; 15:105–6.

66. McNamara DR, Tleyjeh IM, Berbari EF, et al. A predictive model of recurrent lower extremity cellulitis in a population-based cohort. Arch Intern Med 2007; 167:709–15.

67. Lewis SD, Peter GS, Gomez-Marin O, Bisno AL. Risk factors for recurrent lower extremity cellulitis in a U.S. Veterans Medical Center population. Am J Med Sci 2006; 332:304–7.

68. Karppelin M, Siljander T, Vuopio-Varkila J, et al. Factors predisposing to acute and recurrent bacterial non-necrotizing cellulitis in hospitalized patients: a prospective case-control study. Clin Microbiol Infect 2010; 16:729–34.

69. Cox NH. Oedema as a risk factor for multiple episodes of cellulitis/erysipelas of the lower leg: a series with community follow-up. Br J Dermatol 2006; 155:947–50.

70. Pavlotsky F, Amrani S, Trau H. Recurrent erysipelas: risk factors. J Dtsch Dermatol Ges 2004; 2:89–95.

71. Leclerc S, Teixeira A, Mahe E, Descamps V, Crickx B, Chosidow O. Recurrent erysipelas: 47 cases. Dermatology 2007; 214:52–7.

72. Sjoblom AC, Eriksson B, Jorup-Ronstrom C, Karkkonen K, Lindqvist M. Antibiotic prophylaxis in recurrent erysipelas. Infection 1993; 21:390–3.

73. Kremer M, Zuckerman R, Avraham Z, Raz R. Long-term antimicrobial therapy in the prevention of recurrent soft-tissue infections. J Infect 1991; 22:37–40.

74. Wang JH, Liu YC, Cheng DL, et al. Role of benzathine penicillin G in prophylaxis for recurrent streptococcal cellulitis of the lower legs. Clin Infect Dis 1997; 25:685–9.

75. Vignes S, Dupuy A. Recurrence of lymphoedema-associated cellulitis (erysipelas) under prophylactic antibiotherapy: a retrospective cohort study. J Eur Acad Dermatol Venereol 2006; 20:818–22.

76. Thomas KS, Crook AM, Nunn AJ, et al. Penicillin to prevent recurrent leg cellulitis. N Engl J Med 2013; 368:1695–703.

77. Brennan TA, Leape LL, Laird NM, et al. Incidence of adverse events and negligence in hospitalized patients. Results of the Harvard Medical Practice Study I. N Engl J Med 1991; 324:370–6.

78. Mangram AJ, Horan TC, Pearson ML, Silver LC, Jarvis WR. Guideline for prevention of surgical site infection, 1999. Hospital Infection Control Practices Advisory Committee. Infect Control Hosp Epidemiol 1999; 20:250–78; quiz 79-80.

79. Gaynes RP, Culver DH, Horan TC, Edwards JR, Richards C, Tolson JS. Surgical site infection (SSI) rates in the United States, 1992-1998: the National Nosocomial Infections Surveillance System basic SSI risk index. Clin Infect Dis 2001; 33(suppl 2):S69–77.

80. Dellinger EP. Approach to the patient with postoperative fever. 3rd ed. Philadelphia: Lippincott Williams & Wilkins, 2004.

81. Burke JF. The effective period of preventive antibiotic action in experimental incisions and dermal lesions. Surgery 1961; 50:161–8.

82. Classen DC, Evans RS, Pestotnik SL, Horn SD, Menlove RL, Burke JP. The timing of prophylactic administration of antibiotics and the risk of surgical-wound infection. N Engl J Med 1992; 326:281–6.

83. Stone HH, Haney BB, Kolb LD, Geheber CE, Hooper CA. Prophylactic and preventive antibiotic therapy: timing, duration and economics. Ann Surg 1979; 189:691–9.

84. Dellinger EP, Gross PA, Barrett TL, et al. Quality standard for antimicrobial prophylaxis in surgical procedures. Infectious Diseases Society of America. Clin Infect Dis 1994; 18:422–7.

85. Bratzler DW, Houck PM. Antimicrobial prophylaxis for surgery: an advisory statement from the National Surgical Infection Prevention Project. Clin Infect Dis 2004; 38:1706–15.

86. McDonald M, Grabsch E, Marshall C, Forbes A. Single- versus multiple-dose antimicrobial prophylaxis for major surgery: a systematic review. Aust N Z J Surg 1998; 68:388–96.

87. Steinberg JP, Braun BI, Hellinger WC, et al. Timing of antimicrobial prophylaxis and the risk of surgical site infections: results from the Trial to Reduce Antimicrobial Prophylaxis Errors. Ann Surg 2009; 250:10–6.

