# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
|                               )
DAMOND LEE WILLIAMS,            )
                                )
      Plaintiff,       )
                                )
v.                              )     Civil Action No. 16-2062 (EGS)
                                )
U.S. DEPARTMENT OF VETERANS     )
AFFAIRS, et al,                 )
                                )
      Defendants.      )
_____ )

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE PLAINTIFF'S EXPERT OPINION AND FOR SUMMARY JUDGMENT

André T. Hammel
Hammel Law LLC
9701 Apollo Drive | Suite 301
Largo, MD 20774
(240) 393-4935 (Office)
(240) 303-2638 (Fax)
andre.hammel@hamlawus.com
Counsel for Plaintiff


**/s/   Danielle P. Turnipseed, Esq.**
Danielle P. Turnipseed, Esq.
DCB No.: 1001033
Turnipseed Law, LLC
14306 Royal Forest Lane
Silver Spring, MD  20904
301.589.5881
danielle@turnipseedlaw.com
Counsel for Plaintiff

**Dated: September 3, 2019**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………

PRELIMINARY STATEMENT ……………………………………………………… 5

FACTUAL BACKGROUND……………………………………………………………...7

PROCEDURAL HISTORY……………………………………………………………. 12

PLAINTIFF'S EXPERT AND HIS PROPOSED OPINIONS…………………………… 14

STANDARDS OF REVIEW ……………………………………………………….. 17

     I. LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT EVIDENCE…… 17

     II. MOTIONS FOR SUMMARY JUDGMENT………………………………….. 19

     III. THE FEDERAL TORT CLAIMS ACT……………………………………… 20

ARGUMENT

OPPOSITION TO MOTION TO PRECLUDE DR. PORTER'S PROPSOED OPINIONS. 21

     I. DR. PORTER IS QUALIFIED TO SERVE AS AN EXPERT DUE TO HIS
     KNOWLEDGE, SKILL, EXPERIENCE, TRAINING, AND EDUCATION……… 21

     II. DR. PORTER'S TESTIMONY WILL ASSIST TH TRIER OF FACT TO
     UNDERSTAND THE EVIDENCE OR TO DETERMINE A FACT IN ISSUE…….22

     III. DR. PORTER'S TESTIMONY DOES SATISFY THE REQUIREMENTS
     OF RULE 702………………………………………………………………………..23

     IV. DR. PORTER'S TESTIMONY IS BASED ON RELIABLE PRINCIPLES
     AND METHODS……………………………………………………………………… 25

MOTION OPPOSING SUMMARY JUDGMENT………….......................................... 25

     I. PLAINTIFF CAN SATISFY THE ELEMENTS OF A FEDERAL TORTS
     CLAIM………………………………………………………………………………26

     II. DEFENDANT'S EXPERT IS NOW RENDERED MUTE……………………..26

     III. DEFENDANT'S ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO
     PLAINTIFF'S CLAIM BASED ON NEGLGENT SUPERVISION……………… 27

IV. IF DR. PORTER'S TESTIMONY IS PRECLUDED PLAINTIFF SHOULD HAVE
LEAVE TO AMEND OR TO SEEK AND DISCLOSE A NEW EXPERT............ 28

CONCLUSION.................................................................................................. 28

## TABLE OF AUTHORITIES

<u>**Federal Cases**</u>

*Daubert v. Merrell Dow Pharmaceuticals Inc. 509 U.S. 579 (1993)....*18, 19, & 23

*Kumho Tire Co. v. Carmichael,* 119 S.Ct. 1167 (1999)…………………………..18

*United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*
80 f. 3d. 1074, 1078 (5ᵗʰ Cir, 1996)…………………………….....……………...19

*Paloi R.R. Yard PCB Litigation,* 35 F 3d. 717, 747 (3d Cir 1994)………………19

*Judicial Watch Inc. Consumer Financial Protection Bureau*,
985 F. Supp. 2d 1,6 (D.D.C 2013)……………………………………...………….20

*Celotex Corp v. Catrett*, 447 U.S. 317, 322 (1986)……………………………...20

*Anderson v. Liberty Lobby Inc.,*  477 U.S. 242, 248 (1986)……………………20

*Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir 2003)………………………………..20

*D'Amico v. City of New York*, 132 F. 3d 145, 149 (2d Cir. 1998) …………........20

*FDIC v. Meyer*, 510 U.S. 471, 477 (1994)………………………………………….21

*Kannankeril v. Terminix, International, Inc.*
128 F. 3d 802, 809 (3d. Cir. 1997)………………………………………………….23

<u>**Statutes**</u>

FTCA, 28 U.S.C. §§ 1346(b), 2671-80………………………………………….21

<u>**Rules**</u>

Fed. R. Civ. P. 56(a)………………………………………..……………...20

Fed. R. Civ. P. 56(c)……………………………………………………………..20

Fed. R. Civ. P. 702………………………………………..... 7, 17, 18, 19, 23, & 25

**Other Sources**

medlineplus.gov……………………………………………………………10

https://www.medicinenet.com……………………………………………10
https://www.idsociety.org/…………………………………………………25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

)
DAMOND LEE WILLIAMS,            )
                               )
            Plaintiff,         )
                               )
v.                             )        Civil Action No. 16-2062 (EGS)
                               )
U.S. DEPARTMENT OF VETERANS     )
AFFAIRS, et al,                )
                               )
            Defendants.        )
_____)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE PLAINTIFF'S EXPERT OPINION AND FOR SUMMARY JUDGMENT

Damond L. Williams (hereinafter referred to as "Plaintiff") by and through his undersigned attorneys respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Preclude Plaintiff's Expert Opinion and for Summary Judgment.