88. van Kasteren ME, Mannien J, Ott A, Kullberg BJ, de Boer AS, Gyssens IC. Antibiotic prophylaxis and the risk of surgical site infections following total hip arthroplasty: timely administration is the most important factor. Clin Infect Dis 2007; 44:921–7.

89. Bartlett P, Reingold AL, Graham DR, et al. Toxic shock syndrome associated with surgical wound infections. JAMA 1982; 247:1448–50.

90. Raab MG, O'Brien M, Hayes JM, Graham DR. Postoperative toxic shock syndrome. Am J Orthop (Belle Mead NJ) 1995; 24:130–6.

91. Mandell GL, Bennett JE, Dolin R, eds. Principles and practice of infectious diseases. 4th ed. New York: Churchill Livingstone, 1995.

92. Cruse PJE. Wound infections: epidemiology and clinical characteristics. CT: Appleton & Lange, 1988.

93. Lee J. Surgical wound infections: surveillance for quality improvement. Boston: Little, Brown and Company, 1995.

94. DeLucia A, Magee JC, Shanley CJ, Simeone DM, Sussman JJ, Wahl WL. Review for surgery: scientific principles and practice. Philadelphia: J.B. Lippincott Company, 1993.

95. Townsend CMJ, Beauchamp RD, Evers BM, Mattox KL, Sabiston S. The biologic basis of modern surgical practice. Philadelphia: W.B. Saunders and Company, 2001.

96. Dellinger EP, Evans HL, Van Eaton EG. Hospital Infections Chapter 817. In: Ashley SW, Cance WG, Chen H, Jurkovich GJ, Napolitano LM, Pemberton JH, Riall TS, Swanson JS, Valentine JS, eds. Decker, Ontario, CA: ACS Surgery Online, 2012; 8–26.

97. Dellinger EP. Surgical infections and choice of antibiotics. In: Townsend CM, Beauchamp RD, Evers BM, Mattox K, eds. The Biologic basis for modern surgical practice. Sabiston Textbook of surgery, 16th edition, Philadelphia: WB Saunders Co, 2001; 171–88.

98. Howard N, Simmons RL. Wound infections: epidemiology and clinical characteristics. Surgical infectious diseases. 2nd ed. CT: Appleton & Lange, 1988.

99. Huizinga WK, Kritzinger NA, Bhamjee A. The value of adjuvant systemic antibiotic therapy in localised wound infections among hospital patients: a comparative study. J Infect 1986; 13:11–6.

100. Meislin HW, Lerner SA, Graves MH, et al. Cutaneous abscesses. Anaerobic and aerobic bacteriology and outpatient management. Ann Intern Med 1977; 87:145–9.

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

101. Paydar KZ, Hansen SL, Charlebois ED, Harris HW, Young DM. Inappropriate antibiotic use in soft tissue infections. Arch Surg 2006; 141:850–4; discussion 55–6.

102. Bobrow BJ, Pollack CV Jr, Gamble S, Seligson RA. Incision and drainage of cutaneous abscesses is not associated with bacteremia in afebrile adults. Ann Emerg Med 1997; 29:404–8.

103. Brook I, Frazier EH. Aerobic and anaerobic bacteriology of wounds and cutaneous abscesses. Arch Surg 1990; 125:1445–51.

104. Meislin HW. Pathogen identification of abscesses and cellulitis. Ann Emerg Med 1986; 15:329–32.

105. Dellinger EP. Postoperative wound infection. 2nd ed. Philadelphia: Mosby Year Book, 2001.

106. Wyrick WJ Jr, Rea WJ, McClelland RN. Rare complications with intravenous hyperosmotic alimentation. JAMA 1970; 211:1697–8.

107. Giuliano A, Lewis F Jr, Hadley K, Blaisdell FW. Bacteriology of necrotizing fasciitis. Am J Surg 1977; 134:52–7.

108. Miller LG, Perdreau-Remington F, Rieg G, et al. Necrotizing fasciitis caused by community-associated methicillin-resistant Staphylococcus aureus in Los Angeles. N Engl J Med 2005; 352:1445–53.

109. Stevens DL, Tanner MH, Winship J, et al. Severe group A streptococcal infections associated with a toxic shock-like syndrome and scarlet fever toxin A. N Engl J Med 1989; 321:1–7.

110. Chelsom J, Halstensen A, Haga T, Hoiby EA. Necrotising fasciitis due to group A streptococci in western Norway: incidence and clinical features. Lancet 1994; 344:1111–5.

111. Anaya DA, Dellinger EP. Necrotizing soft-tissue infection: diagnosis and management. Clin Infect Dis 2007; 44:705–10.