### PRELIMINARY STATEMENT

Plaintiff seeks relief under two theories of liability. The first stated claim is that on October 30, 2013, the medical staff at The Department of Veteran Affairs (hereinafter referred to as "VA") breached the requisite standard of care in assessing, evaluating, and treating Plaintiff when he presented for a medical appointment for swelling in his throat, jaw, and left foot and for difficulties with ambulating, on the aforementioned date. The second claim is that the VA failed to properly supervise their medical staff and that the health care provider who treated Plaintiff on October 30, 2103, should not have been allowed to misevaluate and misdiagnose Plaintiff, because she was not supposed to seeing patients without supervision.

Plaintiff has presented Fernando A. Porter M.D. (hereinafter referred to as "Dr. Porter") as their medical expert to establish that Defendant did in fact breach the medically accepted standards of care, resulting in actual harm to Plaintiff, with said harm causing Plaintiff to suffer damages.  In the preliminary statement section of their memorandum, Defendants either unintentionally simplify or makes a material misstatement in implying that Dr. Porter is just a "Maryland-based home primary care doctor."  As delineated in his provided curriculum vitae, Dr. Porter is board certified by the American Board of Family Medicine to practice medicine in twelve (12) different states and the District of Columbia.  Further, in addition to serving as a physician with Medstar (home-based primary care) he also serves as a provider in a telemedicine capacity, serves as medical director for an ambulance company, and also serves in a different capacity with Medstar, where he is a provider for patients with urgent needs. Exhibit C at 8 of 9 On a daily basis, in his professional capacities he oversees the care provided by physician assistants and nurse practitioners. Dr. Porter's Depo at 28.

Dr. Porter's licensures and depth of professional experience coupled with the provided recognized medical sources juxtaposed with a thorough review of Plaintiff's relevant medical files are the basis by which he formed his professional opinion that the VA providers breached their duty of care to Plaintiff.  Dr. Porter has identified the standard of care, which should have been met by Defendants, thus providing this Honorable Court with basis to deny Defendant's demand for Dr. Porter's opinion to be precluded and to deny Defendant's demand for summary judgment. Exhibit H at IV (12-26).

Defendants' offering that at least one "nurse practitioner examined Plaintiff's foot and there is no dispute about that", is another misstatement of fact.  A mere look by a health care professional does not equate to an examination.  Defendant's medical treatment notes for

Plaintiff's October 30, 2013's visit do not reflect that there was an examination of his foot or any treatment plan provided, regarding the swelling and stiffness in his left foot.  Moreover, Defendants' medical treatment notes, signed by their nurse practitioner, do not reference the fact that Plaintiff was ambulating with a cane on his October 30, 2013 visit. Dr. Porter states that Defendant did breach their duty of care to Plaintiff, which pursuant to the Federal Tort Claims Act and the standards under Federal Rule of Evidence 702, is a sufficient basis for Defendants' motions to be quashed and have this matter proceed in due course. Exhibit C (Finding of Negligence at 4-9).

For the aforementioned reasons and others stated herein, Defendant's motion to preclude Dr. Porter's opinion and Defendant's motion for summary judgment should both be denied.

## FACTUAL BACKGROUND

Plaintiff's date of birth is March 20, 1975. When he entered Defendants' clinic on October 30, 2013 he was thirty-eight (38) years of age.  Plaintiff is a military veteran; he was honorably discharged from the United States Air Force.  He learned the trade of aircraft fuel maintenance engineer while enlisted in the United States military. Plaintiff is a non-smoker and does not drink alcohol. Pl. Depo. at 59 (13-18).  Due to the inherent respiratory health risks accompanied with working inside aircraft fuel system containers daily, for the majority of his workday, plaintiff elected to change careers. Pl. Depo at 93-94.

Plaintiff started a personal training and physical fitness company. Pl. Depo[1] 16-17. However, post the incidents on October 30, 2013, subsequent medical interventions, and extensive rehabilitative therapy, which left Plaintiff in a significantly diminished physical state, Plaintiff could no longer develop or work as a personal trainer, so he is now once again

---

[1] Citations to "Pl. Depo." refer to the transcript of Plaintiff's deposition, taken March 4, 2019.

employed as an aircraft fuel maintenance engineer. Am. Compl[2] ¶ 16. He currently resides in Alabama but frequently travels for his job.

A representation of Plaintiff's commitment to change careers was the fact that on or about October 20, 2013, Plaintiff competed in and finished a "Tough Mudder" endurance competition. Pl. Depo 22-23. Over a twelve (12) mile course traversing through different terrains, water challenges and other obstacles courses, Plaintiff competed along with hundreds of others. During the competition Plaintiff had a pebble in his shoe and that pebble caused a scrape on his foot.  Pl Depo 24-25. The resulting scrape allowed for an opening in the skin in which bacteria entered, causing swelling and stiffness in his left foot, making it difficult for him to ambulate without assistance.

On or about October 29, 2013 Plaintiff called Defendant's Medical Advice Line because he was suffering pain and swelling in his jaw and throat and had difficulty swallowing. Exhibit A.  On October 30, 2013, Plaintiff, a layperson without any medical training or expertise, sought medical guidance and assistance from Defendants. Pl. Depo 45 (2-23).  Plaintiff's mother and sister who are both registered nurses observed his condition and based on their observations, recommended he go in for treatment and evaluation at Defendants' walk-in treatment clinic. Am. Compl. ¶ 19. Subsequently Plaintiff went to Defendant's main hospital, located at 50 Irving Street, NW in the District of Columbia. Therefore, on October 30, 2013, ambulating with a cane, Plaintiff entered Defendants' health clinic at their main hospital for assessment, evaluation and treatment to address his pain and stiffness accompanied by a swollen neck, jaw and foot and his difficulties with swallowing and ambulating. Pl. Depo 32.