112. Zimbelman J, Palmer A, Todd J. Improved outcome of clindamycin compared with beta-lactam antibiotic treatment for invasive Streptococcus pyogenes infection. Pediatr Infect Dis J 1999; 18:1096–100.

113. Mulla ZD, Leaverton PE, Wiersma ST. Invasive group A streptococcal infections in Florida. South Med J 2003; 96:968–73.

114. Tanz RR, Shulman ST, Shortridge VD, et al. Community-based surveillance in the united states of macrolide-resistant pediatric pharyngeal group A streptococci during 3 respiratory disease seasons. Clin Infect Dis 2004; 39:1794–801.

115. Ardanuy C, Domenech A, Rolo D, et al. Molecular characterization of macrolide- and multidrug-resistant Streptococcus pyogenes isolated from adult patients in Barcelona, Spain (1993-2008). J Antimicrob Chemother 2010; 65:634–43.

116. Noels H, Weber C. Catching up with important players in atherosclerosis: type I interferons and neutrophils. Curr Opin Lipidol 2011; 22:144–5.

117. Jaggi P, Beall B, Rippe J, Tanz RR, Shulman ST. Macrolide resistance and emm type distribution of invasive pediatric group A streptococcal isolates: three-year prospective surveillance from a children's hospital. Pediatr Infect Dis J 2007; 26:253–5.

118. Stevens DL. Dilemmas in the treatment of invasive Streptococcus pyogenes infections. Clin Infect Dis 2003; 37:341–3.

119. Kaul R, McGeer A, Norrby-Teglund A, et al. Intravenous immunoglobulin therapy for streptococcal toxic shock syndrome—a comparative observational study. The Canadian Streptococcal Study Group. Clin Infect Dis 1999; 28:800–7.

120. Darenberg J, Ihendyane N, Sjolin J, et al. Intravenous immunoglobulin G therapy in streptococcal toxic shock syndrome: a European randomized, double-blind, placebo-controlled trial. Clin Infect Dis 2003; 37:333–40.

121. Laucks SS 2nd. Fournier's gangrene. Surg Clin North Am 1994; 74:1339–52.

122. Eke N, Echem RC, Elenwo SN. Fournier's gangrene in Nigeria: a review of 21 consecutive patients. Int Surg 2000; 85:77–81.

123. Sissolak D, Weir WR. Tropical pyomyositis. J Infect 1994; 29:121–7.

124. Pannaraj PS, Hulten KG, Gonzalez BE, Mason EO Jr, Kaplan SL. Infective pyomyositis and myositis in children in the era of community-acquired, methicillin-resistant Staphylococcus aureus infection. Clin Infect Dis 2006; 43:953–60.

125. Gafur OA, Copley LA, Hollmig ST, Browne RH, Thornton LA, Crawford SE. The impact of the current epidemiology of pediatric musculoskeletal infection on evaluation and treatment guidelines. J Pediatr Orthop 2008; 28:777–85.

126. Crum NF. Bacterial pyomyositis in the United States. Am J Med 2004; 117:420–8.

127. Garcia-Lechuz JM, Cuevas O, Castellares C, Perez-Fernandez C, Cercenado E, Bouza E. Streptococcus pneumoniae skin and soft tissue infections: characterization of causative strains and clinical illness. Eur J Clin Microbiol Infect Dis 2007; 26:247–53.

128. Theodorou SJ, Theodorou DJ, Resnick D. MR imaging findings of pyogenic bacterial myositis (pyomyositis) in patients with local muscle trauma: illustrative cases. Emerg Radiol 2007; 14:89–96.

129. Turecki MB, Taljanovic MS, Stubbs AY, et al. Imaging of musculoskeletal soft tissue infections. Skeletal Radiol 2010; 39:957–71.

130. Browne LP, Mason EO, Kaplan SL, Cassady CI, Krishnamurthy R, Guillerman RP. Optimal imaging strategy for community-acquired Staphylococcus aureus musculoskeletal infections in children. Pediatr Radiol 2008; 38:841–7.

131. Lin MY, Rezai K, Schwartz DN. Septic pulmonary emboli and bacteremia associated with deep tissue infections caused by community-acquired methicillin-resistant Staphylococcus aureus. J Clin Microbiol 2008; 46:1553–5.

132. Campbell KM, Vaughn AF, Russell KL, et al. Risk factors for community-associated methicillin-resistant Staphylococcus aureus infections in an outbreak of disease among military trainees in San Diego, California, in 2002. J Clin Microbiol 2004; 42:4050–3.