---

[2] Citiations to "Am. Compl." Refer to the Amended Complaint for Negligence Resulting in Personal Injuries and Monetary Damages. The pleading is an exhibit to Plaintiff's renewed motion to amend his complaint, filed January 24, 2018. EXF No.29-1.

On October 30, 2013, when Plaintiff arrived at Defendant's clinic it was not required for him to have an appointment because the clinic accepts walk-in patients. Plaintiff's first contact with a non-administrative member of Defendants' staff was a nurse.  Plaintiff informed the nurse that he was having difficulty with ambulating due to swelling in his left foot and that he had difficulty swallowing due to his neck and jaw being swollen. Pl. Depo 32-34 and Pl. Depo. 57-58.  The medical intake notes do not have any mention of Plaintiff's ambulating with a cane or that his left foot was swollen. Pl.  Depo. 32. and Exhibit A.  The medical intake notes list Plaintiff's chief complaint as having pain and swelling in his jaw. The medical intake notes further state that Plaintiff was alert and orientated. Exhibit A.  Defendants' medical intake notes state Plaintiff's temperature and blood pressure were normal. *Id.*

After his initial medical intake, Plaintiff was next seen by Defendant's nurse practitioner, Ms. Marguerite McGarrah (hereinafter referred to as "NP McGarrah").    Amend. Compl. ¶ 22. Plaintiff advised NP McGarrah that he had difficulty swallowing, that his neck and jaw were swollen, that his left foot was swollen and it was clearly observable that he was ambulating with cane. Pl. Depo 35-36. Plaintiff testified that NP McGarrah touched his throat and said his glands look spongy. Pl. Depo. 36.   Next she attempted to look in his throat but the medical equipment, otoscope, was not working.  NP McGarrah attempted to get it to work but she could not, she was about to leave the room to look for a working otoscope but she stopped and said f*** it (expletive) it. Pl. Depo 36-37 and Pl. Depo at 61.   NP McGarrah never actually examined Plaintiff's mouth or throat with an otoscope.   However, her medical notes infer that she did, because she wrote that she did examine said area with an unremarkable finding. Pl. Depo at. 43 (18-20). There is absolutely no mention in her note that Plaintiff was ambulating with a cane, that his left foot was swollen or that she examined his left foot. Exhibit A.

Based on Defendants' medical notes Plaintiff appeared to be alert, with normal blood pressure and body temperature, and having no remarkable findings from his oral exam, but NP McGarrah still ordered an antibiotic prescription for him, but she stated she had misgivings about prescribing the prescription.  Plaintiff, a non-smoker and non-drinker testified that NP McGarrah counseled him on drug seeking and drug abuse. Pl. Depo. at 37 (12-14) and Pl. Depo. at 62 (7-16).   NP McGarrah did not provide any particular follow-up instructions or advisements regarding the swelling in Plaintiff's left foot and his difficulties with ambulating, such as travel or activity restrictions.  After receiving his prescription, he took his medication and went to his cousin's house, where his cousin observed Plaintiff's disheveled state. Pl. Depo. at 46 (6-15)

After taking the medication prescribed by NP McGarrah, Plaintiff's condition did not improve. Pl. Depo at 47-48.   On or about November 1, 2013, he boarded a flight from the Washington DC area to the Seattle, Washington area to collect personal belongings and effects from storage. Pl. Depo at 48. (8-20) and 49 (7-12).   After the flight Plaintiff's pain and swelling intensified. Pl. Depo. 48-49. On or about November 3, 2013, Plaintiff's pain and complications climaxed to the level where he could no longer ambulate without assistance. Pl. Depo. at 50-51. With assistance he checked into Providence Medical Center for treatment and evaluation. He was subsequently admitted into Providence Medical Center. Pl. Depo at 52-55. At the time of his admission Plaintiff's white blood cell count was forty-three thousand (43,000)[3].  The History and Physical section of his intake note reads as follows:

Mr. Williams is a healthy 38 yo old who lives in Washington DC and is currently visiting a friend in Everett.  On Tuesday, 5 days ago he initially went to the VA clinic in Washington DC for right facial (ear and cheek) swelling and left foot infection with blistering on the dorsum of the left foot (*emphasis added*). He reported some troubles with a root canal on the left and was told he has a possible abscess.  Since starting the penicillin, the facial pain and swelling greatly

---

[3] Per the U.S. National Library of Medicine, the normal number of white blood cells in the blood is 4,500 to 11,000 white blood cells per microliter (4.5 to 11.0 x 109/L) medlineplus.gov

improved. The left foot infection continued to worsen. Today, the leg is swollen with new blistering around the heel and redness extending past the knee.  He noted darkened urine. No leg pain, no fever, no chills, He denies any recent travel however he did participate in a "Mud Run" 10 days ago with some skin abrasions on both feet and a toe-nail injury on the left foot.   Exhibit B at 9.

After a battery of tests, a course of treatment was determined at Providence Medical Center, Plaintiff was transferred to a Harborview Medical Center[4] Exhibit C at 4 of 9.

Just four days after being advised by Defendants' medical staff on drug seeking and Defendants' staff not including anything in their medical note about treatment or advisement for the swelling in his left foot and ambulating with a cane, at Harborview Medical Center Plaintiff was diagnosed with left leg cellulitis and necrotizing fasciitis. Exhibit C 3 of 9.  He had to have immediate medical surgical intervention. Prior to going into surgery he was advised that he might not wake up with his left foot.  After surgery the first thing he checked was his left foot to ensure it was still there, it was. Pl. Depo. at 54 (18-23)

Plaintiff was hospitalized from November 3, 2013 until November 14, 2013. After being discharged, he could not immediately travel or provide care for himself, so his mother, a registered nurse, flew to the Seattle, Washington area and stayed with him at an extended stay hotel until he could travel back to the Washington DC area. Pl. Depo at 55 (14-20). Subsequently, Plaintiff underwent months of extensive rehabilitative and physical therapy at Defendant's main hospital, the same hospital where he went for initial treatment on October 30, 2013.  Amend. Compl. ¶ 43.