133. Weigelt J, Itani K, Stevens D, Lau W, Dryden M, Knirsch C. Linezolid versus vancomycin in treatment of complicated skin and soft tissue infections. Antimicrob Agents Chemother 2005; 49:2260–6.

134. Arbeit RD, Maki D, Tally FP, Campanaro E, Eisenstein BI. The safety and efficacy of daptomycin for the treatment of complicated skin and skin-structure infections. Clin Infect Dis 2004; 38: 1673–81.

135. File TM, Wilcox MH, Stein GE. Summary of ceftaroline fosamil clinical trials and clinical safety. Clin Infect Dis 2012; (suppl 3):S173–80.

136. Stevens DL, Aldape MJ, Bryant AE. Life-threatening clostridial infections. Anaerobe 2012; 18:254–9.

137. Stevens DL, Laine BM, Mitten JE. Comparison of single and combination antimicrobial agents for prevention of experimental gas gangrene caused by Clostridium perfringens. Antimicrob Agents Chemother 1987; 31:312–6.

138. Stevens DL, Maier KA, Laine BM, Mitten JE. Comparison of clindamycin, rifampin, tetracycline, metronidazole, and penicillin for efficacy in prevention of experimental gas gangrene due to Clostridium perfringens. J Infect Dis 1987; 155:220–8.

139. Heimbach D. Use of hyperbaric oxygen. Clin Infect Dis 1993; 17:239–40.

140. Goldstein EJ, Citron DM, Finegold SM. Dog bite wounds and infection: a prospective clinical study. Ann Emerg Med 1980; 9:508–12.

141. Goldstein EJ, Citron DM. Comparative activities of cefuroxime, amoxicillin-clavulanic acid, ciprofloxacin, enoxacin, and ofloxacin against aerobic and anaerobic bacteria isolated from bite wounds. Antimicrob Agents Chemother 1988; 32:1143–8.

142. Kroger AT, Atkinson WL, Marcuse EK, Pickering LK. General recommendations on immunization: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recomm Rep 2006; 55:1–48.

143. Goldstein EJ, Citron DM, Merriam CV, Warren YA, Tyrrell K, Fernandez H. Comparative in vitro activity of ertapenem and 11 other antimicrobial agents against aerobic and anaerobic pathogens isolated from skin and soft tissue animal and human bite wound infections. J Antimicrob Chemother 2001; 48:641–51.

144. Brakenbury PH, Muwanga C. A comparative double blind study of amoxycillin/clavulanate vs placebo in the prevention of infection after animal bites. Arch Emerg Med 1989; 6:251–6.

145. Talan DA, Abrahamian FM, Moran GJ, Citron DM, Tan JO, Goldstein EJ. Clinical presentation and bacteriologic analysis of infected human bites in patients presenting to emergency departments. Clin Infect Dis 2003; 37:1481–9.

146. Pascual FB, McGinley EL, Zanardi LR, Cortese MM, Murphy TV. Tetanus surveillance—United States, 1998–2000. MMWR Surveill Summ 2003; 52:1–8.

147. Goldstein EJ. Bite wounds and infection. Clin Infect Dis 1992; 14:633–8.

148. Gouin S, Patel H. Office management of minor wounds. Can Fam Physician 2001; 47:769–74.

149. Callaham M. Prophylactic antibiotics in common dog bite wounds: a controlled study. Ann Emerg Med 1980; 9:410–4.

150. Elenbaas RM, McNabney WK, Robinson WA. Prophylactic oxacillin in dog bite wounds. Ann Emerg Med 1982; 11:248–51.

151. Dire DJ, Hogan DE, Walker JS. Prophylactic oral antibiotics for low-risk dog bite wounds. Pediatr Emerg Care 1992; 8:194–9.

152. Dire DJ. Emergency management of dog and cat bite wounds. Emerg Med Clin North Am 1992; 10:719–36.

153. Cummings P. Antibiotics to prevent infection in patients with dog bite wounds: a meta-analysis of randomized trials. Ann Emerg Med 1994; 23:535–40.

154. Singer AJ, Dagum AB. Current management of acute cutaneous wounds. N Engl J Med 2008; 359:1037–46.

155. Medeiros I, Saconato H. Antibiotic prophylaxis for mammalian bites. Cochrane Database Syst Rev 2001:CD001738.

156. Goldstein EJ, Citron DM, Wield B, et al. Bacteriology of human and animal bite wounds. J Clin Microbiol 1978; 8:667–72.