In June of 2014, Plaintiff returned to work as an aircraft fuel maintenance engineer.  PL. Depo. at 66-67.  He stopped his pursuits of developing a physical fitness company because he could no longer engage in such strenuous physical activities. Pl. Depo at 95 (11-16).  As a result

---

[4] The only Level 1 adult & pediatric trauma & verified burn center in the state of Washington.

of the infection and subsequent surgeries to date Plaintiff has suffered long term nerve damage, which results in him having chronic swelling, stiffness and pain in his left foot and leg. Amend. Compl. ¶ 52-53.   He consistently wears compression stockings in attempt to mitigate the swelling. Amend. Compl. ¶ 53. His right ankle and foot are also gradually diminishing in capacity because they habitually overcompensate for the lack of capacity and strength in his left leg and foot. Plaintiff went from being able to complete challenging twelve (12) mile obstacle courses to having to take breaks during his workday due to swelling, stiffness and pain.

### PROCEDURAL HISTORY

On or about October 1, 2015, pursuant to the Federal Tort Claims Act, Plaintiff, then Claimant, filed a Standard Form 95 Claim for Damage, Injury, or Death, with supplements and exhibits. Amend. Compl. ¶ 7. The basis for the claim was that Defendants' health care providers deviated from the accepted standard practice of care by not properly assessing and treating Plaintiff on his October 30, 2013 visit at their main hospital in Washington DC. As a result of Defendant's malpractice Plaintiff suffered immense harm and actual injuries. In response to Plaintiff's filings Defendants sent request for information to Plaintiff, Plaintiff timely responded. Although, Plaintiff's counsel made numerous phone calls and inquires, Defendants never denied or accepted liability for his claim. Amend. Compl ¶ 8-11.

On or about October 16, 2016, Plaintiff commenced this civil action. ECF  No. 1. Plaintiff sought relief for two separate acts by Defendants. The first count was general negligence, with a specific focus on the medical malpractice committed by Defendant via NP McGarrah. The basis for the malpractice claim is that NP McGarrah did not properly assess, treat, and evaluate Plaintiff when he was her patient on October 30, 2013.  Amend Compl. ¶ 41.

As a result of Defendants' medical staffs' professional failures, Plaintiff suffered physical and economic injuries and Defendants were the sole and proximate cause of Plaintiff's injuries.

The second count was negligent supervision, specifically that Defendants failed to appropriately manage their staff while administering quality care. Amend Compl. ¶ 48.  In addition, that NP McGarrah had professional restrictions, which precluded her from providing care without supervision.  When NP McGarrah treated Plaintiff she operated independently without supervision. Amend. Compl ¶ 45. The amount sought in damages was one million seven hundred fifty thousand dollars ($1,750,000.00 USD).  The monetary amount sought provides for compensatory damages, pain, suffering, reimbursement of medical expenses, hotel expenses, lost wages, and diminished wage earning capacity, as well as attorneys' fees, costs and interest.

In Plaintiff's original complaint he failed to list the United States of America as a named Defendant.  In response, Defendant moved to dismiss this action. Conversely, Plaintiff sought leave from this Honorable Court to add the United States of America as a Defendant, said leave request was granted. Plaintiff subsequently filed an amended complaint, with the only substantive change to his prayer for relief, being that he added the United States of America as a Defendant; all other aspects of his theory of liability, upon which he sought relief, in his original filing, were sustained in his amended complaint. ECF No. 26, 29.

This matter has not been scheduled for formal mediation or alternative dispute resolution. Moreover, there have been no substantive, meaningful or productive settlement discussions in this matter. This Honorable Court's May 2, 2019, Minute Order, stated "the Court strongly encourages the parties to consider mediation in this matter", but Defendants expressed they would prefer to wait until a Summary Judgment order is issued before engaging in substantive settlement discussions.

### PLAINTIFF'S EXPERT AND HIS PROPOSED OPINIONS

On or about January 10, 2018, Plaintiff initially disclosed Robert Macht, M.D. (hereinafter referred to as "Dr. Macht) as his medical expert. Accompanying that disclosure was Dr. Macht's expert opinion, identifying how NP McGarrah deviated from the acceptable standard of care and how said deviations and nonfeasance caused Plaintiff harm and injuries. Specifically, considering Plaintiff's overall physical state and the fact that he presented with a cane on October 30, 2013, the standard of care dictated that NP McGarrah should have obtained minimal labs and warranted cultures, and to start treatment and to follow-up with the patient. Exhibit D at 4. This did not occur.  Therefore, Dr. Macht reached the following finding:

NP McGarra negligence in providing care Mr. Williams is the direct cause of the extensive injuries suffered by Mr. Williams.  Again, if the infection had been detected earlier, by proper examination and testing, Mr. Williams' would not have had to undergo such extensive treatments and procedures.  To determine the long term impact on Mr. Williams health an independent medical exam should be performed. *Id. at 5.*

Since 2012 Dr. Macht has been qualified or been deposed as an expert in over sixty (60) civil actions. Exhibit E. Due to retirement Dr. Macht decided not to continue as Plaintiff's expert in this case matter.