157. Abrahamian FM, Goldstein EJ. Microbiology of animal bite wound infections. Clin Microbiol Rev 2011; 24:231–46.

158. Goldstein EJ, Citron DM, Richwald GA. Lack of in vitro efficacy of oral forms of certain cephalosporins, erythromycin, and oxacillin against Pasteurella multocida. Antimicrob Agents Chemother 1988; 32:213–5.

159. Goldstein EJ, Citron DM, Merriam CV. Linezolid activity compared to those of selected macrolides and other agents against aerobic and anaerobic pathogens isolated from soft tissue bite infections in humans. Antimicrob Agents Chemother 1999; 43:1469–74.

160. Stevens DL, Higbee JW, Oberhofer TR, Everett ED. Antibiotic susceptibilities of human isolates of Pasteurella multocida. Antimicrob Agents Chemother 1979; 16:322–4.

161. No authors listed.] Diphtheria, tetanus, and pertussis: recommendations for vaccine use and other preventive measures. Recommendations of the Immunization Practices Advisory Committee (ACIP). MMWR Recomm Rep 1991; 40:1–28.

162. Bowie C. Tetanus toxoid for adults—too much of a good thing. Lancet 1996; 348:1185–6.

163. Zook EG, Miller M, Van Beek AL, Wavak P. Successful treatment protocol for canine fang injuries. J Trauma 1980; 20:243–7.

164. Schultz RC, McMaster WC. The treatment of dog bite injuries, especially those of the face. Plast Reconstr Surg 1972; 49:494–500.

165. Stucker FJ, Shaw GY, Boyd S, Shockley WW. Management of animal and human bites in the head and neck. Arch Otolaryngol Head Neck Surg 1990; 116:789–93.

166. Palmer J, Rees M. Dog bites of the face: a 15 year review. Br J Plast Surg 1983; 36:315–8.

167. Inglesby TV, Henderson DA, Bartlett JG, et al. Anthrax as a biological weapon: medical and public health management. Working Group on Civilian Biodefense. JAMA 1999; 281:1735–45.

168. Dixon TC, Meselson M, Guillemin J, Hanna PC. Anthrax. N Engl J Med 1999; 341:815–26.

169. No authors listed.] Update: Investigation of bioterrorism-related anthrax and interim guidelines for exposure management and antimicrobial therapy, October 2001. MMWR Morb Mortal Wkly Rep 2001; 50:909–19.

170. Bass JW, Freitas BC, Freitas AD, et al. Prospective randomized double blind placebo-controlled evaluation of azithromycin for treatment of cat-scratch disease. Pediatr Infect Dis J 1998; 17:447–52.

171. Ramirez Ramirez CR, Saavedra S, Ramirez Ronda CH. Bacillary angiomatosis: microbiology, histopathology, clinical presentation, diagnosis and management. Bol Asoc Med P R 1996; 88:46–51.

172. Andrychowski J, Jasielski P, Netczuk T, Czernicki Z. Empyema in spinal canal in thoracic region, abscesses in paravertebral space, spondylitis: in clinical course of zoonosis Erysipelothrix rhusiopathiae. Eur Spine J 2012; 21(suppl 4):557–63.

173. Brooke CJ, Riley TV. Erysipelothrix rhusiopathiae: bacteriology, epidemiology and clinical manifestations of an occupational pathogen. J Med Microbiol 1999; 48:789–99.

174. Estes DM, Dow SW, Schweizer HP, Torres AG. Present and future therapeutic strategies for melioidosis and glanders. Expert Rev Anti Infect Ther 2010; 8:325–38.

175. Srinivasan A, Kraus CN, DeShazer D, et al. Glanders in a military research microbiologist. N Engl J Med 2001; 345:256–8.

176. Perry RD, Fetherston JD. Yersinia pestis—etiologic agent of plague. Clin Microbiol Rev 1997; 10:35–66.

177. Maurin M, Pelloux I, Brion JP, Del Bano JN, Picard A. Human tularemia in France, 2006–2010. Clin Infect Dis 2011; 53:e133–41.

178. Kroshinsky D, Grossman RE, Fox LP. Approach to the patient with presumed cellulitis. Semin Cutan Med Surg 2007; 26:168–78.

179. Lopez FA, Sanders CV. Dermatologic infections in the immunocompromised (non-HIV) host. Infect Dis Clin North Am 2001; 15:671–702, xi.

180. Pizzo PA. Fever in immunocompromised patients. N Engl J Med 1999; 341:893–900.

181. Podjasek JO, Wetter DA, Pittelkow MR, Wada DA. Cutaneous small-vessel vasculitis associated with solid organ malignancies: the Mayo Clinic experience, 1996 to 2009. J Am Acad Dermatol 2012; 66: e55–65.