Seeking a new expert in this matter, Plaintiff substituted Dr. Porter for Dr. Macht.  Dr. Porter is a 2010 graduate of Florida State University College of Medicine; in 2005 after earning his degree bachelor's degree from Florida A&M University, with honors, he completed a one-year bridge baccalaureate program at Florida State in 2006.  Exhibit C at 8 of 9. As previously stated he is licensed to practice medicine in twelve (12) states and the District of Columbia. Dr. Porter has several different professional titles and roles in each capacity.  *Id*, at 9. During his deposition inquiry defense counsel did not inquire all aspects and the time commitments for each

role. However, it was established that Dr. Porter provides oversight for nurse practitioners.  Dr. Porter. Depo. at 28 (1-9).

In his role as Medical Director of Life Ambulance, he actively directs and leads the clinical performance of the Life Ambulance EMS, and he has the ultimate clinical authority on executed clinical guidelines, rules procedures, and medications used given the current evidence based practices. Exhibit C at 8-9. In his role with the MedStar Prompt Care team he evaluates, treats and diagnosis patients with urgent care needs and supervises physician assistants and nurse practitioners. *Id.* In his primary role with MedStar, in addition to providing routine primary care services he provides joint injections, arthrocentesis and radiography readings, cyrotherapy procedures, cyst removals, skin biopsies and incision and drainage procedures. *Id.* Dr. Porter's Depo at 22-23.    .[5]Finally, in his part-time role with Doctor on Demand, he provides telemedicine[6] consultations to patients in 14 different states with patient population having basic care needs to both acute and chronic needs. Exhibit C 8-9.

Before speaking with Plaintiff, Dr. Porter first had a phone conversation with Plaintiff's lead counsel and subsequently reviewed the following documents, VA Medical Center Treatment Notes from October 30, 2013, Providence Medical Center notes, and Harborview Medical Center notes, along with photos of Plaintiff post operations in Seattle, Washington. Still having questions he followed up with Plaintiff to have a phone discussion. Dr. Porter also made contemporaneous notes from his discussions. Dr. Porters. Depo at 9. (8-18)

In the Background section of his expert opinion he stated that prior to the October 30, 2013, VA encounter, Plaintiff's overall health would be considered excellent. Further, stating

---

[5] Citations to Dr. Porter's Depo refer to the transcript of Dr. Porter's deposition taken March 4, 2019, Relevant excepts from the transcript are submitted herewith as Exhibit J
[6] Online clinical health care services

that Plaintiff was a non-smoker, non-drinker and non-illicit drug user and that he exercised regularly and worked as a personal trainer. Exhibit C at 2-3 of 9. Dr. Porter also acknowledged that prior to his VA visit Plaintiff had just completed an obstacle course where he traversed up and down a number of hills, across bodies of water, among other tasks over a twelve (12) mile course. *Id.*

In the Basis of Findings section of Dr. Porter's report he delineates that NP McGarrah's treatment notes only reference that Plaintiff presented with right neck swelling and puffiness extending down to the level of the thyroid. Exhibit C at 2-3. He further notes that NP McGarrah's note does not reflect any mention of Plaintiff ambulating abnormalities. *Id at 3.* He continues his appraisal of NP McGarrah's clinical intake, stating it appears that she completed her clinical examination of him without any evaluation of his lower extremities. *Id.* Further Dr. Porter explains, if it is not in the treatment note, there is no way to document that treatment happened. Dr. Porter Depo at 12-13.  He concludes this portion of analysis by again stating, another item lacking from NP McGarrah's treatment note is any mention that Plaintiff had ambulatory dysfunction, that there was swelling in his left foot, and that he was walking with a cane. Exhibit C at 2-3.

Next Dr. Porter shifts his attention to Plaintiff's medical intake at Providence Regional Medical Center. He notes that their Plaintiff is diagnosed with severe cellulitis that extended from his foot up to the level of his thigh. *Id.* Laboratory testing also found him to have acute renal insufficiency, and elevated bilirubin levels and rhabdomyolysis (evidence of severe muscle cell death). He further pronounces the sum of his (Plaintiff's) myositis findings on MRI was found to be necrotizing fasciitis. *Id.* Necrotizing fasciitis is considered to be a life threating medical problem if not addressed in a timely fashion.   Ultimately, he notes that Providence

Medical Hospital transferred Plaintiff to Harborview Medical Center because Plaintiff's condition and the requisite treatment exceeded Providence Medical Center scope of practice. *Id,* at 4. At Harborview Medical Center Mr. Williams underwent fasciotomy procedure[7] and on November 15, 2013, after further treatments, medications and observations he was cleared of cellulitis in his lower left extremity. *Id. at 4.*

In the Findings of Negligence section of his opinion, with consideration for Plaintiff as a patient and how he presented on October 30, 2013 at the VA clinic, Dr. Porter states the appropriate standard of care would have been for

[E]valuation and treatment for cellulitis at minimum, would have been to evaluate the extremity or area of concern with a history and physical exam consisting of, but not limited to, the appearance of the skin, observation of fluid collection, color and collection of fluid for culture if drainage was present, temperature of the skin compared to other areas, sensation and laboratory testing.  In addition to not practicing within the standard of care there were no follow-up instructions given to advise Mr. Williams if or when to come back if he were to have complications, worsening symptoms or incomplete/poor response to the treatment given.

If NP McGarrah would have performed even some of the aforementioned exams or test to the lower extremity, or followed up via phone call or in person with Mr. Williams, the chances of earlier detection, treatment, and reduce suffering would have been improved for Mr. Williams.  It is very likely that if a lower extremity exam had been properly performed, evaluated and treated with the proper spectrum of antibiotics, that Mr. Williams would not have had to undergo life-saving medical treatment that left him with a career ending outcome (as a personal trainer) due to significantly decreased physical capacity, overall decrease in quality of life, chronic swelling, extremity and joint pain, and neurological dysfunction. *Id.* at 5-6.