182. Gafter-Gvili A, Fraser A, Paul M, et al. Antibiotic prophylaxis for bacterial infections in afebrile neutropenic patients following chemotherapy. Cochrane Database Syst Rev 2012; 1:CD004386.

183. Montoya JG, Giraldo LF, Efron B, et al. Infectious complications among 620 consecutive heart transplant patients at Stanford University Medical Center. Clin Infect Dis 2001; 33:629–40.

184. Lamoth F, Jaton K, Prod'hom G, et al. Multiplex blood PCR in combination with blood cultures for improvement of microbiological documentation of infection in febrile neutropenia. J Clin Microbiol 2010; 48:3510–6.

185. Petti CA. Detection and identification of microorganisms by gene amplification and sequencing. Clin Infect Dis 2007; 44:1108–14.

186. Schuetz AN. Invasive fungal infections: biomarkers and molecular approaches to diagnosis. Clin Lab Med 2013; 33:505–25.

187. Freifeld AG, Bow EJ, Sepkowitz KA, et al. Clinical practice guideline for the use of antimicrobial agents in neutropenic patients with cancer: 2010 update by the Infectious Diseases Society of America. Clin Infect Dis 2011; 52:e56–93.

188. Lingaratnam S, Slavin MA, Koczwara B, et al. Introduction to the Australian consensus guidelines for the management of neutropenic fever in adult cancer patients, 2010/2011. Australian Consensus Guidelines 2011 Steering Committee. Intern Med J 2011; 41:75–81.

189. Segal BH, Freifeld AG, Baden LR, et al. Prevention and treatment of cancer-related infections. J Natl Compr Canc Netw 2008; 6:122–74.

190. Tomblyn M, Chiller T, Einsele H, et al. Guidelines for preventing infectious complications among hematopoietic cell transplant recipients: a global perspective. Preface. Bone Marrow Transplant 2009; 44:453–5.

191. Walsh TJ, Anaissie EJ, Denning DW, et al. Treatment of aspergillosis: clinical practice guidelines of the Infectious Diseases Society of America. Clin Infect Dis 2008; 46:327–60.

192. Pappas PG, Kauffman CA, Andes D, et al. Clinical practice guidelines for the management of candidiasis: 2009 update by the Infectious Diseases Society of America. Clin Infect Dis 2009; 48:503–35.

193. Mermel LA, Allon M, Bouza E, et al. Clinical practice guidelines for the diagnosis and management of intravascular catheter-related infection:

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019

2009 update by the Infectious Diseases Society of America. Clin Infect Dis 2009; 49:1–45.

194. Legrand M, Max A, Peigne V, et al. Survival in neutropenic patients with severe sepsis or septic shock. Crit Care Med 2012; 40:43–9.

195. Paesmans M, Klastersky J, Maertens J, et al. Predicting febrile neutropenic patients at low risk using the MASCC score: does bacteremia matter? Support Care Cancer 2011; 19:1001–8.

196. Klastersky J, Paesmans M, Georgala A, et al. Outpatient oral antibiotics for febrile neutropenic cancer patients using a score predictive for complications. J Clin Oncol 2006; 24:4129–34.

197. Lanoix JP, Schmit JL, Douadi Y. Bacterial lung sepsis in patients with febrile neutropenia. Curr Opin Pulm Med 2012; 18:175–80.

198. Mebis J, Jansens H, Minalu G, et al. Long-term epidemiology of bacterial susceptibility profiles in adults suffering from febrile neutropenia with hematologic malignancy after antibiotic change. Infect Drug Resist 2010; 3:53–61.

199. Nordmann P, Cuzon G, Naas T. The real threat of Klebsiella pneumoniae carbapenemase-producing bacteria. Lancet Infect Dis 2009; 9:228–36.

200. Johnston DL, Waldhausen JH, Park JR. Deep soft tissue infections in the neutropenic pediatric oncology patient. J Pediatr Hematol Oncol 2001; 23:443–7.

201. Reich HL, Williams Fadeyi D, Naik NS, Honig PJ, Yan AC. Nonpseudomonal ecthyma gangrenosum. J Am Acad Dermatol 2004; 50: S114–7.

202. Wade JC. Viral infections in patients with hematological malignancies. Hematology Am Soc Hematol Educ Program 2006; 2006:368–74.

203. Pizzo PA. Management of fever in patients with cancer and treatment-induced neutropenia. N Engl J Med 1993; 328:1323–32.

204. Kosmidis CI, Chandrasekar PH. Management of gram-positive bacterial infections in patients with cancer. Leuk Lymphoma 2012; 53:8–18.