## STANDARD OF REVIEW

## I. LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT EVIDENCE

---

[7] Surgery (fasciotomy) is the only treatment for acute compartment syndrome. The muscle compartment is cut open to allow muscle tissue to swell, decrease pressure and restore blood flow. Complications may include muscle loss, amputation, infection, nerve damage, and kidney failure. https://www.medicinenet.com › compartment_syndrome › article

Federal Rule of Evidence 702, establish the following threshold requirements for introducing expert testimony:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 has been amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993) and to the many cases applying *Daubert, including Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999). In *Daubert*, the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. In *Kumho*, the Court made it clear that this gatekeeper function applies to all expert testimony, not just testimony based strictly on scientific principles. Rule 702, as amended, affirms the trial court's role as gatekeeper and provides general standards to be used to assess the reliability and helpfulness of the proffered expert testimony.

*Daubert* set forth a non-exclusive checklist for trial courts to use in determining whether or not to admit expert testimony. The specific factors identified by the Supreme Court in *Daubert* are: (1) whether the expert's theory can be or has been tested objectively, as opposed to being a subjective, conclusory approach that cannot be verified; (2) whether the expert's theory has been subjected to peer review or publication; (3) whether the expert's theory is subject to known or potential rates of error; (4) whether the expert's theory comports with applicable standards and controls; and (5) whether the expert's theory has acquired general acceptance in the relevant academic community.

Other courts have identified other factors to be applied, including: (1) whether the expert's testimony arises out of research conducted by the expert independent of the pending

litigation, as opposed to the formulation of opinions exclusively for purposes of testifying; (2) whether the expert's opinion flows naturally, or constitutes a quantum leap from the factual data forming a matrix for the expert's theory; (3) whether other alternative explanations have been addressed and rationally eliminated; (4) the level of intellectual rigor which characterizes the expert's work; and (5) whether the discipline of which the expert is a member itself affords the requisite degree of reliability.

The authoritative commentary in the Advisory Committee Notes for Rule 702 concludes that "the rejection of expert testimony is the exception rather than the rule" even after *Daubert*. "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi,* 80 F. 3d. 1074, 1078 (5th Cir. 1996). *Daubert* and its progeny regularly refer to the primary role of thorough cross examination and presentation of countervailing testimony, in conjunction with careful jury instructions, as the "traditional and appropriate means of attacking shaky but admissible evidence." *Daubert* supra., 509 U.S. at 595.

Moreover, although the filing of *Daubert* motions is attaining the frequency level of motions to dismiss on the basis of alleged spoliation of evidence (largely because the courts have refrained from imposing sanctions for the filing of frivolous *Daubert* or spoliation motions), the Advisory Committee notes that neither Rule 702 nor the decisional law flowing from *Daubert* are intended to provide an excuse for an automatic challenge to the testimony of every expert. As the court stated in In re *Paoli R.R. Yard PCB Litigation*, 35 F 3d. 717, 744 (3d Cir. 1994) proponents of expert testimony "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."

II. **MOTIONS FOR SUMMARY JUDGMENT**

Summary judgment short-circuits the fact-finding function of the federal courts. It is only "granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. In determining whether a genuine issue of fact exists, the court must view all facts in the light most favorable to the non-moving party." *Judicial Watch, Inc. v. Consumer Financial Protection Bureau*, 985 F. Supp. 2d 1, 6 (D.D.C. 2013)

Summary judgment should only be granted if the record and affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The parties may support their positions by citing to the record, including, inter alia, documents, affidavits, or declarations, or by showing that the materials cited by the other party do or do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); see also *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The moving party shoulders the initial burden of setting out the basis of its motion and showing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Once met, the burden then shifts to the nonmoving party who, in order to defeat a motion for summary judgment, "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). Even so, "[t]he Court must draw all

inferences in favor of the non-moving party." Id. "A court may grant summary judgment only when no rational jury could find in favor of the non-moving party." Id.

## III. THE FEDERAL TORT CLAIMS ACT

The standard set forth by Defendant is appropriate. In addition, note:

The FTCA, 28 U.S.C. §§ 1346(b), 2671-80, waives the sovereign immunity of the United States for certain torts committed by federal employees. *FDIC v. Meyer*, 510 U.S. 471, 477 (1994). It provides that district courts have exclusive jurisdiction of civil actions against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee" of the federal government while acting within the scope of his office or employment. 28 U.S.C. § 1346(b).

## ARGUMENT

## OPPOSITION TO MOTION TO PRECLUDE DR. PORTER'S PROPOSED OPINIONS

## I. DR. PORTER IS QUALIFIED TO SERVE AS AN EXPERT DUE TO HIS KNOWLEDGE, SKILL, EXPERIENCE, TRAINING AND EDUCATION.

Defendant grossly understates the depth of Dr. Porter's professional experiences. For Medstar, Dr. Porter serves in urgent care and primary care roles; serving in both for the majority of his career, he has conservatively provided care for over twenty thousand (20,000) patients. Medstar is the largest private healthcare provider in this region. He also supervises physician assistants and nurse practitioners in urgent care settings for Medstar.

In his administrative role as Medical Director, he overseas the clinical policy manual for all providers of emergency care services and the policy and procedures for emergency management technicians who provide service on each of Life Medical's twenty six (26) emergency service vehicles.

Dr. Porter's educational credentials, licensure in twelve 12 states and the District of Columbia, volume of practice, management experience, and administrative policy experience qualify him to articulate the appropriate level of care that should be provided in the urgent and primary care settings and conversely affords him the ability to outline the clinical failings of Defendants, specifically, NP McGarrah.

Finally, as Dr. Porter stated in his deposition he has diagnosed cellulitis too many times to count. Dr. Porter's Depo. at 25-26.  It is within his expertise and scope of practice to diagnosis and refer out, as Defendants' nurse practitioner should have done with Plaintiff.