205. Tattevin P, Camus C. What can we learn from studies comparing linezolid with vancomycin in neutropenic patients when vancomycin dosages are not optimized? Clin Infect Dis 2006; 42:1813–4; author reply 14–5.

206. Jaksic B, Martinelli G, Perez-Oteyza J, Hartman CS, Leonard LB, Tack KJ. Efficacy and safety of linezolid compared with vancomycin in a randomized, double-blind study of febrile neutropenic patients with cancer. Clin Infect Dis 2006; 42:597–607.

207. Freifeld A, Marchigiani D, Walsh T, et al. A double-blind comparison of empirical oral and intravenous antibiotic therapy for low-risk febrile patients with neutropenia during cancer chemotherapy. N Engl J Med 1999; 341:305–11.

208. Freifeld AG, Sepkowitz KA. No place like home? Outpatient management of patients with febrile neutropenia and low risk. J Clin Oncol 2011; 29:3952–4.

209. Spellberg B, Ibrahim A, Roilides E, et al. Combination therapy for mucormycosis: why, what, and how? Clin Infect Dis 2012; 54(suppl 1): S73–8.

210. Wingard JR, Santos GW, Saral R. Differences between first and subsequent fevers during prolonged neutropenia. Cancer 1987; 59:844–9.

211. Wade JC. Management of infection in patients with acute leukemia. Hematol Oncol Clin North Am 1993; 7:293–315.

212. Leeflang MM, Debets-Ossenkopp YJ, Visser CE, et al. Galactomannan detection for invasive aspergillosis in immunocompromised patients. Cochrane Database Syst Rev 2008; 4:CD007394.

213. Maertens J, Theunissen K, Lodewyck T, Lagrou K, Van Eldere J. Advances in the serological diagnosis of invasive Aspergillus infections in patients with haematological disorders. Mycoses 2007; 50(suppl 1):2–17.

214. Segal BH, Almyroudis NG, Battiwalla M, et al. Prevention and early treatment of invasive fungal infection in patients with cancer and neutropenia and in stem cell transplant recipients in the era of newer broad-spectrum antifungal agents and diagnostic adjuncts. Clin Infect Dis 2007; 44:402–9.

215. Mays SR, Bogle MA, Bodey GP. Cutaneous fungal infections in the oncology patient: recognition and management. Am J Clin Dermatol 2006; 7:31–43.

216. Goodrich JM, Reed EC, Mori M, et al. Clinical features and analysis of risk factors for invasive candidal infection after marrow transplantation. J Infect Dis 1991; 164:731–40.

217. Bodey GP, Luna M. Skin lesions associated with disseminated candidiasis. JAMA 1974; 229:1466–8.

218. Wingard JR, Merz WG, Saral R. Candida tropicalis: a major pathogen in immunocompromised patients. Ann Intern Med 1979; 91:539–43.

219. Jarowski CI, Fialk MA, Murray HW, et al. Fever, rash, and muscle tenderness. A distinctive clinical presentation of disseminated candidiasis. Arch Intern Med 1978; 138:544–6.

220. Walsh TJ, Newman KR, Moody M, Wharton RC, Wade JC. Trichosporonosis in patients with neoplastic disease. Medicine 1986; 65:268–79.

221. Allo MD, Miller J, Townsend T, Tan C. Primary cutaneous aspergillosis associated with Hickman intravenous catheters. N Engl J Med 1987; 317:1105–8.

222. Petrikkos G, Skiada A, Lortholary O, Roilides E, Walsh TJ, Kontoyiannis DP. Epidemiology and clinical manifestations of mucormycosis. Clin Infect Dis 2012; 54(suppl 1):S23–34.

223. Kontoyiannis DP, Marr KA, Park BJ, et al. Prospective surveillance for invasive fungal infections in hematopoietic stem cell transplant recipients, 2001–2006: overview of the Transplant-Associated Infection Surveillance Network (TRANSNET) Database. Clin Infect Dis 2010; 50:1091–100.

224. Kontoyiannis DP, Sumoza D, Tarrand J, Bodey GP, Storey R, Raad II. Significance of aspergillemia in patients with cancer: a 10-year study. Clin Infect Dis 2000; 31:188–9.

225. Gartenberg G, Bottone EJ, Keusch GT, Weitzman I. Hospital-acquired mucormycosis (Rhizopus rhizopodiformis) of skin and subcutaneous tissue: epidemiology, mycology and treatment. N Engl J Med 1978; 299:1115–8.

226. Anaissie E. Opportunistic mycoses in the immunocompromised host: experience at a cancer center and review. Clin Infect Dis 1992; 14 (suppl 1):S43–53.