## II DR. PORTER'S TESTIMONY WILL ASSIST THE TRIER OF FACT TO UNDERSTAND THE EVIDENCE OR TO DETERMINE A FACT IN ISSUE.

Dr. Porter will assist the trier of fact in understanding the clinical documentation requirements for medical care providers, in urgent and primary care settings.  In his articulation he will use the VA's own guidelines, a national standard, which clearly states "[m]edical documentation is required for all services provided to a Veteran under the Department of Veterans Affairs." Exhibit F. at 1. There is absolutely nothing in NP McGarrah's treatment note that supports Defendants' new found contention that she did in fact examine Plaintiff's left foot on October 30, 2013. Moreover, she provides no basis for prescribing an antibiotic, when according to her treatment notes; her oral exam yielded an unremarkable finding for Plaintiff. Dr. Porter's Depo. at 38-39 and at 78. . According to the minimum requirements for content of medical documentation or records, for VA staff, the record may include, "an executive summary of the encounter to include any procedures performed and recommendations for further testing or follow-up (i.e. discharge summary for inpatient)." Exhibit F. at 4. That was absent in NP McGarrah's note as well.

In piercing contrast, Defendant's own medical expert[8] states the following in the Conclusion of his expert report:

There is no evidence that he (Plaintiff) notified the VA staff that something was wrong with his lower extremity.  Consistent with the standard of medical care for a such a circumstance, he was therefore not evaluated for a lower extremity infection."   Exhibit G at 6 (Conclusion)

Plaintiff and at least two witnesses will provide testimony that on October 30, 2013 he was ambulating with a cane. In their interrogatory responses Defendants' offer that Plaintiff was not ambulating with a cane. Exhibit K at 6.   Dr. Porter will assist the trier of fact in understanding the national standard of care in a clinical setting for a healthy active adult (in this instance a person who completed a twelve mile obstacle course), having no known infirmities but for some reason is ambulating with a cane due to swelling and stiffness in a lower extremities.  Using national acceptable standards he will outline the appropriate clinical testing and laboratory testing that should occur in said circumstance and the appropriate manner in which to escalate the treatment of the patient.  Exhibit H at IV (12-26).

Using nationally accepted standards, Dr. Porter will assist the trier of fact in understanding the next steps that should be taken in a clinical setting when there is a diagnosis, such as cellulitis. *Id.*

Finally, Defendants' are conflating the issue of expert opinion admissibility by choosing to focus on "principles and methodology, not on the conclusions they generated by Dr. Porter. The Supreme Court emphasized in *Daubert*, that the four factors are neither exclusive nor entirely dispositive of whether or not the testimony at issue should be admitted. Not all of the specific *Daubert* factors can apply to every form of expert testimony. For instance, lack of peer review or publication is deemed unimportant where the opinion is supported by "widely accepted

---

[8] Shmuel Shoham, MD

scientific knowledge." *Kannankeril v. Terminix, International, Inc*. 128 F.3d 802, 809 (3d. Cir. 1997).

## III.   DR.   PORTER'S   PROPOSED   TESTOMONY   DOES   SATISFY   THE REQUIREMENTS OF RULE 702.

Based on the medical treatment note of NP McGarrah, Defendant's interrogatory response and Defendant's own medical expert opinion there was no examination or treatment of Plaintiff's left foot on October 30, 2013.  Therefore, Dr. Porter's proposed standard of care is not misplaced. His analysis focuses on Defendants departure from appropriate and acceptable medical standards for documentation, evaluation and follow-up, none of which occurred by Defendants on October 30, 2013, related to Plaintiff's left foot.  Moreover, Defendants conflate the matter of diagnosis and treatment.  The appropriate clinical measure for NP McGarrah after diagnosis would have been to refer this matter to a specialist at the main the hospital, just as the Providence Medical Center did with Mr. Williams and as Dr. Porter testified he has done in his practice. Dr. Porter Depo at 25-26.

Dr. Porter's testimony will assist the trier of fact in making their determinations on Defendants' veracity; by juxtaposing the shifting of Defendants' positions on critical matters such as, the allegation that NP McGarrah did an actual exam of Plaintiff's left foot on October 30, 2013.  Likewise, if the trier of fact draws their own independent inferences on if NP McGarrah did in fact examine Plaintiff's foot, they will have to grapple with why didn't she notate it in her treatment notes, like her findings for Plaintiff's oral exam.  More importantly, if they in fact accept that an exam of Plaintiff's foot occurred, NP McGarrah did follow the appropriate standard of care after completing the examination as far as diagnosis, follow-up and documentation of the event.

Again, Dr. Porter's expertise and reliance upon national medical standards will assist the trier of fact in understanding what the reasonable level of care should have been for 1) the initial examination and corresponding documentation for treatment of Plaintiff's left foot and overall visit, 2) what should have been done with the findings; and 3) any follow-up protocol that should have been applied.

## IV. DR. PORTER'S TESTIMONY IS BASED ON RELIABLE PRINCIPLES AND METHODS.

The Infectious Disease Society of America, a medical association that has eleven thousand (11,000) physician members[9], provides the standard of care utilized by Dr. Porter in his articulations. Dr. Porter relied upon the guidelines for authority and he supplemented his deposition testimony with the article outlying where he received his authority. Of note, is that Defendants' medical expert is published and is an ad-hoc reviewer in two of the Infectious Disease Society of America's journals, namely the American Journal of Infectious Disease and Clinical Infectious Diseases.

For the above referenced reasons, Dr. Porter's medical opinion satisfies the requirements to be admissible under Federal Rule 702. Further, Dr. Porter is qualified to offer an opinion regarding the standard of care and his opinions are reliable and will assist the trier of fact and this Honorable Court in the administration of justice. Finally, his proposed testimony is not based on incomplete and erroneous fact and it does reflect a methodology based on reliable principles.