227. Nucci M, Anaissie E. Fusarium infections in immunocompromised patients. Clin Microbiol Rev 2007; 20:695–704.

228. Doucette K, Fishman JA. Nontuberculous mycobacterial infection in hematopoietic stem cell and solid organ transplant recipients. Clin Infect Dis 2004; 38:1428–39.

229. Griffith DE, Aksamit T, Brown-Elliott BA, et al. An official ATS/IDSA statement: diagnosis, treatment, and prevention of nontuberculous mycobacterial diseases. Am J Respir Crit Care Med 2007; 175: 367–416.

230. Ambrosioni J, Lew D, Garbino J. Nocardiosis: updated clinical review and experience at a tertiary center. Infection 2010; 38:89–97.

231. Thomas LM, Rand HK, Miller JL, Boyd AS. Primary cutaneous aspergillosis in a patient with a solid organ transplant: case report and review of the literature. Cutis 2008; 81:127–30.

232. Shinohara MM, George E. Scedosporium apiospermum: an emerging opportunistic pathogen that must be distinguished from Aspergillus and other hyalohyphomycetes. J Cutan Pathol 2009; 36(suppl 1):39–41.

233. Miyamoto H, Hayashi H, Nakajima H. Cutaneous mucormycosis in a patient with acute lymphocytic leukemia. J Dermatol 2005; 32:273–7.

234. Halpern M, Balbi E, Carius L, et al. Cellulitis and nodular skin lesions due to Fusarium spp in liver transplant: case report. Transplant Proc 2010; 42:599–600.

235. Abuav R, McGirt LY, Kazin RA. Cryptococcal panniculitis in an immunocompromised patient: a case report and review of the literature. Cutis 2010; 85:303–6.

236. Perfect JR, Dismukes WE, Dromer F, et al. Clinical practice guidelines for the management of cryptococcal disease: 2010 update by the

Infectious Diseases Society of America. Clin Infect Dis 2010; 50: 291–322.

237. Wheat LJ, Freifeld AG, Kleiman MB, et al. Clinical practice guidelines for the management of patients with histoplasmosis: 2007 update by the Infectious Diseases Society of America. Clin Infect Dis 2007; 45:807–25.

238. Freifeld AG, Wheat LJ, Kaul DR. Histoplasmosis in solid organ transplant recipients: early diagnosis and treatment. Curr Opin Organ Transplant 2009; 14:601–5.

239. Shiley K, Blumberg E. Herpes viruses in transplant recipients: HSV, VZV, human herpes viruses, and EBV. Infect Dis Clin North Am 2010; 24:373–93.

240. Erard V, Guthrie KA, Varley C, et al. One-year acyclovir prophylaxis for preventing varicella-zoster virus disease after hematopoietic cell transplantation: no evidence of rebound varicella-zoster virus disease after drug discontinuation. Blood 2007; 110:3071–7.

241. Erard V, Wald A, Corey L, Leisenring WM, Boeckh M. Use of long-term suppressive acyclovir after hematopoietic stem-cell transplantation: impact on herpes simplex virus (HSV) disease and drug-resistant HSV disease. J Infect Dis 2007; 196:266–70.

242. Basile A, Simzar S, Bentow J, et al. Disseminated *Strongyloides stercoralis*: hyperinfection during medical immunosuppression. J Am Acad Dermatol 2010; 63:896–902.

243. Walia R, Montoya JG, Visvesvera GS, Booton GC, Doyle RL. A case of successful treatment of cutaneous *Acanthamoeba* infection in a lung transplant recipient. Transpl Infect Dis 2007; 9:51–4.

244. Godoy HL, Guerra CM, Viegas RF, et al. Infections in heart transplant recipients in Brazil: the challenge of Chagas' disease. J Heart Lung Transplant 2010; 29:286–90.

245. Sandhu K, Gupta S, Kumar B, Dhandha R, Udigiri NK, Minz M. The pattern of mucocutaneous infections and infestations in renal transplant recipients. J Dermatol 2003; 30:590–5.

246. Pickering LK. Committee on Infectious Diseases, American Academy of Pediatrics. Antimicrobial agents and related therapy. 26th ed. Elk Grove Village, IL: American Academy of Pediatrics, 2003.

247. Pascual A, Csajka C, Buclin T, et al. Challenging recommended oral and intravenous voriconazole doses for improved efficacy and safety: population pharmacokinetics-based analysis of adult patients with invasive fungal infections. Clin Infect Dis 2012; 55:381–90.

Downloaded from https://academic.oup.com/cid/article-abstract/59/2/e10/2895845 by Washington Hospital Center user on 05 March 2019