### MOTION OPPOSING SUMMARY JUDGMENT

Dr. Porter's testimony is admissible for the aforementioned stated reasons. Thus, in review the fact most favorable light to the Plaintiff, Plaintiff has met their burden to quash Defendants' Motion to preclude Dr. Porter's expert opinion and Motion for Summary Judgment.

---

[9] Per the website of the Infectious Disease Society of America https://www.idsociety.org/

Dr. Porter's sole opinion is not just that NP McGarrah should have examined Plaintiff's foot.  He further articulates the specific types of treatment Plaintiff should have been afforded by NP McGarrah and mitigating impact of said treatments, in addition to his deposition testimony that her treatment do not reflect she in fact examined Plaintiff's foot.

Further, and more importantly there are genuine disputes of material fact.  Such as did NP McGarrah accurately document her treatment notes for Plaintiff on October 30, 2013. Plaintiff's contention is that she did not clinically examine his foot and that her lack clinical competency led to the injuries suffered by Plaintiff.  Further, that Plaintiff is forever physically diminished due to Defendants' breach of duty from the acceptable medical standards of care. And finally, that NP McGarrah should not have been providing care without supervision.

## I. PLAINTIFF CAN SATISFY THE ELEMENTS OF A FEDERAL TORT CLAIMS ACT

By virtue of Plaintiff's status as a veteran receiving care in a VA facility, Defendants owed a duty of care to Plaintiff. Namely that duty was to appropriately evaluate, treat, and follow-up to ensure Plaintiff was receiving quality care.  By not thoroughly examining Plaintiff's left lower extremity and by failing to perform the appropriate test Defendants' breached that duty. Providence Regional Medical Center did not breach their to Plaintiff. When the medical staff at Providence Regional Medical Center learned of Plaintiff's foot swelling they did not blindly prescribed an antibiotic, rather they performed a battery of medical examinations and test, thoroughly noted their methods and ultimately transferred Plaintiff to the appropriate facility once it was determined that the needs of Plaintiff's diagnosis care plan exceeded their scope of practice.  Finally, Plaintiff can establish that he did in fact suffer damages as a proximate cause of Defendants' negligence.

## II. DEFENDANTS' EXPERT OPINION IS NOW RENDERED MUTE

Defendants attempt to now conveniently proffer that NP McGarrah actually examined Plaintiff's left foot on October 13, 2013, is unconvincing and unpersuasive, with appropriate consideration given to the fact that in their interrogatory responses Defendants denied that Plaintiff ambulated with a cane and further that Plaintiff did not complain about foot or leg pain. Secondly, in formulating his opinion Defendants' medical expert states that Defendants did not evaluate Plaintiff for a lower extremity infection.  This is in direct contrast with Defendants most recent admission and proposal of undisputed facts that NP McGarrah did in fact examine Plaintiff's foot on October 30, 2013.

Defendants have not sought relief to alter or amend their opinion or to disclose a new expert or opinion or both. It is conceivable that if Defendants continue with their new assertion, which now they must, that NP McGarrah did in fact examine Plaintiff's left foot, their expert will have to concur with Dr. Porter and VA standards, that Defendants departed from the appropriate standard of care by not documenting treatment and that the failure to thoroughly examine, and to order additional tests and provide follow-up instructions was a breach of duty by Defendants and said breach was the sole and proximate cause of the damages suffered by Plaintiff.

## III. DEFENDDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S CLAIM BASED ON NEGLIGENT SUPERVISION.

A significant portion of Plaintiff's claim regarding Defendants negligent supervision of NP McGarrah is enveloped in the verbal admissions made to Plaintiff by Defendants employees. Those admissions were received while Plaintiff received rehabilitative and physical therapy treatments at Defendants Washington DC main hospital.  The substance of the admissions was that NP McGarrah had professional restrictions, which precluded her from providing direct patient care without supervision.

There is nothing in Defendants' treatment notes that states NP McGarrah had supervision while providing care to Plaintiff on October 30, 2013.  Although Defendants did not address this issue in their deposition questions of Plaintiff, it was addressed in their denial of Plaintiff's claim in their answer to Plaintiff's amended complaint. Therefore, there is a disputed fact that makes this issue ripe for assessment by trier fact.

## IV. IF DR. PORTER'S TESTIMONY IS PRECLUDED PLAINTIFF SHOULD HAVE LEAVE TO AMEND OR TO SEEK AND DISCLOSE A NEW EXPERT

There are facts of genuine issue that are in dispute, even if Dr. Porter's testimony is precluded.  Chiefly did Defendants' nurse practitioner actually preform a clinical exam on Plaintiff's foot on October 30, 2013? Therefore, if Dr. Porter's testimony is precluded, Plaintiff should be granted to leave to either amend Dr. Porter's proffered opinion or substitute a different expert.

## CONCLUSION

Therefore, for the reasons set forth above and herein, this Honorable Court should deny Defendants' motions to preclude Dr. Porter's expert testimony and deny Defendant's motion for summary judgment.

Dated: Tuesday, September 3, 2019.

<div style="margin-left: 50%;">

Respectfully Submitted,
/s/_____
André T. Hammel
Hammel Law LLC
9701 Apollo Drive | Suite 301
Largo, MD 20774
(240) 393-4935 (Office)
(240) 303-2638 (Fax)
andre.hammel@hamlawus.com
Counsel for Plaintiff

</div>

/s/   Danielle P. Turnipseed, Esq.
Danielle P. Turnipseed, Esq.
DCB No.: 1001033
Turnipseed Law, LLC
14306 Royal Forest Lane
Silver Spring, MD  20904
301.589.5881
danielle@turnipseedlaw.com
Counsel for Plaintiff